UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION



RILEY THORNOCK,

Plaintiff,

v.

CORPORATION OF THE PRESIDING BISHOP OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS,

Defendant.

Case Number _3:25 cv 56 - RCY_

COMPLAINT

Plaintiff, **Riley Thornock**, pro se, respectfully submits this Complaint against Defendant, **The Church of Jesus Christ of Latter-day Saints (the Church)**, and alleges as follows:

**TABLE OF CONTENTS:**

- Introduction                                                   Page 6

- Jurisdiction and Venue                                         Page 9

- What Triggered This Lawsuit                                    Page 15

- Core Claims                                                    Page 20

- Preempting Church Deflecting Arguments                         Page 22

    o  Overcoming Charitable Immunity                            Page 22

    o  Argument Against First Amendment Defenses                 Page 27

    o  Argument Against Ecclesiastical Abstention                Page 32

    o  Argument Against the Ministerial Exception                Page 37

    o  Argument Against the 'Church's Autonomy in Resource Allocation' Defense

                                                                 Page 42

    o  Argument Against the Lack of Duty Defense                 Page 47

- Factual Background                                             Page 52

    A. Historical Context: Commitment to the Church              Page 52

    B. Emotional Despair and Cultural Rejection at BYU           Page 66

    C. The Tragic Story of Dana Thornock Rasmussen               Page 69

    D. The Parallel Tragedy: The Plaintiff's Wife's Experience as a Convert   Page 79

    E. Recent Experiences with Inconsistent Food Assistance      Page 84

    F. Systemic Imbalance Brought on By LDS Teachings and Burden on Poor Members

                                                                 Page 88

    G. Systemic Issues in Food Assistance Distribution           Page 91

    H. Financial Independence and the Need for Reform            Page 94

    I.   Systemic Concerns Regarding Tithing and its Application     Page 96

    J.   Context of Bedford County's Retaliation     Page 100

- Systemic Disenfranchisement and the Betrayal of Moral Foundations     Page 101

- Supporting Case Law for Charitable Claims     Page 106

- Relevant Case Law Supporting Sexual Abuse Claims     Page 112

- Broader Case-Law Context of Financial Transparency and Accountability Issues with The LDS Church     Page 115

- Examination of Public Reports on Aid Distribution Practices     Page 119

- Systemic Bottlenecks in the Distribution of Resources     Page 122

- Evaluation of Charitable Contributions and Transparency     Page 128

- Judicial Oversight of Financial Practices and Doctrinal Enforcement     Page 134

- The Need for Immediate and Effective Aid Distribution     Page 127

- Legal Claims     Page 130

    o   Count I: Breach of Implied Contract     Page 130

    o   Count II: Negligence     Page 145

    o   Count III: Intentional or Negligent Infliction of Emotional Distress Page 146

    o   Count IV: Breach of Fiduciary Duty     Page 147

    o   Count V: Unjust Enrichment     Page 153

    o   Count VI: Unconscionability in Tithing and Fast Offering Practices Page 154

    o   Count VII: Breach of Duty of Good Faith and Fair Dealing     Page 158

    o   Count VII: Constructive Fraud For Tithing and Fast Offerings     Page 163

    o   Count VIII: Negligent Supervision     Page 168

    o   Count IX: Invasion of Privacy (Intrusion Upon Seclusion)     Page 173

- o   Count X: Intentional Infliction of Emotional Distress          Page 178
- o   Count XI: Constructive Fraud For Sexual Abuse                   Page 184
- o   Count XII: Breach of Fiduciary Duty Over Sexual Abuse          Page 189
- o   Count XII: Institutional Negligence and Liability for Sexual Abuse   Page 194
- o   Count XIII: Failure to Train or Supervise                       Page 198
- o   Count XIV: Failure to Warn                                      Page 202
- o   Count XV: Civil Conspiracy                                      Page 205
- o   Count XVI: Fraudulent Concealment                              Page 210
- o   Count XVII: Enabling Harm Through Systemic Neglect             Page 214
- o   Claim XVIII: Negligence and Systemic Failure of Duty of Care During Missionary Service          Page 219
- o   Claim XIV:  Wrongful Death Claim Against the Church Regarding Dana Thornock Rasmussen          Page 223
- o   Claim XV:  For Intentional or Negligent Infliction of Emotional Distress During Mission          Page 227
- o   Claim XVI: Religious Coercion and Systemic Harm                Page 231
- o   Count XVII: Systemic Bad Faith and Gross Negligence            Page 239
- Systemic Responsibility                                           Page 242
- Scriptural Tensions and Real-World Division                       Page 245
- The Church's Responsibility as a Steward of Doctrine and Scripture   Page 249
- Further Proposed Reforms and Relief Requested                     Page 257
- Conclusion                                                        Page 265
  - o   Witnessing Systemic Retaliation Against Victims              Page 265

- o   Why the Church is the Appropriate Entity to Sue          Page 267

- o   A Call for Accountability and Reform          Page 271

- o   Examining Real-World Consequences: Fostering Peace and Understanding

  Page 272

- o   Reducing Hostility and Division:          Page 273

- o   Strengthening the Church's Legacy          Page 276

- o   A Constructive Call for Accountability          Page 277

- o   Willingness to Resolve Through Meaningful Reform          Page 279

- o   No Tolerance for Retaliation          Page 280

- o   A Call for Mutual Benefit          Page 281

**Introduction**

1. This lawsuit raises critical concerns about systemic practices within The Church of Jesus Christ of Latter-day Saints (the Church), particularly regarding its administration of aid and its failure to protect members from abuse. While the broader context of this complaint highlights systemic inequities and cultural practices that perpetuate harm, the core issues presented here are undeniable: **the Church's failure to provide food assistance when it was reasonably requested during the Christmas season for a family of five with three small children while the church has received tremendous donations from the plaintiff and controls extraordinary financial resources, and its systemic support for an environment that enabled the Plaintiff's stepfather's abuse.**

2. The Plaintiff acknowledges that this lawsuit may touch on issues that could be perceived as skirting doctrinal lines in order to help inspire the church to reform. However, this case does not seek for the court to forcibly challenge or reinterpret Church teachings or religious beliefs. Instead, the court should focus on the Church's actions—or inactions—that have caused tangible harm, while allowing the church to meaningfully reform appropriate doctrines and beliefs of its own accord. These failures include the denial of basic aid, even when the Church was aware of the Plaintiff's clear need, and the perpetuation of an environment that empowered abusive behavior while silencing victims.

3. The Plaintiff brings this case not only to seek justice for personal harm but also to raise awareness about broader systemic issues within the Church. These include inconsistencies in aid distribution, lack of transparency, and cultural dynamics that

prioritize institutional reputation over individual well-being. While these broader concerns provide context, the Plaintiff's primary goal is accountability for the undeniable harm caused by the Church's specific actions and inactions.

4. This lawsuit is, at its core, a call for accountability. It seeks to ensure that no member of the Church is ever again denied the most basic of assistance—food—when they are in need, and that no institution, no matter how revered, is allowed to systemically support environments that foster abuse. Through this case, the Plaintiff asks the Church to live up to its professed mission: to care for the poor, protect the vulnerable, and uphold the principles of justice and mercy.

5. This case arises from systemic failures within The Church of Jesus Christ of Latter-day Saints (the Church) to establish clear, transparent, and equitable policies for administering aid and safeguarding its members, particularly in times of vulnerability and need. At the heart of this complaint lies the Church's reliance on subjective discretion, rigid adherence to outdated financial doctrines, and systemic neglect, which collectively harm its most faithful and vulnerable members.

6. The Plaintiff, Riley Thornock, and his family have faced significant emotional and financial hardships exacerbated by the Church's failures. Despite decades of faithfulness, including lifelong membership, substantial familial contributions, and adherence to its teachings, the Plaintiff's reasonable requests for minimal aid—such as food assistance—were denied based on subjective evaluations by local leaders. These denials reflect broader systemic issues in the Church's aid distribution process, including inequities tied to Church attendance and rigid interpretations of financial need.

7

7. Compounding this harm is the Plaintiff's personal history of abuse, neglect, and emotional harm perpetuated by Church-affiliated leaders and cultural practices. The Church's failure to prevent or address these abuses demonstrates a systemic lack of oversight and accountability. This neglect, coupled with the Church's financial practices—including a reported $100 billion in reserves—highlights the imbalance between institutional wealth and the well-being of its members.

8. The Plaintiff also raises concerns regarding the Church's financial transparency and fiduciary responsibilities. While members are encouraged to pay tithing as a divine mandate—even at great personal sacrifice—the Church amasses immense wealth with comparatively minimal reinvestment in its struggling members. These practices perpetuate cycles of poverty and disenfranchisement, particularly among those already facing external hardships.

9. The Plaintiff seeks declaratory and injunctive relief to address these systemic issues and ensure equitable and transparent practices within the Church. This includes the implementation of clear guidelines for aid distribution, reforms to tithing practices, and accountability mechanisms to protect vulnerable members from harm. Through this case, the Plaintiff underscores the urgent need for the Church to align its financial and doctrinal practices with its professed mission to care for the poor, the vulnerable, and the afflicted.

**Jurisdiction and Venue**

10. This Court has jurisdiction under 28 U.S.C. § 1332 as the Plaintiff is a resident of Virginia and the Defendant is headquartered in Utah, and the amount in controversy exceeds $75,000, based on the harm caused and the value of systemic reforms sought.

11. Venue is proper in this district under 28 U.S.C. § 1391 because the harm occurred in Virginia.

**Parties**

12. Plaintiff, **Riley Thornock**, is a resident of Virginia who has been a member of the Church for decades, since birth.

13. Defendant, **The Church of Jesus Christ of Latter-day Saints**, is a Utah-based religious organization operating worldwide, including in Virginia.

**Jurisdiction and Venue Considerations**

**Proper Venue for Systemic Claims**

14. This action is properly filed in the United States District Court for the Eastern District of Virginia because:

   • The Plaintiff resides in Virginia and has experienced significant harm resulting from the systemic policies, doctrines, and negligence of the Church of Jesus Christ of Latter-day Saints.

• While some incidents of abuse occurred in Utah, the systemic issues raised in this lawsuit—including financial practices, abusive worthiness interviews, and failures to provide aid—have had a direct and ongoing impact on the Plaintiff in Virginia.

• The Church conducts business and maintains a significant presence across the United States, including Virginia. This Court has jurisdiction under principles of diversity jurisdiction, as the Church is a corporate entity based in Utah and the Plaintiff resides in Virginia.

**Systemic and Individual Claims Are Interconnected**

15. Although the sexual abuse claims occurred in Utah, they are part of a larger pattern of systemic harm perpetuated by the Church. The Church's failure to safeguard members, provide oversight, and address abuse stems from policies and practices originating in Utah, but these failures have a direct impact on members nationwide, including the Plaintiff. This systemic neglect is a central issue in this case and justifies Virginia as an appropriate venue.

**Application of Utah Law to Sexual Abuse Claims**

**a. Statute of Limitations**

• **Utah Law**: Utah law explicitly provides that there is **no statute of limitations** for claims involving sexual abuse of a child (Utah Code § 78B-2-

10

308). Since the Plaintiff's abuse occurred in Utah, this law should apply to these claims, ensuring that they are not barred as untimely.

• **Virginia Law (Alternative Argument)**: Even if this Court applies Virginia law, the systemic nature of the abuse places the claims within the recognized timeframe under Virginia's discovery rule.

• **Recognition of Harm**: The statute of limitations begins when the Plaintiff fully recognizes the harm caused by the abuse. Due to the covert nature of the abuse and its connection to systemic Church practices, the Plaintiff only fully understood the scope and impact of the harm within the past 20 years.

• **Ongoing Harm from Systemic Abuse**: The Church's systemic failures to prevent or address abuse contributed to ongoing emotional and psychological harm. These continuous effects bring the Plaintiff's claims within the applicable timeframe for filing.


**Precedent Supporting Timeliness**

• Courts have repeatedly recognized the delayed discovery of harm in cases involving covert abuse and institutional failure:

• **Doe v. Boy Scouts of America**, 356 P.3d 1049 (Or. 2015): The court acknowledged systemic abuse and delayed recognition of harm as valid grounds for filing claims outside traditional limitations periods.

• **Green v. Church of Jesus Christ of Latter-day Saints**, 2008 UT 20, 184 P.3d 1269 (Utah): The court emphasized the importance of addressing systemic

failures in abuse cases and recognized delayed discovery of harm as a valid legal argument.

**Punitive Damages: Application of Utah Law**

**a. Standard Cap on Punitive Damages**

 • Under **Utah Code § 78B-8-201**, punitive damages are generally capped at **three times the amount of compensatory damages** or **$50,000**, whichever is greater.

**b. Exceeding the Cap in Cases of Egregious Harm**

1. **Egregious Nature of the Abuse**:

 • The Plaintiff's stepfather, acting under the authority and structure of the Church, engaged in covert psychological and sexual abuse. The Church's failure to address or prevent this abuse demonstrates willful neglect and reckless disregard for the Plaintiff's safety and well-being.

 • The systemic practices and teachings of the Church enabled this behavior, amplifying the harm caused to the Plaintiff.

2. **Systemic Responsibility**:

 • The Church's doctrines and worthiness interview practices created an environment that facilitated abuse, while its lack of oversight allowed it to persist. This systemic neglect constitutes willful or malicious disregard for the welfare of its members, warranting punitive damages beyond the statutory cap.

3. **Precedent for Exceeding the Cap**:

• Courts have allowed punitive damages to exceed statutory caps in cases of systemic abuse to hold organizations accountable for widespread harm. Relevant cases include:

• **Doe v. Boy Scouts of America**, 356 P.3d 1049 (Or. 2015): The court permitted significant punitive damages for systemic institutional failures.

• **Green v. Church of Jesus Christ of Latter-day Saints**, 2008 UT 20, 184 P.3d 1269 (Utah): The court recognized the need for accountability in cases of institutional neglect and systemic harm.

**4. Why Utah Law Should Govern Punitive Damages**

• The abuse occurred in Utah, where the Church's policies and practices were developed and enforced.

• Utah law's exception to the punitive damages cap for willful or malicious conduct ensures meaningful accountability for systemic failures, unlike Virginia's $350,000 cap, which would fail to reflect the gravity of the harm.

**Strategic and Moral Considerations**

1. **Systemic Nature of the Abuse**:

• The Church's systemic practices perpetuated harm across its membership, making this case about more than individual abuse. The Plaintiff's experience reflects a broader pattern of institutional neglect.

2. **Accountability Through Damages**:

> • Punitive damages are essential not only to address the Plaintiff's harm but also to hold the Church accountable for systemic failures and encourage meaningful reform.

3. **Public Policy Implications**:

> • Allowing claims of this nature to proceed under the most favorable jurisdiction ensures that victims of abuse can seek justice, and institutions are incentivized to address systemic issues.

14

**What Triggered This Lawsuit**

16. The Plaintiff's decision to file this lawsuit was the result of years of systemic harm, personal betrayal, and institutional failures by both Bedford County, the Church, and even family. The most critical factor that triggered this lawsuit was the Plaintiff's realization of Bedford County's provable retaliatory nature, coupled with the Church's denial of a food assistance request and a lack of support from family members. These events underscored that legal action was the only way to secure meaningful and consistent support while wading into dangerous waters to hold the County accountable.

17. At the same time, this systemic perspective provided the Plaintiff with the grounds to hold his stepfather accountable. For years, the Plaintiff sought a way to address the harm his stepfather inflicted, harm often supported or excused by the Church's cultural norms. The Plaintiff realized that this lawsuit could address not only systemic failures but also the personal injustices that compounded his suffering.

Provable Retaliation by Bedford County

18. The Plaintiff's experiences with Bedford County's retaliatory government served as the primary trigger for this lawsuit. The County's consistent pattern of punitive actions and broader pattern of retaliatory litigation, coupled with its willingness to exploit power to harm those who challenge it, made clear to the Plaintiff that legal action was the only viable path to accountability. However, the Plaintiff also recognized that standing up to such a government entity would place him and his family at risk. The Church's failure to provide meaningful support, even after

escalating his requests, further highlighted the absence of a safety net as he prepared to confront Bedford County.

The Role of the Plaintiff's Aunt

19. When the Plaintiff turned to his aunt for understanding and support after the Church denied his food assistance request, her response reflected a broader cultural conditioning to deflect responsibility from the Church and stigmatize those in need. She stated:

> "You are a bitter man, my dear nephew. You live as though everyone, and every organization owes you money. The Church was never meant to feed everyone in and out of the Church, nor can it do so."

20. When the Plaintiff pointed out the Church's hypocrisy, her rebuttal- "and that's the Church's fault?" illustrating how members are conditioned to shield the institution from accountability. She further accused the Plaintiff of squandering his inheritance, even understanding the battle with Bedford County, and suggested his struggles were his own fault:

> "First you were carried by grandma and grandpa's inheritance, which was a vast amount of money. Once that was squandered, you then blame the family for that. Then when the Church helped you, you were grateful but not enough to go back to Church and participate in what it was that that organization had to offer."

21. These remarks reinforced the Plaintiff's realization that neither the Church nor his family would offer meaningful or consistent support as he pursued justice against Bedford County.

Faith, Loss, and the Burden of Blame

22. The Plaintiff's struggles were further compounded by the emotional trauma of losing his mother during his mission, while missing her funeral to continue his service. Church teachings instilled a belief that blessings, including his mother's healing, depended on his faithfulness. This led the Plaintiff to carry an unbearable burden of guilt as he explained to his aunt:

> "Watching my mother die slowly in front of me, largely because of Marty's (Stepfather) influence, while wondering if I was somehow the cause of her death because I wasn't faithful enough, do you know what kind of dissonance that causes? I stayed in bed for days at a time on occasion."

23. This internalized shame, born from the Church's teachings, caused lasting harm and highlighted its systemic failure to provide support during the Plaintiff's most vulnerable moments.

Holding the Stepfather Accountable

24. The Plaintiff's stepfather played a significant role in exacerbating the harm he
    endured. For years, the Plaintiff sought a way to hold his stepfather accountable for
    his actions, which were often supported or excused by the Church's cultural norms.
    As the Plaintiff built this case, he realized that addressing the systemic failures of the
    Church and Bedford County provided a pathway to meaningfully confront the
    personal harm caused by his stepfather.

25. The Church's cultural environment allowed individuals like the Plaintiff's stepfather
    to operate without accountability, reinforcing patterns of harm and oppression. This
    lawsuit seeks not only to address institutional failures but also to hold those
    empowered by these systems, like the Plaintiff's stepfather, accountable for their
    actions.

The Connection to Systemic Harm

26. The Plaintiff's experiences are emblematic of the systemic issues central to this case.
    Bedford County's retaliatory practices and the Church's cultural conditioning to
    deflect accountability work in tandem to marginalize and harm individuals who
    challenge their authority or require assistance. These systems enabled personal harm,
    such as the actions of the Plaintiff's stepfather, and institutional harm, leaving the
    Plaintiff with no choice but to pursue legal action to address these injustices.

The Motivation Behind the Lawsuit

27. This lawsuit is not about bitterness or resentment. It is about accountability, for the
systemic harm caused by Bedford County and the Church, and for the personal harm
inflicted by individuals like the Plaintiff's stepfather, whose actions were enabled by
these institutions. The Plaintiff is pursuing this lawsuit to protect his family, seek
justice for years of trauma, and ensure that others do not endure similar harm. By
addressing both systemic and personal failures, the Plaintiff aims to create meaningful
change and set a precedent for accountability.

**Core Claims**

28. This complaint addresses the systemic failures and harmful practices of The Church of Jesus Christ of Latter-day Saints (LDS Church), focusing on three central claims: **negligence in providing charitable aid**, **negligent supervision enabling abuse**, and **institutional harm caused by rigid cultural expectations**. Together, these claims demonstrate the Church's breach of its moral, ethical, and legal responsibilities toward its members.

**1. Negligence in Providing Charitable Aid**

29. The LDS Church collects billions annually in tithing from its members, many of whom are struggling financially. Despite its immense wealth, the Church has consistently failed to equitably distribute charitable aid to those in need. Specifically, the Plaintiff, after contributing significantly to the church throughout his life, was denied basic assistance—such as food—when he sought help during times of personal crisis. This claim highlights the Church's systemic neglect and its prioritization of institutional wealth over fulfilling its stated mission to serve and uplift the vulnerable.

**2. Negligent Supervision Enabling Abuse**

30. The Church knowingly placed individuals in leadership positions without adequate oversight, creating environments where abuse could occur unchecked. The Plaintiff was subjected to severe emotional and psychological harm under the authority of his stepfather, an active Church leader, who manipulated Church teachings to perpetuate control and abuse. The Church failed to investigate or intervene despite being aware

of warning signs, enabling harm under its watch. This claim seeks accountability for the Church's failure to protect its members and its negligence in supervising those entrusted with authority.

### 3. Institutional Harm from Cultural Rigidity

31. The Church's rigid cultural expectations, particularly regarding sexuality, identity, and moral perfection, have caused profound emotional harm to its members. The Plaintiff, a bisexual man who adhered strictly to the Church's law of chastity, faced rejection, judgment, and stigma from peers and leaders alike. This culture of judgment not only isolates vulnerable members but fosters environments where personal struggles are punished instead of supported. The Plaintiff's experiences reflect broader systemic harm caused by the Church's failure to foster compassion and understanding within its community.

### Relief Sought

32. This complaint seeks meaningful accountability from the LDS Church, including financial restitution reflecting decades of contributions made by the Plaintiff's family, acknowledgment of harm caused by systemic failures, and reforms to prevent similar injustices in the future. This case is not only about justice for the Plaintiff but about addressing institutional failures to create a path for healing and change.

**Preempting Church Deflecting Arguments**

**Overcoming Charitable Immunity**

33. The Defendants may seek to invoke the doctrine of charitable immunity, arguing that
they are shielded from liability as a religious organization operating for charitable
purposes. However, this doctrine is inapplicable to the claims presented in this case
for the following reasons:

1.   Contributions by Plaintiff Establish a Special Relationship

The Plaintiff was not merely a "beneficiary" of the Church's charitable services.
Instead, the Plaintiff and his family were substantial contributors to the Church's
operations:

- o   Over many years, the Plaintiff and his family made significant financial
contributions through tithing, which the Church explicitly represented as
funding for both religious and charitable purposes, including assistance for
those in need.

- o   The Plaintiff also contributed time, labor, and commitment to the Church's
mission during his period of active participation, including missionary
service and adherence to its teachings at great personal cost.

     o   These contributions created a reasonable expectation that the Church
would honor its promises and provide support when needed.

Although the Plaintiff has not been active in recent years, the Church's teachings
emphasize the cumulative blessings and support owed to faithful contributors.
This makes the Plaintiff's past loyalty and significant contributions highly
relevant to the Church's obligations. The relationship between the Plaintiff and
the Church, rooted in years of substantial contributions and reliance on its
assurances, is distinct from that of a traditional "beneficiary" and cannot be
dismissed under the guise of charitable immunity.

2. Implied Contracts and Promises

The Plaintiff's claims are not based on discretionary acts of charity but on
breaches of implied contractual obligations arising from the Church's
representations and the Plaintiff's reasonable reliance on those representations:

     o   The Church has consistently represented, both explicitly and implicitly,
that members who faithfully contribute will receive spiritual and temporal
support in times of need.

     o   These representations created a reasonable expectation and an implied
contractual obligation that the Church would provide assistance when
requested, particularly to contributors like the Plaintiff who had
demonstrated significant commitment and support.

Charitable immunity does not shield organizations from liability for breaches of
contractual obligations, whether explicit or implied. The Plaintiff's claims arise

from the Church's failure to fulfill these obligations, not from any discretionary act of charity.

2.  Gross Negligence and Bad Faith

   Even if the doctrine of charitable immunity were to apply, it does not extend to acts of gross negligence, fraud, or willful misconduct. The Church's actions in this case demonstrate:

   o   Bad faith in denying aid to the Plaintiff, despite his substantial contributions and reliance on the Church's assurances of support.

   o   Intentional misrepresentation of its commitment to care for contributors, using promises of aid as a means to solicit contributions without any intent to fulfill those promises in good faith.

   o   Reckless disregard for the harm caused to the Plaintiff, who reasonably relied on the Church's representations for support in his time of need.

   The Plaintiff alleges that the Church's actions go beyond mere negligence and rise to the level of gross misconduct, which is not protected by charitable immunity.

4. Secular Nature of Claims

The Plaintiff's claims do not seek to challenge the Church's religious doctrines, beliefs, or practices. Instead, they focus on:

o   Secular harms arising from the Church's failure to honor its commitments
    and obligations.

o   The Church's administrative and operational decisions, which fall outside
    the scope of protected religious autonomy.

Virginia courts have recognized that charitable immunity does not apply to
claims rooted in secular actions or harm caused by operational misconduct
unrelated to religious doctrine. The Plaintiff's claims are based on the
Church's failures as an organization, not its protected religious practices.

## 5. Plaintiff's Harm Was Not a Charitable Act

The harm suffered by the Plaintiff was not the result of any charitable act or
omission but rather the Church's failure to act in accordance with its
representations and obligations:

o   Denying food aid to a longstanding, contributing member who had relied on
    Church assurances demonstrates a failure of accountability that is not shielded
    by immunity.

o   This harm was compounded by the Church's failure to exercise reasonable
    care in its interactions with the Plaintiff, further removing it from the scope of
    charitable immunity.

Conclusion

The doctrine of charitable immunity is a narrow protection designed to preserve resources for legitimate charitable purposes. It does not apply to:

- Breaches of implied contracts, as demonstrated by the Church's failure to honor its commitments.
- Acts of bad faith, gross negligence, or intentional misrepresentation.
- Harm arising from secular administrative failures, which fall outside the scope of protected religious autonomy.

The Plaintiff respectfully submits that the Defendants invocation of charitable immunity, should they raise it, is unfounded and inapplicable to the facts of this case.

**Argument Against First Amendment Defenses**

The Defendants Actions Are Secular and Subject to Judicial Review

The Defendants may attempt to invoke the First Amendment to shield themselves from liability, arguing that adjudicating the Plaintiff's claims would improperly entangle the court in religious doctrine or governance. However, this defense is inapplicable to the Plaintiff's claims for the following reasons:

1. Secular Nature of the Claims

The Plaintiff's claims are rooted in secular conduct and harms caused by the Defendants, not in disputes over religious doctrine or practice:

- o Sexual Abuse Claims: The Plaintiff's claims related to sexual abuse focus on the Defendants failure to prevent, failure to report, and failure to protect against known risks, as well as their efforts to conceal abuse. These issues are entirely secular in nature and fall under the purview of established legal duties to prevent harm.

- o Negligence and Gross Negligence: The Plaintiff's claims of negligence and gross negligence in the Church's administration of aid, promises, and institutional safeguards arise from operational failures, not theological disputes.

- o Bad Faith and Fraud: The Plaintiff alleges that the Church intentionally misrepresented its willingness to provide support to contributors like the Plaintiff, causing measurable harm. Misrepresentation and fraud are secular claims that courts routinely adjudicate.

Courts Can Adjudicate Secular Conduct: The adjudication of these claims does not require the court to evaluate religious beliefs or practices, but rather to determine whether the Church violated secular legal obligations such as preventing abuse, honoring implied contracts, or managing operations without negligence.

2. Sexual Abuse and Negligence Claims Are Not Protected by the First Amendment

The Defendants' failure to prevent or address sexual abuse, coupled with their efforts to conceal it, falls well outside the scope of religious protection:

- Mandatory Reporting and Safeguarding Duties: Religious organizations are subject to secular laws requiring the reporting of abuse and the implementation of safeguarding measures. These obligations exist regardless of any religious considerations.
- Institutional Negligence: The Church's conduct, including placing known abusers in positions of trust or failing to supervise them properly, constitutes actionable institutional negligence.
- Cover-Ups and Concealment: Efforts to shield abusers or suppress reports of abuse are deliberate, secular acts of misconduct that courts can and must address.

Precedent: Courts have consistently ruled that the First Amendment does not protect religious organizations from liability for sexual abuse or the failure to prevent it. For example, in Malicki v. Doe (2002), the Florida Supreme Court held that the First Amendment does not bar claims of negligence against a church for failing to protect parishioners from abuse.

3. Administrative Decisions and Operational Conduct Are Secular

The Plaintiff's claims related to the Church's administration of aid and implied promises focus on its organizational and operational decisions, which are secular in nature:

- ○ The Defendants denial of food aid was an administrative action, not a religious practice, and therefore does not implicate the First Amendment.
- ○ The Plaintiff's claims of misrepresentation and bad faith involve the Church's secular conduct in managing resources and interactions with contributors, rather than theological principles.

Precedent: In Jones v. Wolf (1979), the U.S. Supreme Court upheld the use of 'neutral principles of law' to decide cases involving religious organizations, allowing courts to adjudicate disputes without delving into religious doctrine.

4. Fraud and Bad Faith Are Not Protected

The Plaintiff alleges that the Defendants acted in bad faith and engaged in fraudulent misrepresentation:

- ○ The Church made explicit and implicit promises to provide support to contributors in times of need, inducing reliance and financial contributions.
- ○ The Plaintiff's claims focus on the Church's intentional failure to fulfill these promises, which constitutes fraud and bad faith.

The First Amendment does not shield religious organizations from liability for fraud or misrepresentation. In United States v. Ballard (1944), the Supreme Court held that courts could address fraudulent conduct even when it involves religious organizations, provided the claims do not require evaluating the truth of religious beliefs.

5. Secular Harm from Sexual Abuse and Organizational Failures

The harm suffered by the Plaintiff is secular and actionable, arising from:

- o  The Defendants' failure to protect the Plaintiff from sexual abuse, which caused lasting emotional and psychological trauma.
- o  The Defendants' gross negligence in failing to provide reasonable aid and support despite their representations, leading to financial and emotional harm.
- o  The Defendants' bad faith and misrepresentation of their obligations to contributors like the Plaintiff.

These harms are not tied to religious beliefs or practices but stem from secular misconduct by the Defendants, which courts can adjudicate without violating the First Amendment.

6. Public Policy and Accountability

Allowing the Defendants to invoke the First Amendment in this context would create a dangerous precedent, enabling religious organizations to:

- o  Avoid accountability for failing to prevent abuse.

- o   Evade responsibility for fraudulent conduct or mismanagement of resources.
- o   Shield themselves from scrutiny when their actions cause substantial harm.

Religious organizations must comply with generally applicable laws, including those protecting individuals from harm and holding institutions accountable for their actions.

Precedent: In Employment Division v. Smith (1990), the Supreme Court held that religious practices are not exempt from compliance with neutral and generally applicable laws.
Conclusion

The Plaintiff's claims focus on secular harms caused by the Defendants, including sexual abuse, negligence, bad faith, and misrepresentation. These claims do not require the court to evaluate religious doctrine or beliefs, ensuring that they fall within the bounds of judicial review. The First Amendment does not shield the Defendants from liability for these harms, and any attempt to invoke it as a defense should be rejected.

**Argument Against Ecclesiastical Abstention**

The Claims Are Secular and Do Not Require Interpretation of Religious Doctrine

The Defendants may invoke the ecclesiastical abstention doctrine, arguing that adjudicating the Plaintiff's claims would require the court to interpret or evaluate religious doctrine, governance, or practices. However, the doctrine does not apply in this case for the following reasons:

1. The Claims Involve Secular Conduct

The Plaintiff's claims arise from secular misconduct by the Defendants and do not challenge or require the interpretation of religious beliefs or practices:

- Sexual Abuse Claims: The Plaintiff's claims related to sexual abuse focus on the Defendants failure to protect, failure to report, and efforts to conceal abuse. These issues involve well-established legal duties and standards, such as:
- Mandatory reporting of abuse.
- Safeguarding obligations for vulnerable individuals.
- Negligence and Bad Faith: The claims of gross negligence and bad faith are based on the Defendants operational decisions and misrepresentation of obligations, which do not depend on religious doctrine.

The court can resolve these claims using neutral principles of law, such as tort and contract principles, without entangling itself in ecclesiastical matters.

2. Sexual Abuse and Institutional Negligence Are Not Protected

The ecclesiastical abstention doctrine does not shield religious organizations from liability for sexual abuse or related institutional negligence:

- o Duty to Protect: The Church has a duty to protect individuals from foreseeable harm caused by its agents or representatives, especially when those individuals are in positions of power or trust.

- o Failure to Report: Secular laws require mandatory reporting of abuse, regardless of any religious considerations. The Church's failure to comply with these laws constitutes actionable misconduct.

- o Concealment: Efforts to conceal abuse are secular acts that fall well outside the scope of religious protection.

Supporting Precedent: Courts have consistently rejected ecclesiastical abstention defenses in cases involving sexual abuse. For example:

- o Malicki v. Doe (2002): The Florida Supreme Court held that negligence claims against a church for failing to prevent abuse did not involve ecclesiastical matters and were therefore justiciable.

- o Doe v. Diocese of Dallas (1994): The Texas Supreme Court ruled that claims of institutional negligence in cases of abuse are secular and not shielded by ecclesiastical abstention.

3. Misrepresentation and Fraud Are Secular Issues

The Plaintiff alleges that the Defendants made explicit and implicit promises to provide support to contributors in need, inducing reliance and causing harm when those promises were not fulfilled. These claims involve:

- Secular Misconduct: The Plaintiff's claims focus on fraud and bad faith, which courts routinely adjudicate without evaluating the validity of religious doctrines.
- Reasonable Expectations: The Plaintiff's reliance on these promises was reasonable based on the Church's representations and practices, creating obligations that are secular, not religious.

Supporting Precedent: In United States v. Ballard (1944), the Supreme Court clarified that courts may adjudicate claims of fraud or misrepresentation involving religious organizations as long as the claims do not require evaluating the truth of religious beliefs.

4. Administrative and Operational Decisions Are Justiciable

The Plaintiff's claims regarding the Church's denial of aid and gross negligence focus on its administrative and operational conduct, not on its theological principles. These actions include:

- The Church's failure to exercise reasonable care in its interactions with the Plaintiff.
- Mismanagement of its aid distribution system and obligations to contributors.
- Decisions made in bad faith that caused secular harm.

These claims do not require the court to question religious teachings but rather to evaluate the Church's conduct as an organization subject to neutral legal principles.

## 5. Public Policy Requires Secular Accountability

Allowing the Defendants to invoke ecclesiastical abstention in this context would create a dangerous precedent:

- Religious organizations could avoid accountability for harm caused by their secular misconduct, such as institutional negligence or fraud.
- Victims of abuse and other harm would be left without recourse, undermining public trust in the legal system.

Balancing Religious Freedom and Accountability: Courts must protect legitimate religious practices while ensuring that religious organizations remain accountable for their secular actions. In Employment Division v. Smith (1990), the Supreme Court held that religious entities are subject to generally applicable laws, even when those laws indirectly affect religious practices.

## 6. The Court Can Resolve the Claims Without Entanglement

The Plaintiff's claims can be resolved using neutral principles of law, ensuring that the court does not entangle itself in religious doctrine. For example:

35

- o  Sexual Abuse Claims: The court can evaluate whether the Church failed to fulfill its duty to protect individuals from foreseeable harm without delving into theological considerations.

- o  Fraud and Misrepresentation: The court can assess whether the Church's promises were misleading or made in bad faith without questioning the truth of religious beliefs.

By focusing on the Defendants' secular conduct, the court can ensure that the case is adjudicated fairly while respecting First Amendment protections.

Conclusion

The ecclesiastical abstention doctrine is inapplicable to this case because:

1. The Plaintiff's claims focus on secular misconduct, including sexual abuse, institutional negligence, fraud, and bad faith.

2. The harm suffered by the Plaintiff resulted from operational and administrative failures, not religious doctrine.

3. Public policy and legal precedent support holding religious organizations accountable for their secular actions.

The court can resolve these claims using neutral principles of law, ensuring that the First Amendment is not violated while allowing the Plaintiff to pursue justice for the harm he suffered.

**Argument Against the Ministerial Exception**

The Claims Are Not Related to Ministerial Roles or Religious Employment Decisions

The Defendants may attempt to invoke the ministerial exception, arguing that the Plaintiff's claims are barred because they pertain to a ministerial role or involve internal Church decisions about religious personnel. However, this defense is inapplicable to the Plaintiff's claims for the following reasons:

1. The Ministerial Exception Applies Exclusively to Employment-Related Claims

The ministerial exception is a limited doctrine rooted in the First Amendment, designed to protect the autonomy of religious organizations in hiring, firing, and managing their ministers or equivalent religious leaders. It is intended to shield religious organizations from employment-related claims, such as:

- o  Wrongful termination.
- o  Employment discrimination.
- o  Disputes regarding clergy qualifications or responsibilities.

The Plaintiff's claims do not involve any employment relationship or personnel decisions made by the Defendants. Instead, they are based on:

- o  The Defendants' failure to protect, failure to report, and negligence regarding sexual abuse, which are legal obligations unrelated to ministerial roles.

37

o  The Defendants gross negligence, bad faith, and misrepresentation regarding promises made to the Plaintiff as a contributor, which do not implicate religious employment decisions.

Supporting Precedent: In Our Lady of Guadalupe School v. Morrissey-Berru (2020), the U.S. Supreme Court emphasized that the ministerial exception applies only to employment-related disputes involving religious ministers and does not extend to claims outside this context.

2. The Plaintiff Was Not Acting in a Ministerial Capacity

The Plaintiff's participation in Church activities, including missionary service, does not meet the criteria for a "ministerial" role under the ministerial exception:

o  Limited Role in Religious Leadership: The Plaintiff's missionary service was not a leadership role within the Church but a voluntary activity consistent with Church teachings. While missionaries may engage in proselytizing and service, their role is distinct from clergy or ministers who lead worship or exercise significant control over religious doctrine.

o  No Employer-Employee Relationship: Missionaries are not considered employees of the Church. The Plaintiff's claims stem from his experiences as a participant and contributor, not as an employee subject to Church control.

Supporting Precedent: In Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC (2012), the Supreme Court outlined specific criteria for determining whether an individual

38

qualifies as a minister. The Plaintiff's role as a missionary does not meet these criteria, as it did not involve the responsibilities or authority associated with ministerial leadership.

## 3. Sexual Abuse Claims Are Independent of Ministerial Roles

The Plaintiff's claims regarding sexual abuse focus on the Defendants' institutional failures to protect and report abuse, which are entirely secular and fall outside the scope of the ministerial exception:

- o The Church's obligation to safeguard individuals from abuse exists independently of any religious role or doctrine.
- o The claims involve the Church's institutional negligence and efforts to conceal abuse, not decisions related to religious personnel or leadership.

Supporting Precedent: Courts have consistently rejected the application of the ministerial exception in cases involving sexual abuse. For example:

- o Doe v. Roman Catholic Diocese of Nashville (2008): The court held that claims of negligence and failure to protect in sexual abuse cases are not barred by the ministerial exception because they involve secular legal duties.

## 4. Misrepresentation and Gross Negligence Are Secular Issues

The Plaintiff's claims of misrepresentation, gross negligence, and bad faith focus on the Church's secular conduct and operational decisions, not on religious roles or doctrine:

39

- o The Plaintiff alleges that the Church made explicit and implicit promises to provide support to contributors, then failed to honor those commitments, causing measurable harm.

- o These claims do not depend on the Plaintiff's role as a missionary or any other ministerial position but rather on the Church's failure to fulfill its obligations as an institution.

## 5. Public Policy Supports Accountability

Allowing the Defendants to invoke the ministerial exception in this context would create a dangerous precedent:

- o The doctrine was not designed to shield religious organizations from liability for secular misconduct, such as negligence, fraud, or misrepresentation.

- o Expanding the ministerial exception beyond employment-related disputes would undermine public policy by enabling religious organizations to avoid accountability for harm caused by their actions.

Supporting Precedent: Courts have consistently emphasized that the ministerial exception must be narrowly construed to protect religious freedom without enabling organizations to evade secular legal obligations.

## 6. The Claims Are Secular and Subject to Judicial Review

The Plaintiff's claims can be adjudicated using neutral principles of law without infringing on the Church's religious autonomy:

- o Sexual Abuse Claims: The court can evaluate whether the Church fulfilled its legal duty to protect individuals from abuse without considering religious doctrine.
- o Negligence and Fraud: The court can assess whether the Church's operational decisions caused harm without questioning its theological beliefs.

The ministerial exception does not bar claims rooted in secular misconduct, ensuring that the Plaintiff's case remains within the bounds of judicial review.

Conclusion

The ministerial exception is inapplicable to this case because:

1. The Plaintiff's claims are not employment-related and do not involve decisions about religious personnel or leadership.

2. The Plaintiff's role as a missionary does not qualify as "ministerial" under established legal criteria.

3. The claims focus on the Defendants' secular misconduct, including institutional negligence, misrepresentation, and failure to prevent abuse.

The court can resolve these claims using neutral principles of law without violating the First Amendment or the principles underlying the ministerial exception.

**Argument Against the 'Church's Autonomy in Resource Allocation' Defense**

The Defendants' Resource Allocation Decisions Are Secular and Subject to Judicial Review

The Defendants may argue that their decisions regarding resource allocation, such as the denial of food aid, are protected by their religious autonomy and are not subject to judicial review. However, this defense is inapplicable for the following reasons:

1. Explicit Offer of Food Aid Demonstrates Bad Faith and Misrepresentation

The Plaintiff alleges that a bishop explicitly offered food aid to the Plaintiff, creating a reasonable expectation that the aid would be provided. Despite this promise:

- The Church failed to follow through on the offer, leaving the Plaintiff without critical support in a time of need.
- This conduct demonstrates bad faith, as the Church made a specific representation it had no intention of honoring.
- The offer was not a matter of theological discretion but a secular promise that created an enforceable obligation under neutral legal principles.

Key Argument: This failure to honor an explicit offer of aid distinguishes the Church's actions from discretionary resource allocation and brings them into the realm of actionable secular misconduct.

2. Secular Nature of Resource Allocation Decisions

The Plaintiff's claims are based on the operational and administrative conduct of the Church in managing and allocating resources, not its theological practices:

- o The decision to deny food aid after explicitly offering it was an administrative action, not a religious act.

- o Courts can evaluate these decisions under neutral principles of law without delving into religious doctrine or governance.

Supporting Precedent:

- o â€¢ In Jones v. Wolf (1979), the Supreme Court upheld the use of neutral principles to resolve disputes involving religious organizations without entangling courts in religious matters.

3. Misrepresentation and Implied Obligations

The explicit promise of food aid by the bishop, combined with the Church's prior representations, created a reasonable expectation that aid would be provided:

- o The Church has long represented that contributors who faithfully tithe and support the institution will receive assistance in times of need.

- o The bishop's specific offer of aid reinforced these implied obligations, inducing the Plaintiff's reliance.

o  By failing to honor these representations, the Church engaged in misrepresentation and bad faith, which are secular issues subject to judicial review.

## 4. Gross Negligence in Managing Aid Distribution

The Church's failure to follow through on its explicit offer of food aid also demonstrates gross negligence in its management of charitable resources:

o  Offering aid and then failing to provide it reflects a reckless disregard for the harm caused to the Plaintiff, who reasonably relied on the offer.

o  Such conduct is not protected by religious autonomy, as it involves the Church's administrative failures, not its theological principles.

## 5. Secular Harm Resulting from the Church's Actions

The Plaintiff suffered tangible, secular harm as a direct result of the Church's failure to honor its explicit promise:

o  Emotional Distress: The Plaintiff experienced humiliation, betrayal, and significant emotional harm from the Church's failure to provide promised aid.

o  Financial Hardship: The denial of food aid exacerbated the Plaintiff's financial challenges, particularly given the Plaintiff's reliance on the Church's offer.

o  Reputational Damage: The Church's actions contributed to a narrative of neglect and betrayal that undermined the Plaintiff's standing within his family and community.

6. Religious Autonomy Does Not Shield Secular Misconduct

While religious organizations have discretion in their operations, that discretion does not extend to:

- o Bad faith or intentional misrepresentation of commitments.
- o Reckless operational misconduct that causes harm to individuals.
- o Violations of generally applicable secular laws, such as fraud or breach of implied contracts.

Allowing the Church to invoke religious autonomy in this context would set a dangerous precedent, enabling religious organizations to avoid accountability for harm caused by their secular misconduct.

Supporting Precedent:

- o Employment Division v. Smith (1990): The Supreme Court held that religious organizations are subject to generally applicable laws, even when their actions have religious implications.
- o United States v. Ballard (1944): The Court ruled that fraud and misrepresentation by religious organizations are subject to judicial scrutiny, provided the claims do not challenge theological beliefs.

7. Neutral Principles of Law Can Resolve This Case

The Plaintiff's claims can be adjudicated using neutral principles of law, ensuring that the court does not entangle itself in religious matters:

- o Bad Faith and Misrepresentation: The court can evaluate whether the Church made a specific promise and failed to honor it without interpreting religious doctrine.
- o Gross Negligence: The court can assess whether the Church's failure to provide promised aid constituted reckless disregard for the Plaintiff's welfare.

These principles allow the court to focus on the Church's secular actions and the harm caused by those actions, without infringing on its religious autonomy.

Conclusion

The Defendants' invocation of religious autonomy in resource allocation is inapplicable because:

1. The Church explicitly offered food aid and then failed to follow through, demonstrating bad faith and misrepresentation.

2. The denial of aid was an administrative decision, not a theological one.

3. The Plaintiff suffered tangible, secular harm resulting from the Defendants' actions.

4. The claims can be resolved using neutral legal principles without entangling the court in religious doctrine.

The Plaintiff respectfully submits that the Defendants' reliance on this defense should be rejected, as it does not shield them from accountability for their secular misconduct.

**Argument Against the Lack of Duty Defense**

The Defendants Owed Legal and Implied Duties to the Plaintiff

The Defendants may argue that they had no legal duty to provide food aid, protect the Plaintiff from harm, or fulfill implied promises. However, the Plaintiff asserts that the Defendants owed both legal duties and implied obligations based on their representations and relationship with the Plaintiff. The Plaintiff's claims for negligence, bad faith, and gross misconduct are grounded in the following considerations:

1. Implied Duties Arising from Representations

The Church has consistently represented to its members, including the Plaintiff, that it provides support and blessings to faithful contributors in times of need. These representations created reasonable expectations and implied obligations, including:

- o   Providing spiritual and material support to contributors who demonstrated loyalty and financial commitment.
- o   Honoring promises made by its leaders, such as the bishop's explicit offer of food aid to the Plaintiff.

The Church's failure to fulfill these representations constitutes a breach of its implied obligations and demonstrates bad faith and gross negligence in its interactions with the Plaintiff.

## 2. Fiduciary-Like Relationship

The relationship between the Plaintiff and the Church is fiduciary-like in nature due to the Church's role as a spiritual and moral authority and its reliance on members' trust and contributions:

- o The Plaintiff and his family contributed significant financial resources, including tithing, based on the Church's promises of support and blessings.
- o The Church used its position of authority to solicit trust and reliance from the Plaintiff, creating a heightened duty of care in its dealings with him.

Religious organizations are not exempt from secular duties of care, particularly when they create special relationships with their members that involve reliance and trust.

Supporting Precedent:

- o In Doe v. Evans (2002), the Florida Supreme Court held that a fiduciary-like relationship exists when a spiritual leader uses their position to foster trust and reliance, giving rise to duties of care.

## 3. Specific Offer Creates a Duty

The bishop's explicit offer of food aid to the Plaintiff establishes a specific duty to follow through on that promise:

- By making a clear offer of aid, the bishop created an obligation that the Plaintiff reasonably relied upon in good faith.
- The Church's subsequent failure to provide the promised aid demonstrates gross negligence and bad faith, as it disregarded the harm caused by its failure to act.

This explicit promise distinguishes the Plaintiff's claims from general discretionary decisions about resource allocation and places the Church's actions within the realm of secular contractual obligations.

4. Negligence in Failing to Protect

The Church owed a duty of care to the Plaintiff as a member and contributor, particularly concerning its obligations to:

- Protect individuals from foreseeable harm, such as sexual abuse, when they are in the Church's care or under its influence.
- Report abuse and implement safeguards to prevent harm.

The Church breached these duties by:

- Allowing known risks to persist without taking reasonable steps to mitigate them.
- Engaging in cover-ups or concealment of abuse, thereby enabling further harm.

Religious organizations are not exempt from the duty to protect individuals from harm or comply with mandatory reporting laws.

Supporting Precedent:

- o N.H. v. Presbyterian Church (U.S.A.) (2000): Courts have consistently held that institutions owe a duty of care to prevent foreseeable harm, especially in cases of sexual abuse.

## 5. Public Policy and Accountability

Public policy supports holding religious organizations accountable for their secular obligations:

- o Allowing the Church to disclaim responsibility for harm caused by its negligence, bad faith, or misrepresentation would undermine public trust in institutions that solicit financial contributions and promise support.
- o Religious organizations must adhere to generally applicable laws governing negligence, fraud, and implied contractual obligations.

Supporting Precedent:

- o In Employment Division v. Smith (1990), the Supreme Court held that religious practices are not exempt from compliance with neutral and generally applicable laws.

## 6. Neutral Principles of Law Can Establish Duty

The Plaintiff's claims can be adjudicated using neutral principles of law to establish the Church's duty and evaluate whether it breached that duty:

- o Implied Contract: The Church's promises to contributors created an implied obligation to provide support.
- o Negligence: The Church's actions demonstrated a failure to exercise reasonable care in protecting the Plaintiff and fulfilling its commitments.
- o Bad Faith: The Church's conduct reflects an intentional disregard for the Plaintiff's well-being and reasonable reliance.

Courts can apply these principles without entangling themselves in religious doctrine, ensuring the case is resolved within the bounds of secular law.

Conclusion

The Defendants' argument that they owed no duty to the Plaintiff is unfounded because:

1. The Church's representations and the bishop's explicit promise of aid created implied obligations that the Plaintiff reasonably relied upon.

2. The Church/s fiduciary-like relationship with its members imposes a heightened duty of care in its interactions with them.

3. The Church breached its duty to protect the Plaintiff from harm and follow through on its promises, demonstrating gross negligence and bad faith.

4. These duties are enforceable under neutral principles of law and do not implicate religious doctrine.

**Factual Background**

**A. Historical Context: Commitment to the Church**

34. Plaintiff has demonstrated a lifelong commitment to the Church, including serving a full-time mission in Texas 20 years ago.

35. In preparation for a fulltime mission for the church, the plaintiff confided his local bishop about his struggles with same-sex attraction—a deeply personal and vulnerable admission. While the bishop expressed kindness, the Church offered no structured psychological or emotional support during this challenging time.  While the plaintiff's stepfather condemned him for his failure to obtain his mission calling at first attempt. Despite these struggles, the plaintiff did receive a calling and devoted himself fully to the Church's teachings, serving faithfully on my mission, and later marrying in the temple and building a family. These decisions reflected the plaintiff's reliance on the Church's principles and its implied promises of care and support for its members. However, in the plaintiff's time of need decades later, after following the Church's prescribed path, the plaintiff was denied even minimal assistance, such as food, based on unclear subjective evaluations. This stark inconsistency highlights systemic flaws within the Church's aid distribution process, which fails to uphold the trust placed in it by faithful members.

36. As a quick reference of how much the plaintiff has given to the church, utilizing the church's own likely calculations regarding humanitarian aid of over $1 billion dollars given while calculating in member time donated at $38 per hour, the plaintiff has donated over $150,000 of time on his mission twenty years ago.  With compounding

interest at 6%, this means that the plaintiff has donated over $500,000 to the church in service along with other meaningful tithes and fast offerings contributed. This amount does not account for contributions of parents, grandparents and others which undoubtedly is in the millions and millions of dollars given to the church in time and money.

37. During this mission, Plaintiff was assured by Church leaders, including Apostle Elder M. Russell Ballard, that his family would be cared for while he served. Tragically, in spite of the many blessings from high authorities in the church of complete healing that was given to the plaintiff's mother, the Plaintiff's mother passed away during his mission, and Plaintiff was not offered emotional or pastoral support during this profound loss. Nor did the plaintiff return home for his mother's funeral. Leaving the plaintiff in a state of distress based upon the promises given by Elder Ballard, wondering if he had somehow not served faithfully enough to somehow warrant his mother's death.

38. Furthermore, upon the plaintiffs return home from his mission, a year after his mother's death, he came home to a divided family. Largely brought on by the fact that his stepfather C. Martin Rasmussen sold the family business for $30,000,000 six months after the plaintiff's mother died and split the proceeds among his biological children and donating a significant portion to the church, while cutting the plaintiff and his brothers completely out. Further exacerbated by the fact that Rasmussen built a million-dollar houseboat on lake Powel at the time and would only allow those "who could afford it" to visit. Illustrating the overall family dynamics of creating two distinct social classes within his own family. Even though the plaintiff's mother and

stepfather had been married for 16 years after her first husband was killed in a family car accident that also very nearly killed the plaintiff. Ultimately leaving the plaintiff in a further state of distress, wondering what he did to contribute to such division and if he had somehow spiritually failed the church to deserve such overt division and repercussions.

39. Additionally, the plaintiff learned that Rasmussen had placed the plaintiff's mother in a psychiatric ward while the plaintiff was away on his mission, before she was diagnosed with systemic scleroderma (a condition the plaintiff believes was exacerbated by Rasmussens prolonged narcissistic abuse). Because the doctors couldn't figure out what was wrong with her and concluded it must be all in her head. Illustrating how both the plaintiff's mother and family were not in fact cared for while the plaintiff was serving the church. Because the plaintiff was serving a mission, the plaintiff was also essentially denied a meaningful chance to challenge these grossly unfair and inequitable transactions and was forced to piece together what happened through hearsay upon return. While Rasmussen, leveraging his social authority with the church, largely controlled the narrative and was able to feed his ego as he historically valued his reputation within the church specifically over the wellbeing of his stepfamily. After experiencing years of emotional, psychological, and sexual abuse from his stepfather who also once served as a bishop within the church, while acting as a scout leader within the church organization for much of the plaintiff's youth. The church has largely shielded Rasmussen from accountability on all of these events.

**Sacrifices and Isolation During Missionary Service**

40. At the time of the plaintiff's missionary service, the policies of the Church of Jesus Christ of Latter-day Saints strictly limited contact with family. Unlike current rules that allow missionaries to call or video chat with their families weekly, the plaintiff was restricted to infrequent written correspondence and two phone calls per year—on Christmas and Mother's Day. This rule was framed as a necessary sacrifice to focus on missionary work but came at a tremendous emotional and relational cost.

41. This restriction meant that the plaintiff could not maintain regular communication with his mother during the final year of her life. As a result, the plaintiff was deeply unaware of the rapid decline in her health. His final conversations with her carried reassurances that everything was fine, shielding him from the gravity of her condition.  Only to have an email sent to him the day after she died that she knew she was going to die and requesting that the plaintiff remain on his mission.  When the plaintiff was informed of her passing over the phone by his mission president at the time, the shock was compounded by the isolation he experienced during this critical time.

42. The Church's later change to its policy, allowing weekly calls home, underscores the unnecessary nature of the restriction at the time. While this change has undoubtedly lessened the emotional toll on current missionaries and their families, it also diminishes the significance of the sacrifice made by those who served under the older, more isolating policies. For the plaintiff, this rule not only robbed him of precious final conversations with his mother but also left him profoundly in the dark upon

returning home, contributing to his confusion and disorientation as he tried to navigate a fractured family dynamic.

Emotional, Sexual, and Psychological Abuse

43. The emotional, sexual, and psychological abuse began from Rasmussen at a young age and continued while Rasmussen was serving as the plaintiff's boy scout leader. The Plaintiff endured severe emotional and psychological harm at the hands of his stepfather, a Church-affiliated leader and parental figure, who used the Church's teachings on chastity and sexual purity to justify invasive, manipulative, and abusive behaviors. These actions were part of a broader pattern of control and intrusion rooted in the Church's rigid doctrines regarding sexual morality. Specifically:

> • The Plaintiff's stepfather conducted frequent **worthiness interviews**, demanding that the Plaintiff confess to acts of masturbation, and often requiring him to provide physical or verbal "signs" of his perceived guilt. Rasmussen had become accustomed to such interactions when he was bishop when he would regularly shame young children about their sexual activity during worthiness interviews.

> • On numerous occasions, in acts of psychological warfare, the Plaintiff's stepfather **invaded his privacy**, walking in on him in the shower. The plaintiff assumes it was under the guise of ensuring he was not engaging

in sexual acts, however this later left the plaintiff to wonder if Rasmussen gained some form of perverse pleasure from these transactions.

• The Plaintiff recalls being subjected to other terrorizing a humiliating actions, such as having his **bed covers ripped off** as a young child to catch him in private moments.

• While the Plaintiff's stepfather conducted worthiness interviews with all members of the family as far as the plaintiff knows, his behavior escalated specifically toward the Plaintiff. The stepfather routinely invaded the Plaintiff's privacy by walking in on him while he was showering, under the pretense of monitoring his compliance with chastity teachings.  These actions were not directed at the Plaintiff's brothers or other family members, underscoring the targeted nature of the abuse. Such behavior went far beyond the bounds of religious practice and reflected a personal motive to exert control and cause emotional harm.

•. The Church's failure to supervise the Plaintiff's stepfather allowed him to escalate his behavior toward the Plaintiff without detection or intervention. While worthiness interviews were routine, the Plaintiff's stepfather abused his authority to target the Plaintiff with additional invasive actions, such as walking in on him during showers.  This pattern of escalating behavior highlights the systemic failures within the Church, including the absence of safeguards to identify and prevent abuse by individuals in positions of authority.

44. These invasive actions created a culture of fear and shame for the Plaintiff, instilling in him a sense of unworthiness and guilt over natural behaviors. The Church's teachings on chastity, which equate masturbation with severe sin, provided the justification for this behavior, while the Church's lack of safeguards and oversight enabled it to occur unchecked.  As result of a severely unsafe environment, the plaintiff wondered for years if he was a "Son of Perdition," or someone who would experience the lowest form of hell.  These elements severely undercut the plaintiff's psychological wellbeing and produced an environment where the plaintiff experienced severe bullying as a child.  While such outcomes were unintentional by the church, these outcomes severely undercut the childhood wellbeing of the plaintiff.

45. The plaintiff's family home included a sauna area with a shower that lacked a lock, which became a frequent site of privacy invasions by the plaintiff's stepfather. The openness of the sauna area provided him with easy opportunity to intrude under the guise of monitoring or controlling the plaintiff's behavior. These invasions were justified as attempts to stop masturbation or enforce moral discipline, but in reality, they reflected a harmful fixation on the plaintiff's privacy and autonomy.

46. In addition to the sauna, the plaintiff recalls that his stepfather bypassed locks to invade his privacy in other bathrooms throughout the home, showing a deliberate and premeditated disregard for boundaries. These repeated violations left the plaintiff living in constant fear, never knowing when his stepfather might walk in. The plaintiff felt utterly powerless, unable to relax even in private moments, as the home—a place that should have been safe—became a space of persistent vulnerability.

47. Worse still, the plaintiff felt forced to pretend that these intrusions were acceptable. Expressing discomfort would have been interpreted as an admission of guilt, reinforcing the Church-driven shame surrounding natural sexual development and behaviors. This dynamic of silence and shame compounded the emotional harm, creating a toxic cycle in which the plaintiff was both victimized and coerced into compliance by the implied threat of moral condemnation.

48. The systemic negligence of the Church enabled these violations. Its cultural emphasis on sexual purity and its deference to male authority figures created an environment where such invasive actions were rationalized or overlooked. The plaintiff's stepfather's actions, while deeply personal, were inextricably tied to a broader pattern of systemic abuse and neglect within the Church's teachings and practices.

49. One of the most profoundly damaging aspects of the plaintiff's experience was the overwhelming fear and shame instilled by the Church's teachings about sin, particularly sexual sin. Within LDS doctrine, the term "son of perdition" is reserved for those who commit the gravest of sins—those who are believed to be eternally damned with no hope of redemption. While this doctrine was intended to apply to extreme cases, the Church's cultural focus on sexual purity led the plaintiff, as a child, to misinterpret these teachings in ways that profoundly shaped his understanding of himself and his actions.  Exponentially increasing shame around his childhood experience.

50. The Church repeatedly emphasized that sexual sins—including masturbation—were grievous offenses, often described as "sins next to murder." While an adult might be

able to contextualize these teachings and understand that the Church was likely referring to more severe actions such as adultery or full sexual intercourse outside of marriage, a child lacks the capacity to make such distinctions. The plaintiff, exposed to these teachings at a young and impressionable age, internalized the belief that any sexual curiosity or perceived infraction—including masturbation—was a near-unforgivable offense, placing him on the brink of eternal damnation.

51. Compounding this was the plaintiff's growing awareness of his bisexuality, which he perceived as further evidence of his unworthiness. In a culture where any deviation from heterosexual norms was stigmatized, the plaintiff came to believe that he was fundamentally flawed—someone unworthy of forgiveness, love, or divine grace. This self-condemnation was not an isolated misunderstanding; it was the natural outcome of a system that prioritized rigid standards of sexual purity over compassion, nuance, and age-appropriate guidance.

52. These beliefs left the plaintiff paralyzed. He lived in constant fear—not only of being spiritually condemned as a "son of perdition," but also of exposing himself as unworthy to his family and Church community. This fear directly influenced his decision not to report his stepfather's invasive and abusive actions. The plaintiff worried that exposing his stepfather would also expose his own perceived moral failings, drawing judgment and rejection from those around him. To a child already burdened by feelings of shame and unworthiness, along with severe bullying around him, the risk of being labeled a problem or an outcast was too great.

53. The plaintiff's internal conflict was further exacerbated by the Church's cultural and systemic failures. While the Church focused intensely on controlling and policing

sexual behavior—often at the expense of emotional and psychological well-being—it failed to create a safe environment for vulnerable individuals to report harm. The same culture that instilled fear and shame in the plaintiff also enabled his stepfather to abuse his authority without accountability. This imbalance left the plaintiff feeling trapped, isolated, and powerless to seek justice.

54. In hindsight, the plaintiff recognizes that the teachings he internalized were often oversimplified or misapplied, but at the time, they were experienced as absolute truths. The weight of believing he was irredeemable as a "son of perdition" created a psychological prison that silenced him and allowed the abuse to continue unchecked. Now, as an adult, the plaintiff has found the courage to share his story and expose the systemic failures that perpetuated his suffering—not only for his own healing but to advocate for a more compassionate and just system that protects the vulnerable.

55. Furthermore, the plaintiff developed bisexual feeling, at least in part because of the sexual abuse endured, and bravely confessed such before his mission to his bishop. Who then did not immediately release permission papers to serve a mission.  To which Rasmussen responded that he was embarrassed of the plaintiff.

56. The fact that bisexual feelings were created in part due to the church's negligence and systemic abuse of power brings up a difficult moral question of the church's accountability regarding first creating an environment that creates such affinity and then religiously and morally condemns the proclivities that it has created.

57. The Plaintiff's stepfather, while presenting himself as a devout and righteous orthodox member of the Church of Jesus Christ of Latter-day Saints, engaged in a troubling pattern of behavior that targeted the Plaintiff specifically. Despite being

married to the Plaintiff's mother, who was a beautiful and accomplished health professional, the stepfather repeatedly commented on how he felt guilty engaging in intimacy with her, stating that it felt like he was "cheating on his first wife." He also insisted on keeping his first wife's belongings, such as her gloves and Bible, prominently displayed in their shared home, creating an environment of comparison and psychological manipulation.

58. At the same time, the stepfather displayed an unsettling focus on the Plaintiff, making comments about his physical appearance and stating that the Plaintiff was "the best-looking" of his brothers. This, combined with his invasive monitoring of the Plaintiff's sexual purity—such as walking in on the Plaintiff while showering under the pretense of enforcing Church teachings on chastity—suggests a deeply personal and predatory fixation. These actions were not directed at the Plaintiff's brothers, further emphasizing the targeted nature of the abuse.

59. This behavior caused significant emotional and psychological harm to the Plaintiff, who was left feeling isolated, ashamed, and deeply confused by his stepfather's invasive and controlling actions. The Church's failure to supervise the stepfather or provide safeguards allowed this targeted abuse to continue unchecked.

60. **Responsibility Rooted in Doctrine and Culture:** The Church of Jesus Christ of Latter-day Saints has an inherent responsibility to ensure that its teachings and cultural practices do not create or perpetuate environments where abuse, psychological harm, or boundary violations are justified. The Church's emphasis on strict chastity teachings and its focus on worthiness interviews foster a culture of surveillance and control over members' private lives. This culture allowed the

Plaintiff's stepfather to act as an enforcer of these doctrines, engaging in invasive and abusive practices under the guise of religious righteousness.

61. By promoting shame-based teachings on chastity, equating natural behaviors like masturbation with grave sin, and failing to provide oversight or guidance on healthy boundaries, the Church created the conditions for such harm to occur. The Church's failure to anticipate the misuse of its doctrines or implement safeguards to prevent such behavior is a direct breach of its duty of care toward members, particularly vulnerable minors.

62. **Institutional Enabling of Abuse:**  The Church's systemic failure to oversee the actions of leaders, parents, and others in positions of authority within its organization directly contributed to the harm suffered by the Plaintiff. Leaders and members often wield significant unchecked power in applying Church teachings, creating an environment where abusive behaviors can thrive without accountability. The Plaintiff's stepfather exploited this system, weaponizing the Church's doctrines to rationalize intrusive and humiliating actions.

63. This lack of oversight reflects a broader institutional pattern in which the Church fails to protect vulnerable members. While the Church maintains its right to teach doctrine, it also has a moral and legal duty to ensure that its practices and culture do not enable harm. The Plaintiff's experiences are not isolated incidents but are emblematic of systemic issues within the Church that prioritize rigid enforcement of doctrine over the safety and well-being of its members.

64. Additionally, the Church's culture of secrecy and its failure to report or address abuse enabled individuals like the Plaintiff's stepfather to misuse their authority. While

worthiness interviews were common, the Plaintiff's stepfather used his position to escalate abusive behavior specifically toward the Plaintiff. The Church's systemic neglect allowed this pattern to go unchecked, perpetuating harm.

65. **Connection to Broader Claims:** The Plaintiff's case underscores the broader failures of the Church's financial and operational practices to align with its stated mission of caring for the poor, the vulnerable, and the spiritually afflicted. Just as the Church's financial practices prioritize wealth accumulation over equitable aid distribution, its teachings and lack of safeguards prioritize institutional control over the well-being of its members.  Which will be discussed further in the following sections. The harm suffered by the Plaintiff exemplifies the real-world consequences of these systemic failures, highlighting the urgent need for transparency, reform, and accountability within the Church.

66. Elder Ballard, who was Plaintiff's biological father's mission president and presided over both of Plaintiff's parents' funerals, played a significant role in reinforcing Plaintiff's trust and reliance on the Church. As both of Plaintiff's parents are now deceased, with an estranged relationship with his stepfather, Plaintiff has developed a higher dependency on the Church as a surrogate support system.  Especially as the plaintiffs extended family, in spite of their clear wealth, has proven to be not dependable or helpful during times of clear need.

67. This longstanding relationship reinforced Plaintiff's reliance on the Church's implied promises of care, making the current inconsistencies in aid distribution particularly distressing.

68. While some of these issues may seem tangential, the purpose of this background is to help the court understand the deeply personal and interwoven nature of the church throughout the plaintiff's life and the plaintiffs dependance on the church and its teachings.  While establishing a pattern of a lack of care and follow through on both perceived and overt promises made to the plaintiff by the church and high church authorities.  Especially in light of Elder Ballard's (a long standing member of the Quorum of the 12 Apostles who is recently deceased) close relationship with the plaintiffs family, including Rasmussen.  This also illustrates how Elder Ballard ultimately issued false promises of family wellbeing as result of faith and service, to get the plaintiff to perform in a way that was beneficial for the church by serving a mission.  Ultimately this promise was objectively false as not only did the plaintiffs mother die, but the family was divided upon returning home after faithfully serving. The background details, while seemingly tangential, are essential to understanding how the Church's promises shaped the Plaintiff's reliance on its support, making the subsequent failures more devastating.

69. This pattern of lack of follow-through demonstrates systemic negligence in the Church's care for its vulnerable members, including administration of aid, breaching both implied promises and fiduciary responsibilities.  These failures are not merely procedural they have caused significant emotional and financial harm compounding the immense difficulties faced by the Plaintiff and his family during a time of vulnerability.

## B. **Emotional Despair and Cultural Rejection at BYU**

70. A few years after returning from his mission, at the age of 24, the Plaintiff entered a deeply loving and committed relationship with a girlfriend while attending Brigham Young University (BYU). This woman embodied the hyper-orthodox teachings of the LDS Church, similar in ways to the plaintiff's stepfather. She adhered strictly to Church doctrine, refusing to watch PG-13 movies, abstaining from caffeine entirely, and maintaining her commitment to avoid even kissing before marriage. Raised in a similarly rigid environment, the Plaintiff found himself deeply attracted to her. Her physical beauty, combined with her strict devotion to Church principles, mirrored many of the qualities the Plaintiff admired in his late mother.

71. This connection was deeply significant to the Plaintiff, as he had never discussed his bisexuality with his mother before her passing. In many ways, his girlfriend symbolized the acceptance and love he had long sought from his upbringing. Believing that love should be built on trust and honesty, the Plaintiff eventually confided in her about his bisexuality—an aspect of himself he had grown to despise due to years of internalized shame stemming from the Church's teachings. Along with this confession, the Plaintiff acknowledged mild struggles with pornography and masturbation, behaviors he had already worked to overcome. However, he emphasized that he had strictly lived the law of chastity and had not engaged in any sexual relations outside of marriage.

72. Despite this honesty and his lifelong adherence to Church teachings, the Plaintiff was met with rejection. His girlfriend ended the relationship, citing his bisexuality as the

cause. She further shared his deeply personal confession with others, leading to public embarrassment and reinforcing the Plaintiff's feelings of shame and unworthiness. Spiraling the plaintiff into suicidal ideation and spending days in bed in a state of depression, which state lasted for several years.

73. However, in spite of these challenges, the Plaintiff firmly maintained his faith in the church and continued to uphold the law of chastity, refraining from any sexual relations outside of marriage until he was married in the temple at the age of 28. In fact, the only person that the plaintiff has ever had sexual relations with is his current wife. This lifelong commitment to the Church's standards, even in the face of rejection and isolation, reflects the depth of his dedication and the disproportionate judgment he experienced.

74. The Plaintiff recognizes that some may struggle to understand how he can identify as bisexual while having never engaged in sexual relations outside of marriage. However, sexual orientation is rooted in patterns of attraction, not behavior. Despite adhering strictly to the law of chastity, the Plaintiff's bisexuality remained an intrinsic part of who he was and his experience. This lifelong commitment to Church teachings, even while navigating the complexities of his identity, reflects the Plaintiff's moral integrity and his deep adherence to the principles he was raised with. However, it is important to note that the rejection and harm that the plaintiff experienced was based upon the identity as a bisexual individual, rather than the behavior itself. Emphasizing the disproportionate and systemic nature of the harm experienced.

75. The pain of being rejected by someone he loved deeply, and who in many ways reminded him of his late mother, magnified the emotional toll. It was as if he were being rejected by his own mother—a wound that cut so deeply it left the Plaintiff wishing he were dead, consumed by despair and hopelessness.

76. This incident exemplifies the toxic cultural environment fostered by the LDS Church, which stigmatizes LGBTQ+ identities and promotes rigid adherence to doctrinal expectations at the expense of compassion. The Church's teachings create an environment where vulnerability was met with judgement rather than understanding, leaving the Plaintiff to suffer in isolation without the support the Church claims to provide to its members. This rejection is not an isolated example, but a reflection of the broader systemic harm caused by the Church's culture, which prioritizes doctrinal rigidity over the emotional and spiritual well-being of its members.

77. This deeply personal rejection was not an isolated incident but a symptom of the Church's broader cultural framework, which stigmatizes LGBTQ+ identities, even when individuals like the Plaintiff adhere strictly to the Church's teachings. The hyper-orthodox behavior displayed by the Plaintiff's girlfriend was a direct reflection of the Church's rigid cultural expectations, which prioritize doctrinal conformity over compassion and understanding. This incident underscores the systemic failure of the Church to create an environment that supports and uplifts all members, regardless of identity or perceived imperfections.

## C. **The Tragic Story of Dana Thornock Rasmussen**

## **Systemic Failures and the Consequences for Vulnerable Members**

78. The Plaintiff's mother, Dana Thornock Rasmussen, serves as a tragic and deeply personal example of the Church of Jesus Christ of Latter-day Saints' systemic failures to protect and support vulnerable individuals. Her life and early death illustrate the harm caused by the Church's teachings, its lack of effective support structures, and its harmful cultural and doctrinal practices.

79. **A Life of Silent Suffering Under Doctrinal Constraints**

   • For years, Dana Thornock Rasmussen endured an abusive and emotionally harmful relationship with the Plaintiff's stepfather. Despite recognizing the need to leave the marriage, she felt trapped by the Church's teachings, which discourage divorce and emphasize forgiveness and family preservation at all costs.

   • As a devout and faithful member of the Church, Dana sought counsel and guidance from local and regional leaders. Instead of receiving meaningful support, she was encouraged to stay in the marriage and forgive her abuser. The Church failed to provide her with the resources, guidance, or moral support necessary to escape a harmful environment, leaving her isolated and emotionally drained.

80. **Narcissistic Tactics and Emotional Manipulation**

   • The Plaintiff's stepfather used his public persona of devout righteousness as a tool for covert abuse, systematically undercutting Dana Thornock Rasmussen's spirit and self-worth. She would often describe him as a "very righteous, but very young spirit," recognizing his outward appearance of piety while grappling with the harm he caused behind closed doors.

   • His manipulation included weaponizing the memory of his first wife, who had passed away from cancer. As previously described, he insisted that her gloves and Bible remain on Dana's nightstand, creating a constant comparison that left her feeling as though she were living in his late wife's shadow. He further reinforced this emotional harm by describing how he felt like he was "cheating" on his first wife when he was intimate with Dana, leaving her in a perpetual state of self-doubt and inadequacy.

   • While the plaintiff experienced many of his own forms of devaluation from Rasmussen, these tactics exemplify covert narcissistic abuse, where the abuser's outward piety masks deeply manipulative and harmful behavior. The Church, through its doctrines and cultural norms, created an environment that allowed such abuse to flourish unchecked.

81. **The Failure of Promised Blessings**

   • During her battle with terminal illness, Dana Thornock Rasmussen received multiple priesthood blessings from high-ranking Church leaders. These blessings explicitly promised complete healing, offering hope and reassurance to her and

her family. However, these promises were never fulfilled, leaving her to struggle between her faith and the reality of her condition.

• The Church failed to provide meaningful emotional or practical support to reconcile the stark disparity between these promised miracles and the harsh realities she faced. This lack of care compounded her suffering during her final years, undermining her spiritual and emotional well-being as she often described herself and her experience as Job from the bible.


### 82. A Lack of Support to Escape Abuse

• Before her illness became terminal, Dana expressed a desire to leave her abusive relationship. However, the Church offered no meaningful assistance or resources to help her escape as she once turned to her eldest son for housing accommodations.

• Cultural and doctrinal pressures within the Church further isolated her, discouraging her from seeking help outside of Church-approved channels. These teachings left her without the support or means to protect herself, trapping her in a toxic environment that exacerbated her physical and emotional decline. The stress caused by remaining in this abusive relationship likely accelerated her early death.


### 83. The Psychological Toll as Evidenced in Her Diary

• Personal diary excerpts reveal the profound emotional toll Dana endured. In her writings, she would alternate between self-doubt and fleeting hope, almost

appearing bipolar as she wrestled with her inability to meet her husband's impossible expectations.

• Her words reflect a woman trapped in a cycle of emotional invalidation, compounded by the Church's emphasis on obedience, forgiveness, and enduring trials. These writings provide stark evidence of the psychological harm caused by her stepfather's covert abuse and the Church's failure to provide meaningful support or intervention.

## 84. The Church's Systemic Neglect

• The Church's failure to address abuse and provide meaningful support reflects a broader systemic issue. By prioritizing doctrinal rigidity over the well-being of its members, the Church created an environment where vulnerable individuals like Dana Thornock Rasmussen were left without the resources or encouragement needed to protect themselves and their families.

• This pattern of neglect perpetuates harm and contributes to generational cycles of abuse, as evidenced by the Plaintiff's own experiences growing up in the same abusive household.

## 85. The Lasting Impact and Delayed Understanding

• It took years for the Plaintiff to understand the covert nature of the abuse that contributed to Dana's suffering and ultimate death. The psychological manipulation and emotional harm inflicted by the Plaintiff's stepfather, combined

with the Church's systemic failures, were not fully apparent until later reflection and personal growth illuminated the true cause of her decline.

• While the church may claim that a wrongful death claim is invalid due to statutory limitations, the Plaintiff believes that the Church holds **meaningful responsibility** for the circumstances leading to Dana's early death. Its failure to intervene, support, or protect her exemplifies the systemic neglect and harmful doctrines that underpin this case.

### 86. The Generational Impact of Systemic Harm

• Dana Thornock Rasmussen's suffering and untimely death have had a profound and lasting impact on the Plaintiff, especially in light of her first husbands early death. Witnessing her abuse, isolation, and decline caused significant emotional distress, compounded by the Church's failure to provide the support and resources she needed.

• Her story exemplifies the broader harm caused by the Church's systemic failures and its inability to fulfill its moral and doctrinal obligations. The Plaintiff's own experiences of neglect and abuse, both directly and as a result of his mother's suffering, underscore the generational consequences of the Church's actions and inactions.

### 87. Ongoing Harm

a.  Following the death of the Plaintiff's mother, Dana Thornock Rasmussen, the Plaintiff's father and mother were buried in separate locations for over a

decade. Although the Plaintiff's stepfather initially agreed to move the Plaintiff's father's grave to rest beside the Plaintiff's mother, he failed to fulfill this promise. Instead, he presented an ultimatum, offering to either address the Plaintiff's brother's immediate financial needs or use the funds to relocate the grave. Ultimately, the Plaintiff and his brothers took matters into their own hands to honor their parents' memory and reunite their resting places.

b.   This situation exemplifies the Plaintiff's stepfather's consistent pattern of weaponizing Church doctrine to exert control and influence over others. His refusal to act on his promise—and his prioritization of his own authority over the emotional needs of the Plaintiff's family—reflects a broader pattern of using doctrinal teachings as a means of personal empowerment. Specifically, doctrines such as resurrection authority and eternal polygamy created a context in which the Plaintiff's stepfather could assert spiritual dominance over the memory and legacy of the Plaintiff's mother. Doctrine and Covenants 132:19–20 teaches that men can be sealed to multiple wives for exaltation, while teachings on resurrection authority imply that men will raise their wives with priesthood power. These beliefs enabled the Plaintiff's stepfather to frame his inaction as spiritually justified, ensuring that he retained control over the Plaintiff's mother's eternal identity.

**A Parallel of Rigidity: The Plaintiff's Mother's Illness and the Church's Culture**

88. As the plaintiff reflects on his mother's tragic experience with systemic scleroderma, he sees a haunting parallel to the condition of the Church. Systemic scleroderma, a disease where the immune system, the body's natural protector becomes overactive, ultimately hardened her organs and suffocated her from within. Similarly, when the culture and doctrines of the Church become rigid, the very system meant to protect and nurture its members can unintentionally cause harm, stifling the spiritual growth and well-being of those it serves. Just as systemic failure occurred within the plaintiff's mother's body, similar systemic failure has occurred within the church.

89. The plaintiff watched as his mother's life became increasingly consumed by the rigid moral environment fostered within their home and Church. Instead of experiencing life with joy and balance, the focus in their home was on perfecting every aspect of that experience. This rigid interpretation of morality, often justified by their shared faith, created an oppressive environment. Over time, his mother's spiritual and emotional autonomy was eroded. By the end of her life, nearly every action she took was dictated by her perceived spiritual obligations, leaving little room for personal joy or freedom. Her body, responding to this unrelenting rigidity, eventually shut down, consumed by the disease that mirrored her life's constraints.

90. The plaintiff's stepfather cloaked his behavior in the language of Christlike love. He frequently justified his actions by claiming that true Christlike love meant bringing others to Christ often through criticism, control, and a relentless focus on performance. The plaintiff knows this to be true because he witnessed it firsthand. His stepfather's version of love was anything but unconditional; it was a tool of

manipulation that undermined his mother's spirit, cutting her down with a thousand small but devastating blows.

91. By the time the plaintiff's mother passed away, she described her physical experience as being pierced by a thousand needles, a chilling mirror to the thousand cuts of emotional pain inflicted by her husband under the guise of righteousness. These small, persistent wounds eventually broke her down, both physically and spiritually. Tragically, the plaintiff experienced similar treatment at the hands of his stepfather, who used the Church's teachings to justify his controlling and invasive actions.

92. This parallel between his mother's illness and the Church's cultural rigidity serves as a call for systemic reflection and reform. Just as an overactive immune system can harm the body it is meant to protect, an overemphasis on rigid doctrine and judgmental attitudes can harm the very members the Church seeks to uplift. The plaintiff implores the Church to reexamine its approach, emphasizing compassion, flexibility, and Christlike love that truly invites and inspires, rather than condemns and constrains.

93. Let this tragic story of systemic failure serve as a reminder: the doctrines and culture of the Church, when wielded without balance or compassion, can inadvertently become instruments of harm. But with a renewed focus on love, humility, and the true teachings of Christ, the Church has the opportunity to heal, to grow, and to better serve its members and the world.

94. **Call For Accountability:**

- The harm caused to the Plaintiff is rooted in a duality of responsibility. On one hand, the Plaintiff's stepfather clearly abused his position of authority and took liberties in interpreting and weaponizing Church doctrine for his personal gain. On the other hand, the Church created an environment that not only enabled but legitimized such behavior through its rigid teachings, hierarchical structure, and lack of safeguards against doctrinal misuse.

- The Church cannot absolve itself of responsibility by attributing the Plaintiff's suffering solely to the actions of an individual actor. Doctrine and Covenants 121:36–37 explicitly warns that 'the powers of heaven cannot be controlled nor handled only upon the principles of righteousness,' yet the Church failed to provide adequate oversight to ensure that this principle was upheld. By creating a culture that prioritizes adherence to doctrine over the well-being of its members, the Church enabled individuals like the Plaintiff's stepfather to manipulate these teachings under the guise of spiritual authority.

- The Church's strict teachings on chastity, eternal marriage, and resurrection authority were presented as infallible truths, yet their application left room for profound exploitation. The Plaintiff's stepfather's actions—such as walking in on the Plaintiff while he was showering and weaponizing worthiness interviews— were framed as compliance with Church doctrine, blurring the line between personal misconduct and institutional complicity. This duality of harm exemplifies the systemic failures at the heart of this case. The Church cannot simply blame individual actors for literal interpretations of its teachings while

simultaneously relying on those same teachings to assert moral and spiritual authority.

95. **Relief Requested**

- The Plaintiff seeks acknowledgment of the Church's dual responsibility in this matter. While the actions of individual actors like the Plaintiff's stepfather contributed directly to the harm suffered, these actions were made possible and exacerbated by the Church's systemic failures to provide oversight, safeguards, and accountability. The Plaintiff requests the following reforms to address this duality of harm:

    o Implementation of strict guidelines and safeguards to prevent the misuse of Church doctrine, particularly in matters involving chastity, worthiness interviews, and family relationships.

    o Mandatory training for leaders to recognize and address potential abuse of authority.

    o Independent oversight mechanisms to investigate and resolve claims of abuse involving doctrinal manipulation.

    o Formal acknowledgment of the Church's role in enabling these systemic failures, including specific measures to reconcile with those harmed by these practices.

**D. The Parallel Tragedy: The Plaintiff's Wife's Experience as a Convert**

96. The systemic failures that allowed the plaintiff's mother, Dana Thornock Rasmussen, to endure years of psychological and emotional harm were not isolated. These same cultural and structural shortcomings within the Church also harmed the plaintiff's wife, a convert to the LDS faith, during her first marriage. Her story, like Dana's, reveals a disturbing pattern of the Church enabling abuse by prioritizing deference to abusive spouses over the safety and well-being of vulnerable women.

97. The plaintiff's wife joined the Church with hope and faith, seeking a community rooted in principles of love, compassion, and mutual respect. After nine months of dating, she married a fellow member of the Church in 2006 in the Salt Lake Temple. However, during their courtship, they engaged in what the Church considers a violation of the law of chastity—"heavy petting with their clothes on." This minor infraction triggered a disciplinary council for her then-fiancé, requiring both of them to undergo a deeply personal and humiliating process of repentance.

98. As part of this process, the plaintiff's wife was required to discuss her "sexual misdeeds" in detail before a room full of men, leaving her feeling exposed and shamed. Despite the minor nature of the infraction, the Church subjected her and her fiancé to intense scrutiny, with the council imposing strict requirements for repentance before they were deemed worthy to marry in the temple. This experience left a lasting impression on the plaintiff's wife about the Church's strict enforcement of sexual purity and its deeply invasive methods of addressing such issues.

99. However, the Church's response to far graver issues of abuse during their marriage was strikingly different. Just ten days after their wedding, her ex-husband choked her

during an argument over moving his computer out of their bedroom. When she sought help from her bishop, she expected understanding and intervention. Instead, the bishop merely asked if she had forgiven her abuser, brushing the incident under the rug. Unlike the public disciplinary process for the law of chastity violation, her ex-husband faced no formal Church disciplinary action for his violent behavior. The abuse continued unchecked, with no referrals to law enforcement, counseling, or domestic violence resources.

100.    Over the years, her ex-husband's abuse escalated. At various times, he punched her in the chest, threw a phone at her face, and threatened further violence. She confided in six or seven bishops over the course of her marriage, yet the responses were overwhelmingly inadequate. Most bishops advised her to forgive him, handle the matter privately, and focus on improving the marriage as she went through approximately seven bishops during the course of her marriage.  Even while her ex-husband was working as a veil-worker, the worst that happened to him was having his temple recommend removed for a short time.  It was not until she encountered a bishop who was also a child abuse attorney that she finally received the support needed to separate and escape the toxic marriage.

**A Rare and Difficult Escape**

101.    While the plaintiff's wife ultimately escaped her abusive marriage, her story is statistically rare. According to research by the National Domestic Violence Hotline and other advocacy organizations, leaving an abusive relationship is fraught with

challenges.  On average, victims of domestic violence attempt to leave their abuser **seven times before they are able to permanently leave.** Factors like financial dependency, emotional manipulation, societal stigma, and lack of support from trusted institutions make it difficult for victims to escape.

102.   For the plaintiff's wife, the Church's repeated failures to address her situation only compounded these difficulties. Instead of receiving immediate and decisive support, she faced a system that prioritized keeping her marriage intact and forgiving her abuser over ensuring her safety. This pattern of enabling abuse by pressuring victims to remain in harmful marriages significantly reduces the likelihood of escape for many women.  As was the case with the plaintiff's mother.

103.   Statistics show that women who remain in abusive relationships face a much higher risk of severe injury or even death. The National Coalition Against Domestic Violence reports that, on average, **nearly 20 people per minute are physically abused by an intimate partner in the United States**, and nearly **one in three women** experience physical violence from an intimate partner during their lifetime. Tragically, approximately 1 in 4 women murdered in the United States are killed by an intimate partner. The plaintiff's wife narrowly avoided becoming part of this statistic.

104.   The Church's culture and practices played a significant role in creating the conditions that made escape so difficult. By emphasizing forgiveness and discouraging external interventions, while emphasizing a patriarchal driven society, the Church's approach not only failed to protect the plaintiff's wife but also enabled her ex-husband to continue his abusive behavior without meaningful accountability.

That he went on to abuse and nearly kill his second wife after marrying her also in the temple, in spite of overt warnings to the church concerning her ex-husbands behavior, underscores how the Church's inaction emboldened him and perpetuated the cycle of abuse.

### The Connection to the Plaintiff's Experiences

105.   The plaintiff's wife's experience with the Church's disproportionate focus on sexual purity at the expense of addressing abuse mirrors the plaintiff's own traumatic experiences. The plaintiff's stepfather, Marty Rasmussen, embodied the same warped priorities: while Marty obsessed over the sexual behavior of the plaintiff and his siblings, going so far as to walk in on the plaintiff in the shower to ensure he was not masturbating, he subjected the plaintiff to emotional and psychological abuse that went entirely unchecked. The Church's teachings about sexual purity—emphasized above all else—enabled Marty to weaponize this doctrine as a means of control and abuse, while other harmful behaviors, including his divisive and manipulative treatment of the family, were ignored.

106.   This pattern of misaligned priorities extended to the plaintiff's experience at Brigham Young University (BYU). During this period, the plaintiff adhered strictly to the Church's law of chastity, refraining from sexual relations outside of marriage. Despite this, when the plaintiff confided in his girlfriend about his bisexuality, she rejected him. Her response, rooted in hyper-orthodox Church teachings, echoed the same obsessive focus on sexual purity that had been weaponized against him

throughout his life. The rejection left the plaintiff devastated, as it reinforced the internalized shame he already carried about his sexuality.

## A Broader Pattern of Misaligned Priorities

107.    The plaintiff's wife's story, the plaintiff's mother's experiences, and the plaintiff's own trauma are not isolated but reflect a consistent pattern of harm perpetuated by the Church's systemic failures. These stories reveal how the Church's cultural framework disproportionately emphasizes sexual purity while neglecting other, often more critical, moral and ethical issues.

108.    For the plaintiff's wife, this imbalance was evident in how the Church responded with harsh discipline for a minor infraction during courtship while failing to take meaningful action when she faced life-threatening domestic violence. For the plaintiff's mother, this was reflected in the Church's tolerance of Marty Rasmussen's abusive behavior, which caused lasting harm to the family. For the plaintiff, it manifested in years of shame, self-loathing, and rejection, fueled by the Church's rigid and harmful teachings about sexuality.

109.    These stories underscore the urgent need for the Church to address its systemic negligence, shift its priorities to protect vulnerable members, and hold abusers accountable in a meaningful and consistent manner. While the Church claims to uphold family values, its practices often undermine those very families by enabling

abusers, silencing victims, and stigmatizing those who do not conform to its narrow standards of purity. The plaintiff's experiences, along with those of his wife and mother, expose the systemic failures of the Church to provide the compassion, protection, and accountability it claims to offer.

### E. Recent Experiences with Inconsistent Food Assistance

110.    After being bankrupted by Bedford County, Plaintiff faced financial hardship and suicidal ideation. During this period, the Church—through Bishop Call in Bedford—provided life-saving financial and psychological support, stabilizing Plaintiff and his family.

111.    In providing significant aid, Bishop Call was given a transparent overview of Plaintiff's financial circumstances. This disclosure was appropriate given the scope of the aid provided and helped ensure that the assistance was administered fairly and effectively.

112.    Six months after fleeing Bedford County's pattern of retaliatory behavior and relocating to Richmond, Plaintiff requested short-term food assistance from Bishop Wiser, outlining the financial strain caused by seasonal work challenges in his new position as a door-to-door salesman. Plaintiff made this request in person in a one-on-one interview on November 27th, 2024, where the bishop was given an extensive background and history of the plaintiff's position.  Including details of the ongoing lawsuit with Bedford County.

113.   The plaintiff followed up with Bishop Wiser via text message on December 2, 2019, explaining his family's situation and offering to provide additional financial details if needed. (See **Exhibit A**.)

114.   Despite Plaintiff's reasonable request and Bishop Wiser's initial willingness to assist, the aid was never provided. Bishop Wiser indicated that he would contact Plaintiff's former bishop, Bishop Call, to obtain further context. However, Bishop Wiser subsequently ceased responding to Plaintiff's follow-up inquiries, as documented in their text exchanges. (See **Exhibit A**.)

115.   Plaintiff explained that his family was not in immediate danger of starvation, but that assistance with food would ease the burden of paying for essential expenses like historically high rent and daycare costs.  Brought on by the extraordinary recent inflationary state.

116.   The texts show Plaintiff's repeated attempts to provide additional information, clarify his need, and facilitate communication between Bishop Wiser and Bishop Call. Despite these efforts, no assistance was rendered, leaving Plaintiff and his family to manage without the promised aid. (See **Exhibit A**.)

117.   This breakdown in communication underscores systemic flaws in the Church's aid distribution process, including reliance on subjective discretion and inconsistent coordination between local leaders.

118.   During the one-on-one meeting, Bishop Wiser expressed his empathy with the fact that he had once experienced this trauma.  But in learning that our rent is $3240 per month, he also expressed that he couldn't afford rent now.  Which created concerns of unjust judgement and possible begrudging motives as we were attempting

to afford such high rent.  While this is possibly untrue, the point is to illustrate how subjective interpretations of need can cause harm.  Because of the bankruptcy, the plaintiff and his wife's options were limited and they were unable to compete for more reasonably priced accommodations that had many applications, but were granted a lease on a more expensive rental.  These systemic challenges in addition to the historically high inflationary state of the economy were likely not fully considered but have greatly contributed to the need for the request for assistance such as food as the cost of living has become extremely high.

119.    It is important to note that Bishop Call helped the plaintiff and family relocate into this new home from Roanoke to Richmond by paying for their first month's rent through the church.  As the plaintiff and family fled Roanoke due to consistent retaliatory measures taken by Bedford County.  Illustrating that Bishop Call had a keen understanding of all of the elements that pushed the plaintiff's family into the home and rent price that the plaintiff is in.  Since that time, the plaintiff had not requested further assistance from the church for over 6 months, attempting to be self-sufficient, until the food request was submitted.

120.    Given the modest scope of this request, a detailed financial review was neither warranted nor requested by Bishop Wiser in the end.  While further financial details were offered as according to exhibit A.  However, despite offering to provide food assistance, Bishop Wiser failed to follow through, ultimately ceasing communication with Plaintiff.

121.    While Bishop Call remained responsive to Plaintiff, Bishop Wiser did not respond to Plaintiff's follow-up inquiries and texts.

122.    The denial of food assistance, despite its minimal nature and Bishop Wiser's
initial offer, underscores systemic issues within the Church's aid distribution
practices and the harm caused by reliance on subjective discretion.

123.    After Bishop Wiser failed to provide the promised food assistance, Plaintiff
reached out to the local stake president for additional support and clarification. In a
text sent on December 8, 2019, Plaintiff explained his financial struggles, including
his family's recent bankruptcy and his inability to rely on extended family for
support. (See **Exhibit B**.)

124.    Plaintiff highlighted the lack of follow-through by Bishop Wiser and asked for
assistance to bridge the financial gap for his family during the winter months. The
stake president acknowledged Plaintiff's concerns and confirmed that assistance was
still under the authority of Bishop Wiser. (See **Exhibit B**.)

125.    Despite the stake president's response and Plaintiff's willingness to provide
additional context and communication, no aid was rendered. This further
demonstrates the systemic gaps in coordination and timely decision-making within
the Church's aid distribution process.

126.    The delays and lack of follow-through caused additional emotional and financial
strain on Plaintiff's family, compounding the challenges they faced after relocating
and experiencing Bedford County's retaliatory actions.

127.    After repeated delays and non-responsiveness from both Bishop Wiser and the
stake president, Plaintiff made a final attempt to resolve the matter by reaching out to
Elder Dushku, a Church authority, for assistance.  Elder Dushku is a general authority
in the church with a strong legal background that could possibly understand the

dynamics with the Bedford County case. Plaintiff submitted a letter to church headquarters, detailing the systemic inconsistencies in the Church's aid distribution process, the emotional and financial harm caused by these delays, and the urgent need for assistance. (See **Exhibit C**.)

128.    In the letter, Plaintiff reiterated the strain caused by Bedford County's retaliatory actions, the significant financial burden faced by his family, and the lack of consistent support from local Church leaders. Despite this effort, no meaningful resolution was offered, leaving Plaintiff with no alternative but to seek judicial relief to address these systemic issues. (See **Exhibit C**.)

129.    The lack of action from Elder Dushku further demonstrates the systemic nature of the problem within the Church's aid process, as even appeals to higher-level authorities failed to yield any resolution.


**F. Systemic Imbalance Brought on By LDS Teachings and Burden on Poor Members**

130.    While this case is focused on the equitable distribution of aid, an evaluation of church teachings including a focus on tithing is warranted as it has contributed to the wealth disparity to the actual aid distributed.  While the issue of tithing is a doctrinal issue, the line becomes blurred into secular issues when the church fails to meet its stated purpose in caring for the poor and the needy in conjunction with the clear wealth disparity in place.  The purpose of discussing tithing is not to challenge the doctrine of the law, but to measure its real world effect and application in light of recent events.

131.    The Church's teachings on tithing have evolved over time. Originally, tithing was presented as a flexible system, encouraging members to pay what they could, ideally 10%, based on their surplus or income (Doctrine and Covenants 119:3-4). However, during a financial crisis in the early 20th century, the Church shifted its teachings to emphasize paying tithing as a first priority, regardless of personal financial circumstances. This shift, initiated during President Lorenzo Snow's administration and reinforced by leaders such as Heber J. Grant, helped stabilize the Church financially but disproportionately burdened poorer members.

132.    Today, the application of this doctrine remains unchanged, even though the Church's financial reserves have grown to staggering levels. A whistleblower in 2019 revealed that Ensign Peak Advisors, the Church's investment arm, manages over $100 billion, much of which remains untouched and unallocated for charitable purposes. Despite this wealth, local leaders are given significant discretion to determine aid eligibility, resulting in inconsistent and arbitrary outcomes for those seeking assistance.

133.    Furthermore, the Church's emphasis on self-reliance and preparation, while valuable in many contexts, has unintentionally contributed to a culture that discourages generosity among those with means. Members are taught to "prepare like the wise virgins," prioritizing their own savings and reserves, yet this teaching is not consistently balanced with the gospel imperative to assist those in need.  While often those in need are shamed for not saving sufficient "oil for their lamps."  As a result, many members feel justified in withholding help from struggling family members or others, perpetuating cycles of poverty and shame.  As has recently happened to the

plaintiff who was called a bitter apostate by family rather than meaningfully responding to current need.

134.    The Church has reached a point of financial independence where it no longer relies on tithing contributions for its sustainability. Its financial reserves, managed through Ensign Peak Advisors, reportedly exceed $100 billion and generate substantial annual investment income. Conservative estimates suggest that these investments alone produce billions of dollars annually, more than enough to cover the Church's operational costs, including global missionary work, temple construction, and humanitarian efforts.

135.    In light of these financial realities, the Church must reevaluate its emphasis on tithing. Originally implemented as a necessary means of sustaining the Church during times of financial hardship, the mandatory 10% contribution is no longer essential for institutional survival. Instead, the Church is in a unique position to shift its focus toward **fast offerings**, which directly support those in need and align more closely with Christ's teachings on charity and care for the poor.

136.    The Church's ability to sustain itself through its investments and business ventures makes this shift not only feasible but imperative. Continuing to mandate tithing contributions to achieve the highest degree of heaven and for temple attendance, places unnecessary financial strain on members, particularly those already struggling in today's economy, and risks alienating members who see the disconnect between the Church's wealth and its demands for financial sacrifice.

**G. Systemic Issues in Food Assistance Distribution**

137.    The Church's reliance on local leaders to determine need without clear, objective

policies creates significant inequities and undue burdens for members in crisis.

138.    Food assistance, in particular, is subject to unnecessary barriers caused by:

• Subjective interpretations of financial need, which require members to justify their

requests even when the aid requested is minimal.

• Possible reliance on Church attendance as a criterion for aid, which unfairly penalizes

members undergoing faith transitions or those unable to attend meetings due to personal

challenges.

• As illustrated throughout this complaint, the church often has created the hostile

environment in which disenfranchisement and faith transitions exist.  Especially with the

massive dissonance that exists in church history that the church has been releasing.

Therefore, to punitively punish members for naturally reacting to such an environment

through arbitrary decisions over worthiness by withholding basic needs such as food, is

inherently hypocritical in nature.

139.    These systemic issues disproportionately harm vulnerable members by creating

unnecessary delays, denying basic aid like food, and subjecting members to irrelevant

or punitive considerations.

140.    The Church's reliance on local discretion disregards the broader trust members

place in its teachings and promises. This issue is particularly pronounced for

members like Plaintiff, who have endured significant personal challenges while

maintaining adherence to Church principles. The systemic inconsistency in food

assistance distribution undermines the foundational trust between the Church and its members.

141.     The Church's failure to provide the promised aid—despite repeated, good-faith efforts by the Plaintiff—exacerbated the financial and emotional distress caused by external retaliation. This compounded harm underscores the urgent need for systemic reforms to ensure equitable aid practices.

142.     Plaintiff's request for food assistance was reasonable and moderate, aimed at alleviating temporary financial strain caused by seasonal work challenges. The Church's failure to provide this aid, despite an explicit offer, demonstrates the need for reforms to ensure food is distributed based on need rather than subjective evaluations of finances or Church activity.

143.     All of these efforts in contacting the Bishop, the Stake President, and then a General Authority shows the plaintiff's good faith efforts to get basic needs met outside of litigation.  This additionally shows a rather extraordinary effort to get basic needs met from the church.

144.     The Church's subjective aid practices and rigid emphasis on tithing disproportionately harm its most vulnerable members. These systemic flaws are exemplified by the following experiences reported by faithful members:

• The plaintiff has personally witnessed the strain that rigid tithing expectations place on struggling members of the church.  A close friend and his family (a true believing and lifelong faithful member of the church), living out of a small travel trailer in Texas with an annual income of less than $20,000, faithfully pays 10% of their income as tithing, believing in the spiritual and even physical blessings promised by Church teachings.

Despite their faith, they neither seek nor receive assistance, living on faith and a shoestring budget. As this friend described being blessed by finding rolls of toilet paper strewn across the side of the road or being given produce to sustain his family that was purposed for mulch. While this friends faith and ingenuity is admirable even as the widow's faith in contributing her mite was admirable, this illustrates the imbalance of the church's resources and teachings, and perceived negative stigmas attached with receiving church assistance (including lack of faith or faithful payment of tithes if assistance is received) versus the needs of its members.

145.    Additionally, the plaintiff's brother's family (also a true believing and lifelong faithful member of the church), despite their dire financial circumstances, were forced to rely on weevil-infested rice for sustenance for a time after their bishop determined they were "unworthy" of additional assistance. While yet another of the plaintiff's siblings has moved into a travel trailer with his family of five with three small children in the middle of the rural Utah desert, after declaring bankruptcy due to health issues. Later, he moved to Puerto Rico in hopes to find a more reasonable cost of living overall. These families embody the sacrifices praised in the widow's mite but also expose the exploitative nature of a system that demands such sacrifices while withholding meaningful support.

146.    These stories are not isolated. They reflect broader systemic inconsistencies within the Church's aid distribution practices, where local leaders exercise significant discretion without transparent guidelines. Meanwhile, the Church continues to accumulate vast financial resources, raising serious questions about the alignment between its teachings and its practices.

147.    Compounding these systemic failures is the culture fostered by the Church's financial example and teachings on preparation. While self-reliance and saving for the future are admirable principles, they must be balanced with the responsibility to care for others. Instead, the Church's actions encourage a model in which wealth is hoarded rather than shared, leaving struggling members caught in a cycle of deflection between the Church and their families, as has been the case with the plaintiff. This imbalance undermines the gospel principles of charity and community and leaves vulnerable members without the aid they need.

148.    The Church's current practices reflect an imbalance between institutional wealth and member contributions. Tithing is taught as a mandatory obligation, even for members facing significant financial hardship, while the Church's financial reserves remain largely untouched and its business ventures continue to thrive. This disconnect creates systemic inequities in aid distribution, where members in need often turn to fast offerings for assistance, yet these offerings are underemphasized and underutilized.

149.    Fast offerings, which are explicitly intended to support struggling members, provide a more compassionate and effective alternative to rigid tithing practices. By encouraging fast offerings over mandatory tithing, the Church can better address the needs of its members without compromising its financial stability. This shift would also allow the Church to emphasize voluntary generosity and compassion over obligation, fostering a culture of charity and mutual support.

### H. Financial Independence and the Need for Reform

150.    The Church's ability to sustain itself through its financial reserves and business ventures represents a significant milestone in its history, but it also necessitates a reevaluation of its priorities. For decades, tithing has been taught as a mandatory obligation, with members encouraged to "pay tithing first" even when facing financial hardship. While this teaching served a critical purpose during times of institutional need, it is no longer necessary given the Church's current financial position.

151.    Fast offerings, by contrast, are specifically designed to assist those in need. These voluntary donations reflect Christ's teachings on charity and provide immediate, meaningful support to struggling families. By shifting the emphasis from mandatory tithing to inspiring fast offerings, the Church can uphold its mission to care for the poor while reducing the unnecessary financial strain placed on its members.

152.    This shift is particularly urgent in today's economic climate of rising inflation and financial instability where small vulnerable families such as described are getting crushed. Members should not be asked to choose between paying tithing and meeting their basic needs, especially when the Church has the resources to operate without their contributions. Instead, the Church should inspire voluntary generosity, encouraging members to give as they are able and ensuring that all donations are used to support those who need it most.

**Why This Shift is Imperative**

153.    The Church is at a crossroads. Its financial independence gives it the unique opportunity to reform its teachings on tithing and embrace a more compassionate,

Christ-centered approach to supporting its members and others in need. By emphasizing fast offerings and reducing the focus on mandatory tithing, the Church can:

- **Demonstrate Compassion**: Show members that their well-being is prioritized over institutional wealth that historically drives wealth to the top 1%.

- **Align with Christ's Teachings**: Reflect the gospel principles of charity, mercy, and care for the poor.

- **Foster Voluntary Generosity**: Inspire members to give out of love and gratitude rather than obligation.

- **Address Economic Realities**: Provide relief for members struggling with inflation and financial instability.

154.    This reform is not only feasible but necessary to ensure that the Church's practices align with its mission and values. The financial burden on members must no longer be justified when the Church has the means to sustain itself through its reserves and investments.

## I. Systemic Concerns Regarding Tithing and its Application

155.    Doctrine and Covenants 119 establishes tithing as a "standing law" within the Church, requiring members to pay one-tenth of their annual interest. Historically, this principle was introduced during a period of financial instability to sustain the Church and provide a framework for faith and sacrifice. However, the application of this law

has evolved into a rigid expectation of 10% contributions, often without regard for individual circumstances or economic realities.

156.    As previously mentioned, the Church's financial landscape has also significantly changed since the introduction of this principle. Today, its reserves, reportedly exceeding $100 billion, generate billions of dollars annually through investments, providing financial independence far beyond the needs of its global operations. This financial reality necessitates a reevaluation of how tithing is taught and applied within the Church, especially when juxtaposed with the economic hardships faced by many members due to rising inflation and other financial pressures.

**Balancing Doctrine with Compassionate Application**

157.    Tithing, as established in Doctrine and Covenants 119, is a principle of faith and stewardship. However, the current emphasis on mandatory 10% contributions risks overshadowing the broader gospel principles of agency, equity, and care for the poor. A more balanced doctrinal approach would ensure that members can exercise their agency in contributing as they are able, without fear of judgment or exclusion. This balance would also better reflect the intent of the law as a means of building faith, not imposing hardship.

158.    Additionally, the underutilization of fast offerings—a program specifically designed to support struggling members—represents a missed opportunity to align Church teachings with Christ's call to care for the poor and needy. Fast offerings should be elevated as a central practice of compassionate giving, particularly in light

of the Church's financial independence. Shifting emphasis from rigid tithing obligations to inspiring fast offerings would foster a culture of generosity and support within the Church while relieving undue financial strain on members.

**Avoiding Perverse Incentives**

159.    An unbalanced application of tithing creates perverse incentives for some individuals to misuse the principle, effectively reducing it to a transactional exchange. For example, individuals like the plaintiff's stepfather, C. Martin Rasmussen, have leveraged their financial resources to "buy their way into heaven," contributing significantly to Church funds while neglecting or even exploiting the weaker and disenfranchised members of their families. Following the death of the plaintiff's mother, Rasmussen's actions of contributing significantly to the church and his biological children while cutting his stepchildren out, exemplified how rigid interpretations of tithing and Church contributions can inadvertently perpetuate inequity and harm.

160.    This distortion of doctrine is not aligned with Christ's teachings. The Savior's message consistently emphasized the weightier matters of the law: judgment, mercy, and faith. By shifting the emphasis to voluntary giving, fast offerings (so long as those fast offerings are distributed transparently and equitably), and a contextual application of tithing, the Church can prevent such abuses and ensure that its teachings inspire compassion, not self-righteousness.

**Transparency and Stewardship**

161.   The sacred nature of tithing as described in Doctrine and Covenants 119 necessitates transparency and stewardship in how these funds are used. Members deserve to see that their contributions are not only sustaining the Church's operations but are also directly alleviating poverty, supporting the needy, and addressing the challenges faced by vulnerable members. Greater transparency would not only strengthen trust within the Church but also ensure that its financial practices align with its mission to build God's kingdom and care for His children.

**Proposed Reforms Within Church**

162.   To address these systemic concerns, the following reforms are proposed:

1. **Reevaluate the Rigid Application of Tithing**: Encourage members to pay tithing based on their ability and circumstances, reflecting the original intent of the law as a principle of faith and stewardship rather than a strict financial obligation.

2. **Increase Emphasis on Fast Offerings**: Elevate fast offerings as the primary means of addressing poverty and need within the Church, ensuring that resources are directed toward the poor and vulnerable in alignment with Christ's teachings.

3. **Ensure Transparency in Financial Practices**: With a greater focus on fast offerings, provide clear and detailed reports on how fast offering funds are used in

particular, demonstrating that these contributions are being used to support members and fulfill the Church's mission.

4. **Promote Compassionate Leadership**: Train local leaders to apply tithing principles with flexibility and compassion, while more liberally providing aid through fast offerings by empowering them to support struggling members without fostering shame or judgment.

## J. Context of Bedford County's Retaliation

163.   Plaintiff is concurrently engaged in a legal battle against Bedford County, which has demonstrated a pattern of retaliatory behavior toward Plaintiff and his family.

164.   The County's retaliatory actions have created ongoing financial and emotional strain, placing Plaintiff's family in a precarious position.

165.   The Church's failure to provide consistent assistance not only exacerbates Plaintiff's financial strain but also leaves his family without critical support to withstand Bedford County's retaliatory actions.

166.   This context underscores the urgency of addressing systemic inconsistencies in the Church's aid practices, particularly for basic necessities like food assistance, to ensure timely and reliable support for members facing external challenges. Especially as any further delay could be disastrous in light of Bedford County's retaliatory history.

**Systemic Disenfranchisement and the Betrayal of Moral Foundations**

167.    The Church of Jesus Christ of Latter-day Saints teaches a rigorous moral framework, emphasizing principles such as integrity, chastity, and transparency. For members like the Plaintiff, who were raised in the Church from birth, this moral foundation shaped their worldview, identity, and decisions. However, the Church's actions and historical realities reveal systemic violations of this very moral code. These violations create a cycle of harm in which questioning members are not only left unsupported but actively disenfranchised for failing to conform to a rigid and often contradictory narrative of truth.

168.    The Plaintiff's claim centers on the Church's responsibility to uphold the principles it teaches, to create space for members to navigate these contradictions, and to take accountability for the harm caused when it fails to do so.

169.    The Church's Imposition of a Strict Moral Code

• Moral Framework from Birth:

> • As someone born into the Church, the Plaintiff was taught a strict moral code based on principles of divine truth, honesty, and personal accountability. This foundation was presented as infallible and divinely inspired, creating a profound reliance on the Church as a moral authority.

> • The Plaintiff was raised with the belief that obedience to the Church's teachings was not only a personal duty but essential for eternal salvation.

• The Impact of Doctrinal Rigor:

• The Church's teachings do not allow for ambiguity or flexibility. Members are taught that questioning or doubting the Church's truth claims is tantamount to sin or apostasy.

• This rigidity leaves members like the Plaintiff vulnerable to profound emotional and psychological harm when confronted with contradictions between the Church's moral teachings and its historical actions.

170.   Systematic Violations of the Church's Moral Code

• Contradictions in Historical Practices:

• The Book of Mormon, purportedly translated from "reformed Egyptian," contains extensive verbatim passages from the King James Version (KJV) of the Bible, including known errors unique to the 1769 edition of the KJV. These inconsistencies undermine the Church's narrative of the Book of Mormon's divine origins and raise significant doubts about its authenticity.

• Joseph Smith's marriages to girls as young as 14 are in direct conflict with the Church's teachings on chastity and the sanctity of marriage, highlighting a troubling pattern of manipulation and abuse of power.

• Emma Smith, Joseph's first wife, initially showed some level of acceptance of polygamy, consenting to certain sealings in 1843 so that she could be the 21st wife to be sealed to Joseph in the temple. However, her later rejection of the practice underscores the psychological and emotional turmoil caused by systemic manipulation. Creating grave concerns that her situation was no different that the plaintiff's wife with her first husband, or the plaintiff's stepfather in his treatment of the plaintiff's mother. Leaving a legacy of oppressed and abused women and other vulnerable members under the church's purview. Leaving any believer with a firm moral compass in a genuine quandary of how to remain a faithful member when facts so thoroughly betray the foundation of truth that the church proclaims.

• These contradictions betray the very principles of integrity and moral authority upon which the Church's foundation is built.

• Deflection Through Modern Revelation:

> • The Church may argue that modern revelation justifies changes in practice, such as the end of polygamy. However, historical context reveals that external pressures, including U.S. anti-polygamy laws and Utah's bid for statehood, likely drove these decisions, undermining claims of divine guidance.

> • Deflection through modern revelation does not address the harm caused by these contradictions or the emotional toll they take on members who trusted the Church's moral authority.

171.    The Harm of Rigid and Contradictory Narratives

> • Disenfranchisement of Questioning Members:

> • When members like the Plaintiff confront the contradictions between the Church's moral teachings and its historical realities, they are often labeled as apostates and ostracized.

> • This creates a damaging cycle in which the Church imposes a strict moral code, violates that code, and then punishes members who question or deviate from the rigid narrative it propagates.

• The Impact on Families:

> • The Church's framing of nonbelievers as apostates and believers as morally superior fractures families, creating resentment and misunderstanding.

> • Believing family members often adopt a position of moral superiority, while nonbelievers may view their loved ones as brainwashed, leading to irreparable divides.

• These divisions erode family bonds, leaving individuals isolated and unsupported on both sides. The Plaintiff's family experienced these dynamics firsthand, compounding their emotional harm and sense of exclusion.

172.    The Church's Responsibility to Uphold Its Moral Foundations

• Accountability for Violations:

  • The Church cannot claim moral authority while systematically violating its own teachings. To do so undermines the trust and reliance placed in it by members like the Plaintiff.

  • The Church has a responsibility to acknowledge its failures, take accountability for the harm caused, and reform its practices to align with its professed principles.

• Creating Space for Questioning Members:

  • The Church must create space for members to navigate faith crises without fear of ostracism or judgment. This includes recognizing the harm caused by rigid narratives and systemic hypocrisy and providing support for those struggling to reconcile their beliefs.  While this request is understandably difficult, this transition will begin by the institution placing the wellbeing of its members and society above its own survival and public image.  Or at least a more balanced approach is generally adopted.  For it is morally reprehensible to first teach the foundations of morality, and then systematically violate those foundations, and then push those who still value those foundations into disenfranchisement.

  • This can be achieved with a further emphasis on compassion and understanding.  Recognizing the fallibility of the church as an organization, rather

than simply excusing problems as the failures of man. The church as an organization must exercise a portion of humility that it requests from its members in order for inclusion and future sustainability to exist. This does not mean that it must denounce its truth claims, regardless of how true the claims actually are. But this does mean that the church cannot maintain a position of rigid moral superiority. Instead, focus further on inviting others to Christ through care, kindness, and patience rather than through fear, condemnation, or cloaked self-righteousness and superiority. Because regardless of how accurate the church's truth claims are, the universal truths of love, kindness, generosity, and understanding will rise to the top as it should. A space where believers and nonbelievers can coexist peacefully and work together for the greater good.

173. Harm to the Plaintiff

• Betrayal of Trust:

> • The Plaintiff's reliance on the Church's moral teachings from birth created a foundation of trust that was systematically betrayed by the Church's actions and contradictions.

> • This betrayal caused significant emotional and psychological harm, leaving the Plaintiff disenfranchised and unsupported.

• Systemic Neglect:

> • The Church's failure to address its own systemic contradictions and create space for questioning members reflects a broader pattern of neglect that has compounded the Plaintiff's suffering.

## Supporting Case Law for Charitable Claims:

174.    The Plaintiff's claims are grounded in established legal precedents that address implied agreements, fiduciary relationships, transparency obligations, unjust enrichment, and equitable relief within religious organizations. The following cases support the Plaintiff's arguments:

## I. Implied Agreements and Duty of Care

### Watson v. Jones, 80 U.S. 679 (1871)

175.    In *Watson v. Jones*, the U.S. Supreme Court held that courts may adjudicate matters involving secular agreements or obligations between individuals and religious organizations, provided they do not intrude upon doctrinal matters. The Plaintiff's claims focus on the Church's implied promise to use fast offerings to assist members in need—an obligation rooted in secular principles of fairness and reliance. The Church's failure to provide such assistance constitutes a breach of this implied agreement.

### Moses v. Diocese of Colorado, 863 P.2d 310 (Colo. 1993)

176.    In *Moses v. Diocese of Colorado*, the court enforced implied agreements between a religious organization and its members, provided such agreements did not require interpretation of religious doctrine. Similarly, the Church's representations regarding the purpose of fast offerings establish a secular obligation to assist members in need, which the Church failed to fulfill in the Plaintiff's case.

**Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952):**

177.   This case establishes that courts may intervene in disputes involving fiduciary responsibilities of religious organizations when such issues do not involve religious doctrine. The Plaintiff's claims focus on the Church's fiduciary obligations to use fast offerings as intended—supporting members in need—and this is a secular issue that the courts are well-equipped to adjudicate. In this instance, the Church's failure to equitably administer these funds, despite its longstanding representations, constitutes a breach of fiduciary duty.

**Martin v. Vandermast, 668 N.Y.S.2d 731 (N.Y. App. Div. 1998):**

178.   In *Martin*, the court recognized fiduciary duties arising from relationships of trust, even in non-commercial contexts. Similarly, the Church's explicit and implicit representations to its members regarding the administration of fast offerings and tithing create a fiduciary relationship. Plaintiff's reliance on these representations, coupled with significant financial contributions from the Plaintiff and his family, strengthens the claim that the Church breached its fiduciary duty by denying reasonable and modest aid.

**II. Transparency and Accountability**

**Jones v. Wolf, 443 U.S. 595 (1979)**

179.    The Supreme Court's decision in *Jones v. Wolf* affirmed that courts may resolve disputes involving religious organizations using **neutral principles of law** that do not entangle the judiciary in doctrinal matters. The Plaintiff's request for transparent and consistent policies governing fast offerings and aid distribution can be addressed under neutral principles without interfering with religious autonomy.

**General Council on Finance & Administration v. Superior Court, 439 P.3d 1117 (Cal. 2019)**

180.    In this case, the court compelled a religious organization to disclose financial records when they were relevant to resolving secular claims. Similarly, the Plaintiff's request for aggregated data regarding fast offerings and their distribution is essential to demonstrate systemic inconsistencies and is a secular issue subject to judicial review.

**Corporation of Presiding Bishop v. Amos, 483 U.S. 327 (1987)**

181.    The Supreme Court held in *Amos* that religious organizations remain subject to civil laws that do not excessively entangle courts in religious matters. The Plaintiff's request for transparency and equitable aid distribution aligns with secular legal principles and does not infringe on the Church's religious freedoms.

**Doe v. Holy See, 434 F. Supp. 2d 925 (D. Or. 2006):**

182.    This case permits claims against religious organizations for secular misconduct, such as the mismanagement of financial resources. The Plaintiff seeks accountability

and transparency in the administration of fast offerings—issues that are entirely secular in nature and well within the jurisdiction of the courts.

## III. Negligence and Fiduciary Duty

**Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952)**

183.    While emphasizing religious autonomy in doctrinal matters, *Kedroff* allows courts to adjudicate secular disputes involving property or fiduciary responsibilities within religious organizations. The Church's fiduciary duty to administer fast offerings transparently and equitably creates a secular obligation enforceable by the court.

**Martin v. Vandermast, 668 N.Y.S.2d 731 (N.Y. App. Div. 1998)**

184.    This case recognized fiduciary duties arising from relationships of trust and reliance. The Church's longstanding representations about aiding members in need, combined with the Plaintiff's and his family's significant financial contributions, establish a fiduciary relationship that the Church breached by failing to provide consistent aid.

## IV. Unjust Enrichment

**First English Evangelical Lutheran Church v. Los Angeles, 482 U.S. 304 (1987)**

185.    This case established that financial resources entrusted to religious organizations must be used for their stated purposes. The Church's accumulation of fast offerings

and tithing contributions, without fulfilling its promises of aid, constitutes unjust

enrichment at the expense of the Plaintiff and other members.

**Doe v. Holy See, 434 F. Supp. 2d 925 (D. Or. 2006)**

186.    In *Doe v. Holy See*, the court permitted claims for financial redress against a

religious organization for secular misconduct. The Plaintiff's case aligns with this

precedent by demonstrating systemic inequities in how the Church handles financial

contributions and aid distribution.

## V. Equitable Relief

**Employment Division v. Smith, 494 U.S. 872 (1990)**

187.    The Supreme Court held that neutral, generally applicable laws may regulate

religious organizations without violating constitutional protections. The Plaintiff's

request for reforms in the Church's aid distribution policies—such as training for

bishops and transparent criteria—aligns with this principle, ensuring the requested

relief does not infringe on religious autonomy.

**Serbian Orthodox Diocese v. Milivojevich, 426 U.S. 696 (1976)**

188.    In *Milivojevich*, the court recognized that while religious organizations enjoy

certain freedoms, secular obligations are enforceable through civil law. The Plaintiff's

claims for equitable relief are based on neutral principles, seeking transparency and

systemic reform without interfering in religious doctrine.

**Conclusion**

189.    The cited case law demonstrates that the Plaintiff's claims are firmly rooted in secular legal principles and precedents. Courts have consistently recognized their jurisdiction to address issues of implied agreements, fiduciary duties, and financial transparency within religious organizations. By resolving these claims, this Court will not intrude upon religious doctrine but will ensure fairness, accountability, and equity for members who rely on the Church's promises.

**Relevant Case Law Supporting Sexual Abuse Claims**

**Negligent Supervision**

190.   **Doe v. Holy See**, 557 F.3d 1066 (9th Cir. 2009)

• The court allowed claims against the Catholic Church for failing to prevent

abuse by priests, ruling that institutions can be held liable for negligent

supervision when they exercise control over individuals who commit abuse. This

case is relevant because it highlights the Church's responsibility to oversee

individuals acting under its authority.

191.    **L.L.N. v. Clauder**, 563 N.W.2d 434 (Wis. 1997)

• This case established that religious organizations can be held liable for negligent

supervision if they knew or should have known about the potential for harm and

failed to take reasonable action. It demonstrates the duty of care required in

supervising individuals within a religious institution.

192.    **Martinelli v. Bridgeport Roman Catholic Diocesan Corp.**, 989 A.2d 695

(Conn. 2010)

• The court ruled that religious organizations have a duty to protect children from

foreseeable harm caused by individuals acting within their sphere of influence.

This supports your claim that the Church's lack of oversight over its teachings and

representatives allowed abuse to occur.

**Intentional Infliction of Emotional Distress (IIED)**

193.    **Doe v. Cutter Biological, Inc.**, 971 F.2d 375 (9th Cir. 1992)

• This case emphasized that extreme and outrageous conduct causing severe emotional distress could give rise to an IIED claim. The stepfather's actions, rooted in the Church's shame-based teachings, meet this standard.

194. **Nally v. Grace Community Church**, 763 P.2d 948 (Cal. 1988)

• While the court ruled against the plaintiff in this case, it recognized that IIED claims could succeed if tied to harmful actions that arise from institutional teachings or counseling practices. This case highlights the importance of oversight when teachings are likely to cause harm.

## Breach of Fiduciary Duty

195. **Doe v. Evans**, 814 So. 2d 370 (Fla. 2002)

• The court ruled that clergy and religious organizations owe a fiduciary duty to their members, particularly when a trust-based relationship exists. This applies to the Church's duty to act in the best interests of its members and protect them from harm.

196. **Moses v. Diocese of Colorado**, 863 P.2d 310 (Colo. 1993)

• This case held that a church could be liable for breach of fiduciary duty when its leaders used their position of trust to harm members. This supports your argument that the Church's teachings enabled abuse by creating a power dynamic that allowed your stepfather to exploit his authority.

## Invasion of Privacy

197. **Doe v. Liberatore**, 478 F. Supp. 2d 742 (M.D. Pa. 2007)

113

• The court recognized that repeated intrusions into personal privacy, particularly in cases of abuse, could give rise to legal claims. This supports your claims regarding your stepfather's invasive actions under the guise of enforcing chastity.

198. **Restatement (Second) of Torts § 652B:**

• Recognized as persuasive authority, this section defines invasion of privacy as including "intrusion upon the solitude or seclusion of another." Your stepfather's actions, such as walking in on you in the shower, clearly meet this standard.

**General Sexual Abuse Precedent**

199. **Doe v. Boy Scouts of America**, 147 Cal. App. 4th 853 (Cal. Ct. App. 2007)

• The court allowed claims against the Boy Scouts for failing to prevent abuse, emphasizing the duty of care owed to children in their programs. This case parallels your situation by focusing on systemic failures within a trusted institution.

200. **Doe v. Roman Catholic Archbishop of Archdiocese of Detroit**, 264 Mich. App. 632 (Mich. Ct. App. 2004)

• The court recognized that systemic issues within religious organizations could lead to liability for harm caused by individuals acting under their authority.

**Broader Case-Law Context of Financial Transparency and Accountability Issues with The LDS Church**

201.   This case does not stand alone in raising concerns about The Church of Jesus Christ of Latter-day Saints' financial practices and accountability. Several prominent legal cases have addressed related issues, highlighting systemic patterns that support the need for judicial intervention in this matter.

202.   **James Huntsman v. Corporation of the President of The Church of Jesus Christ of Latter-day Saints (2021)**

   • **Facts**: James Huntsman, a prominent businessman and former member of the LDS Church, alleged that the Church misrepresented the intended use of tithing funds. Specifically, he argued that funds solicited for charitable and religious purposes were diverted to for-profit ventures, including the City Creek Mall in Salt Lake City.

   • **Procedural History**: The U.S. District Court for the Central District of California initially dismissed portions of Huntsman's claims, but in 2023, the Ninth Circuit Court of Appeals reinstated critical aspects of the case, allowing the fraud claims to proceed.

   • **Relevance**: Huntsman's case underscores concerns about the Church's use of member contributions and raises broader questions about its fiduciary responsibilities. The parallels between Huntsman's allegations and this case lie in the Church's lack of transparency and its failure to fulfill implied obligations to its members.

203. **Class-Action Lawsuit by Former Members (2019)**

• **Facts**: Three former members of the LDS Church brought a class-action lawsuit alleging intentional misrepresentation of Church teachings and practices to induce tithing contributions. They claimed that the Church's financial practices violated the implied trust and expectations of its members.

• **Procedural History**: While the case faced challenges due to its overlap with doctrinal matters, it highlighted broader concerns about the Church's financial accountability.

• **Relevance**: This case reflects ongoing legal and ethical questions about the Church's financial transparency and its obligations to members, particularly in the context of charitable funds like fast offerings.

204. **Whistleblower Allegations on $100 Billion Fund (2019)**

• **Facts**: David Nielsen, a former senior portfolio manager for Ensign Peak Advisors, filed a whistleblower complaint with the IRS, alleging that the Church had amassed over $100 billion in funds meant for charitable purposes but instead used them for for-profit investments. He further claimed that the Church misled members about the use of their contributions.

• **Outcome**: While this was not a court case, the allegations led to widespread media scrutiny and public debate about the Church's financial practices.

• **Relevance**: The whistleblower claims emphasize systemic issues with transparency and the proper use of funds, supporting the need for accountability mechanisms as requested in this case.

205. **Recent Donor Fraud Lawsuit (2023)**

• **Facts**: In a federal lawsuit, three donors alleged that their contributions were fraudulently solicited for charitable purposes but were instead used for investments and other non-charitable purposes.

• **Procedural History**: This case is ongoing but has drawn significant attention due to its claims of misrepresentation and breach of fiduciary duty.

• **Relevance**: Like the present case, this lawsuit highlights a broader pattern of member dissatisfaction with how the Church manages and distributes funds, raising critical questions about fiduciary obligations.

## Implications for This Case

206.    These cases collectively illustrate a consistent pattern of concerns regarding the LDS Church's financial transparency and accountability:

• **Implied Obligations**: Members contribute to fast offerings and tithing with the expectation that these funds will be used to support those in need or further charitable purposes. The Church's failure to meet these expectations breaches implied agreements with its members.

• **Judicial Oversight**: The procedural outcomes in Huntsman and similar cases demonstrate that courts can and do intervene when claims are based on secular principles, such as fraud, fiduciary duty, or misrepresentation, rather than religious doctrine.

• **Systemic Patterns**: The parallels between these cases and the Plaintiff's claims suggest that the issues raised here are not isolated incidents but part of a broader systemic problem within the Church.

**Conclusion**

207.    The Plaintiff's claims align with growing concerns about the Church's financial practices, as evidenced by these legal cases and whistleblower allegations. This lawsuit seeks not only to address the Plaintiff's individual grievances but also to contribute to systemic reform that ensures transparency, accountability, and fairness in the administration of charitable funds.

**Examination of Public Reports on Aid Distribution Practices**

208.    Recent investigative reports have highlighted concerns regarding the aid

distribution practices of The Church of Jesus Christ of Latter-day Saints (LDS

Church), particularly in Utah. These reports reveal instances where individuals

seeking assistance were subjected to religious pressures or denied aid based on

discretionary decisions by local church leaders.

209.    **Integration of Church and State Welfare Systems**:

• **Findings**: An investigation by ProPublica and The Salt Lake Tribune uncovered

that Utah's welfare system is closely intertwined with the LDS Church. State

officials have, at times, directed individuals to seek assistance from the Church

rather than state programs. In certain cases, local church leaders, known as

bishops, have required individuals to attend church services or consider baptism

as a condition for receiving aid.

• **Implications**: This integration raises concerns about the equitable distribution of

aid, particularly for non-members or those unwilling to participate in religious

activities. The discretionary power vested in individual bishops can lead to

inconsistent aid distribution, potentially leaving vulnerable individuals without

necessary support.

210.    **Pressure to Join the Church for Assistance**:

• **Findings**: Reports indicate that some individuals in Utah have felt compelled to

join the LDS Church to receive welfare assistance. The reliance on the Church's

119

welfare program, coupled with stringent state assistance criteria, has created
situations where people perceive conversion as a prerequisite for aid.

• **Implications**: Such practices blur the line between religious affiliation and
access to essential services, potentially coercing individuals into religious
participation against their personal beliefs. This dynamic undermines the principle
of impartial aid distribution based solely on need.

211.   **State Reliance on Church Welfare Contributions:**

• **Findings**: The state of Utah has formal agreements with the LDS Church,
allowing the state to count a percentage of the Church's welfare provisions toward
its own welfare spending. This arrangement enables the state to save millions in
public assistance funds.

• **Implications**: While this partnership may reduce state expenditures, it raises
questions about the adequacy and fairness of the welfare system, especially when
church-based aid is contingent upon religious participation or subject to
discretionary denial.

**Relevance to Plaintiff's Claims**

212.   These public reports provide context to the Plaintiff's allegations of inconsistent
and arbitrary aid distribution by the LDS Church. The documented experiences of
individuals facing religious pressures or discretionary denial of assistance mirror the
Plaintiff's situation, suggesting a broader pattern of behavior within the Church's
welfare practices.

• **Systemic Issues**: The integration of church and state welfare systems, coupled with discretionary aid distribution, indicates systemic issues that may lead to inequitable treatment of individuals seeking assistance.

• **Support for Equitable Relief**: The Plaintiff's request for systemic reforms, such as standardized aid distribution guidelines and increased transparency, aligns with concerns raised in these reports. Implementing such reforms could address the inconsistencies and potential biases in the current system.

**Conclusion**

213.    The investigative findings underscore the need for judicial scrutiny of the LDS Church's aid distribution practices, especially in a neutral space outside of Utah courts. The Plaintiff's experiences are not isolated but reflect broader concerns about the intersection of religious affiliation and access to essential services. Addressing these issues through equitable relief would promote fairness and transparency, ensuring that aid is distributed based on need rather than discretionary or religious considerations.

**Systemic Bottlenecks in the Distribution of Resources**

214.     The Church's financial structure, including its reported $100 billion reserve and
its status as a tax-exempt nonprofit under IRS Code § 501(c)(3), imposes unique
challenges in distributing resources equitably and effectively. While the Church's
mission includes caring for the poor and needy, the scale of its financial reserves,
combined with the legal and tax restrictions on how nonprofit entities can allocate
their funds, creates a systemic bottleneck that prevents it from meaningfully
addressing the needs of its members.

**The Bottleneck of Tax-Exempt Restrictions**

215.     As a tax-exempt religious organization, the Church must comply with strict rules
governing how it distributes aid. While these rules allow for charitable giving, they
impose limits on how funds can be allocated to individuals or families without
jeopardizing the organization's tax-exempt status. For example:

  • **Direct Cash Payments**: The Church cannot simply provide substantial cash
  distributions, such as $100,000 to struggling families, without raising red flags
  under IRS regulations. Such payments must align with narrowly defined
  charitable purposes and be thoroughly documented to avoid being classified as
  private inurement or personal benefit.

  • **Aid Consistency**: Aid must be distributed in a manner that reflects the
  organization's broader mission and does not disproportionately favor certain

122

individuals or groups. This requirement necessitates a highly bureaucratic and selective process, creating delays and inconsistencies in how aid is distributed.

## The Need for Immediate and Effective Distribution

216.    Given these constraints, the Church's ability to distribute aid is inherently limited by legal requirements and administrative capacity. However, these limitations only underscore the necessity of addressing requests for aid promptly and effectively. Every delay in responding to a request exacerbates the dynamics of wealth accumulation and inequitable distribution, worsening the already disproportionate growth of the Church's financial reserves relative to the aid it provides.

- **Delays Worsen Financial Hardship:** When requests for aid are delayed or denied, members are often forced into even greater financial distress, creating a cycle of need that becomes harder to address over time.

- **Amplifying the Bottleneck:** Each unaddressed or delayed request represents an opportunity lost to distribute resources in compliance with tax-exempt regulations, leaving reserves to grow unchecked while members' needs go unmet.

- **Eroding Trust:** When aid is delayed or inconsistently granted, members lose faith in the Church's ability to support them, further alienating those who are already vulnerable.

217.    For example, as previously described, a close friend of mine lives in a small travel trailer with his wife and child, earning less than $20,000 a year. Despite their

financial struggles, they faithfully pay 10% of their income in tithing, with a firm belief that God will bless them both spiritually and financially for their sacrifices. Similarly, my own brother, during a time of need, was denied assistance from the Church and forced to feed his family with weevil-filled rice. These are not isolated incidents but symptoms of a systemic problem: the Church's wealth continues to grow, yet those most in need of support often face barriers to receiving it.  While those who traditionally need help are blocked from making a meaningful claim because of both stigmas around such action in conjunction with their faith.

**The Impossibility of Equitable Distribution**

218.    The bottleneck created by tax-exempt restrictions and administrative delays ensures that the Church's resources will continue to grow disproportionately to the aid it distributes. This dynamic:

- **Undermines the Church's Mission**: The Church's inability to distribute aid equitably and promptly contradicts its stated mission to care for the poor and needy.
- **Fails to Utilize Resources Effectively**: The vast scale of the Church's reserves makes equitable distribution nearly impossible under current practices, further concentrating wealth rather than addressing systemic need.
- **Creates Systemic Inequities**: Aid distribution depends on local leaders' discretion and administrative delays, leaving many requests unanswered or insufficiently addressed.

**Aid Must Be Distributed When Reasonably Requested**

219.    To mitigate these systemic issues, it is imperative that the Church prioritize the immediate and effective distribution of aid when requested. Delays only exacerbate inequities, worsen members' financial challenges, and amplify the bottleneck created by its wealth accumulation. Prompt responses to aid requests ensure that:

- **Resources Are Used Responsibly**: By addressing needs as they arise, the Church can better comply with tax-exempt requirements and demonstrate that its reserves are being used in furtherance of its charitable mission.
- **Members Are Supported Equitably**: Timely aid eliminates the systemic inequities created by local discretion and bureaucratic delays, ensuring that no member's needs are overlooked.
- **Trust Is Restored**: Prompt aid distribution reinforces the Church's commitment to its members and strengthens their trust in its ability to fulfill its mission.

**Moral and Long-Term Risks**

220.    The moral responsibility to care for the poor and vulnerable is central to the gospel and the Church's mission. However, delays and systemic bottlenecks not only jeopardize the trust and well-being of members but also risk creating reputational harm for the Church. As wealth continues to accumulate disproportionately, it may be perceived as prioritizing institutional growth over the welfare of its members, contradicting its stated purpose and inviting scrutiny from both members and external observers.

**Proposed Reforms to Address the Bottleneck**

221.    To ensure that aid is distributed effectively when requested, the Church must

implement reforms that address both the systemic bottlenecks and the need for

immediate action:

- **Centralized Aid Distribution System**: A streamlined, centralized process for

    receiving and addressing aid requests would eliminate delays and ensure equitable

    treatment of all members.

- **Increased Fast Offering Emphasis**: Fast offerings provide a tax-compliant

    mechanism for addressing immediate needs and should be elevated as the Church's

    primary aid distribution channel.

- **Administrative Accountability**: Improved oversight and transparency in aid

    distribution would ensure that all requests are addressed promptly and resources are

    used effectively.

- **Regular Audits and Public Reporting**: Demonstrating how aid requests are

    received, processed, and fulfilled would ensure accountability and compliance with

    nonprofit regulations.

**Conclusion**

222.    The Church's tax-exempt status and financial reserves create unique challenges in

aid distribution, but they also impose a moral and legal obligation to address member

126

needs promptly and equitably. Delays in aid distribution only worsen the systemic bottleneck, allowing wealth to accumulate disproportionately while members' struggles go unaddressed. By prioritizing immediate and effective aid distribution when requested, the Church can fulfill its mission, comply with its legal obligations, and restore trust among its members.

**Evaluation of Charitable Contributions and Transparency**

223.     The Church of Jesus Christ of Latter-day Saints reports annual humanitarian

expenditures exceeding $1 billion, presenting itself as a global leader in charitable

efforts. However, upon closer examination, a significant portion of this figure—

approximately **$197 million in 2023**—is derived from the valuation of **volunteer**

**hours donated by members**, rather than direct financial contributions. While

member participation in humanitarian projects is commendable, the inclusion of these

volunteer hours inflates the Church's reported contributions and obscures the true

scope of its direct financial commitment to humanitarian aid.

**Inflated Reporting of Charitable Contributions**

224.     The Church reportedly values volunteer hours at approximately **$31.80 per hour**,

aligning with national averages. In 2023, members donated **6.2 million hours**,

equating to nearly **14.5% of the Church's reported $1.36 billion in humanitarian**

**spending**. This practice creates a **perception of greater generosity** than the Church's

financial records substantiate. It raises critical ethical concerns about whether the

Church is meeting its fiduciary responsibilities to its members and fulfilling its stated

mission of caring for the poor and needy.

**Disproportionate Surplus and Untapped Potential**

225.    With estimated annual revenues ranging between **$14 billion and $18.5 billion**, and operational costs estimated at approximately **$5 billion**, the Church generates a **surplus of $7–12 billion annually**. This surplus far exceeds the $1.36 billion currently allocated to humanitarian efforts, demonstrating a **systemic imbalance** between the Church's immense financial capacity and its charitable impact.

226.    Even when compared to its **$100 billion reserve fund**, the Church's annual charitable contributions represent only **1.36% of its total reserves**. If the Church were to allocate a modest **5% of its reserves annually**—a standard return on investment for institutional funds—it could contribute **$5 billion per year** to humanitarian aid without reducing its reserves or operational capacity.

**Addressing Common Counterarguments**

227.    The Church may argue that its financial practices are designed to "build an empire for Jesus" in preparation for the Second Coming or to serve as a bulwark against societal collapse. However, these justifications fail under logical and doctrinal scrutiny:

**The Fallacy of Hoarding Wealth for the Second Coming**:

228.    In the event of societal collapse or the Second Coming, monetary reserves such as those held in U.S. dollars would likely lose their value entirely. Preparing for such an

event would be better achieved through **real-time humanitarian efforts** that strengthen communities, alleviate poverty, and promote resilience. Christ's teachings emphasize helping the poor and needy now, as seen in Matthew 25:35-40: "For I was hungry, and you gave me food; I was thirsty, and you gave me drink; I was a stranger, and you welcomed me."

229.     Stockpiling wealth, while prudent to a point, is of little value when the mission of caring for others in the present is neglected.

**Offsetting Congressional Overspending**:

230.     While it is true that the Church's financial responsibility contrasts with government debt practices, this argument only goes so far. The pressing **current needs of members and communities**—including hunger, homelessness, and lack of access to basic necessities—demand immediate action.

231.     Focusing on "big-picture investments" like stockpiles and strategic ventures ignores the real suffering of the most vulnerable members of society today.

**Systemic Inequities and Strategic Investments**

232.     The Church's investments in big business, while profitable, contribute little to alleviating inequality among its members. By prioritizing wealth accumulation and the expansion of its financial portfolio, the Church misses opportunities to directly address the systemic issues facing the lower and middle classes, including:

- **Income Inequality**: Members paying tithing at great personal sacrifice while the Church grows its reserves exacerbates the gap between those who have and those who need.

- **Lack of Immediate Relief**: Aid provided through fast offerings and local Church programs often falls short of addressing the urgent needs of members living paycheck to paycheck.

**Alienation and the Need for Reform**

233.    While I deeply believe in the mission of Jesus Christ to care for the poor and needy and to stand up for those who cannot stand for themselves, I cannot ignore the glaring imbalance between the Church's stated mission and its current practices. This disconnect has deeply alienated me. On the surface, the Church appears to fulfill its mission, but closer examination reveals systemic failures to use its immense resources for the benefit of those most in need.  While there may be legitimate reasons for the disconnect that I am unaware of, the lack of transparency and accountability on the part of the church has disillusioned people like me who are genuinely concerned with the wellbeing of our fellow man and want to ensure that the church is doing its part to alleviate suffering in real time.

234.    This dynamic echoes my experience with Bedford County, where almost every action taken against me has only had the **veneer of legitimacy** while masking deeper systemic injustices. Similarly, while the Church's actions are not as overtly

131

diminished as those of Bedford County, they reflect a **superficial alignment** with its mission that falls short of addressing the real and urgent needs of its members.

235.    Both this lawsuit against the Church and my case against Bedford County are driven by Christ's mission to protect the most vulnerable among us. My goal in pursuing these cases is to bring to light the systemic inequities and injustices that prevent institutions from fulfilling their sacred and ethical duties. The Church, with its immense resources, is uniquely positioned to uplift the poor, strengthen communities, and set an example of compassion and stewardship. To do so, however, it must embrace a clear realignment of its priorities.

**Call for Reform**

236.    The Church's immense financial capacity necessitates greater transparency and accountability in how it administers aid. Specifically, the Church must:

   • **Cease the inclusion of volunteer labor** in its reported charitable contributions, ensuring that its financial generosity is accurately represented.

   • **Increase direct humanitarian spending** to reflect its surplus and reserves, potentially tripling or quadrupling its current contributions to address global poverty, hunger, and crises.

   • **Prioritize aid to individuals over institutional growth**, emphasizing relief for members and communities who need it most.

   • **Shift focus from corporate investments to real-time community strengthening**, aligning its financial practices with its spiritual mission.

> • **Embrace further transparency** by providing detailed financial reports on its income, expenses, and reserves, fostering trust among its members and the broader public.

237.   These reforms are essential to align the Church's financial practices with its stated mission, restore trust among its members, and reaffirm its commitment to Christ's mission to care for the poor and build a better, more equitable world.

**Judicial Oversight of Financial Practices and Doctrinal Enforcement**

**Legal Focus: Secular Accountability and Compliance**

238.     While this case raises questions about the Church's doctrinal enforcement of mandatory tithing as a prerequisite for temple and heaven access, it also addresses broader systemic issues that fall squarely within the scope of judicial oversight. The Church's financial practices, particularly its accumulation of substantial reserves and its limitations in aid distribution, intersect with secular legal obligations under tax-exempt nonprofit laws. These obligations demand:

   1. **Transparency in Financial Practices**: Nonprofits must demonstrate that their resources are used primarily for their stated charitable and religious purposes.

   2. **Equitable Distribution of Aid**: The Church must ensure that its accumulated wealth is meaningfully and fairly applied to meet the needs of its members.

239.     While courts traditionally refrain from adjudicating doctrinal matters, they have a well-established role in addressing secular issues within religious organizations. For example:

   • **Watson v. Jones (1871):** Courts may resolve disputes involving property or financial matters using neutral principles of law, provided they avoid theological entanglement.

   • **James Huntsman v. Corporation of the President (2021):** A claim of financial misrepresentation by the Church was allowed to proceed, demonstrating

that financial practices can be scrutinized without infringing upon religious doctrine.

240.    These precedents make clear that the court has the authority to examine how the Church's financial practices align with its obligations as a tax-exempt organization, including its responsibility to distribute aid fairly and promptly.

**The Church's Accountability as a Steward**

241.    As a nonprofit religious organization, the Church is entrusted with vast financial resources that position it as a steward of extraordinary wealth. This stewardship entails both a moral and legal responsibility to ensure that its resources are used equitably and in alignment with its stated mission of caring for the poor and needy. Any failure to do so not only undermines public trust but also raises questions about compliance with the principles that justify its tax-exempt status.

242.    Members contribute tithing and offerings in good faith, believing their sacrifices will be used to further the Church's spiritual mission and to assist those in need. Yet the Church's reported financial reserves of over $100 billion far exceed what is necessary to sustain its operations, even accounting for its global reach. This disconnect raises concerns about whether the Church's financial practices align with its professed values and legal obligations.

**The Need for Immediate and Effective Aid Distribution**

243.    The Church's current financial practices create systemic bottlenecks that disproportionately burden its most vulnerable members:

1. **The Poor Are Unduly Burdened:** Members living in poverty are required to pay tithing before addressing their own basic needs, reinforcing cycles of financial hardship.

2. **Delays Worsen Financial Hardship:** When requests for aid are delayed or denied, members often face deeper financial distress, creating a cycle of need that becomes harder to address over time.

3. **Amplifying Inequities:** Despite its vast wealth, the Church's aid distribution mechanisms remain constrained by tax-exempt regulations, leaving many requests unanswered while wealth accumulates at unprecedented levels.

244.    For example, my own experiences illustrate these inequities. A close friend of mine, living in a small trailer with his wife and child on less than $20,000 per year, faithfully pays 10% of his income in tithing, yet avoids seeking aid, knowing the process is often slow and insufficient. Similarly, my brother was denied aid in a time of desperate need and forced to feed his family with weevil-filled rice. These experiences reflect a systemic failure: despite its vast resources, the Church often leaves its most faithful members unsupported.

**Reputational and Long-Term Risks**

245.    Without meaningful reform, the Church risks eroding trust among its members

and fostering public scrutiny of its practices. As inequities in aid distribution become

more apparent, the Church could face:

1. **Reputational Harm:** A growing perception that it prioritizes institutional

wealth over member welfare could alienate members and damage public trust.

2. **Legal Challenges:** Accumulated wealth that is not used to further charitable

purposes may invite further regulatory or legal scrutiny.

3. **Moral and Ethical Failures:** As a religious institution, the Church bears a

heightened obligation to care for the poor and needy. Failing to fulfill this mission

risks undermining its moral authority and spiritual credibility.

**Preemptively Addressing Potential Counterarguments**

246.    While the Church engages in charitable activities, these efforts must be

proportionate to the extraordinary financial resources it has accumulated. This case

does not challenge the Church's autonomy over its spiritual teachings but instead

seeks to ensure that its financial practices align with its stated mission and legal

obligations as a nonprofit. Courts have consistently ruled that secular financial

practices, such as aid distribution and tax-exempt compliance, fall within their

jurisdiction and can be addressed without infringing on religious freedom.

**Personal Claim and Broader Implications**

247.    While this case highlights systemic concerns, it is rooted in the personal harm

caused by the Church's practices. My own experiences reflect the broader inequities

faced by members who are burdened by rigid tithing requirements while struggling to

meet their basic needs. Addressing these issues is essential to ensuring that no

member is left behind.

248.    Even if the Court determines that certain aspects of this case—such as the

doctrinal enforcement of tithing—fall outside its jurisdiction, the plaintiff's personal

claims remain actionable. This case also serves as a broader call to action,

encouraging both internal reform within the Church and public discourse on the

intersection of religious practices and financial accountability.

**Conclusion**

249.    The Church's financial practices, including its enforcement of mandatory tithing

and its systemic bottlenecks in aid distribution, create a secular issue that falls

squarely within this Court's jurisdiction. By addressing these practices through

neutral principles of law, the Court can ensure that the Church fulfills its fiduciary

and legal obligations while upholding its mission to care for the poor and needy.

## LEGAL CLAIMS

### Count I: Breach of Implied Contract

250.    Plaintiff and his family have made substantial financial contributions to the Church, including tithing and fast offerings, based on the Church's explicit and implicit representations that such funds would be used to support members in need.

251.    By consistently teaching that fast offerings are intended to assist members facing financial hardship, the Church has established an implied agreement with its members, including Plaintiff.

252.    Plaintiff's reliance on the Church's implied promises is further evidenced by his adherence to its teachings, including serving a full-time mission, marrying in the temple, and raising a family within its principles. This reliance was compounded by the Church's assurances, directly or indirectly, of care and support for members who remain loyal and faithful to its doctrines. The Church's subsequent failure to provide minimal aid, such as food assistance, despite explicit offers, constitutes a breach of this implied contract, resulting in tangible financial and emotional harm.

253.    Plaintiff relied on these representations when seeking short-term food assistance during a period of financial strain caused by external retaliation and systemic challenges.

254.    The Church's failure to provide the promised assistance constitutes a breach of this implied agreement.

255.    Plaintiff seeks damages and equitable relief to address this breach and ensure systemic consistency in the administration of aid.

256.     The plaintiff further asserts that the church has breached its implied contract with members by failing to uphold the principles it espouses in relation to tithing and charitable giving. Members are taught, through explicit teachings and cultural practices, that their tithing contributions will be used primarily to build the kingdom of God by caring for the poor and needy, supporting spiritual endeavors, and furthering the church's mission. However, the church's diversion of substantial tithing funds into for-profit ventures and wealth reserves, without proportional charitable giving, constitutes a breach of trust and aligns closely with concerns raised in Huntsman v. Corporation of the President of the Church of Jesus Christ of Latter-day Saints.

The Huntsman Case and 2023 Class Action: Establishing Context

257.     In the ongoing Huntsman case, along with the ongoing 2023 Class Action alleges that the church misrepresented the use of tithing funds by directing them into investments and commercial ventures rather than the charitable purposes members were led to believe they were supporting. While the church has responded by asserting First Amendment protections, the case remains active and has raised significant ethical and legal questions relevant to this complaint:

1. Transparency Concerns: Huntsman's allegations highlight the lack of transparency in how tithing funds are allocated, mirroring the plaintiff's concerns in this case.

2. Misrepresentation of Use: The core of Huntsman's argument is that members were led to believe their contributions were used for specific spiritual and charitable purposes when, in fact, they were largely diverted to investment accounts.

3. Focus on Wealth Accumulation: The case has revealed that the church has amassed substantial financial reserves while maintaining tax-exempt status, creating ethical concerns about the proportionality of charitable spending relative to wealth accumulation.

258.     The plaintiff's claims build on the foundation laid by Huntsman, emphasizing not just the misrepresentation of funds but the moral and legal ramifications of these financial practices, especially as they exacerbate economic inequality and undermine the church's stated mission to care for the poor.

Breach of Implied Contract and Fiduciary Duty

259.     An implied contract exists between the church and its members, predicated on the following principles:

1. Representation of Intent: Members are consistently taught that tithing is sacred and intended to fund the work of the Lord, including caring for the poor and advancing the gospel. This representation creates a reasonable expectation of ethical stewardship.

2. Moral Obligation: The church espouses doctrines of humility, service, and charity, creating a moral obligation to use tithing funds in alignment with these values.

3. Fiduciary Responsibility: As a tax-exempt religious organization entrusted with billions of dollars in contributions, the church has a fiduciary duty to manage these resources transparently and ethically.

260.    By prioritizing wealth hoarding and business ventures over proportional charitable giving, the church has violated these principles and failed to fulfill its fiduciary obligations.

Wealth Hoarding and Large-Scale Business Ventures

261.    The plaintiff does not argue that financial prudence or investment is inherently wrong. However, the church's disproportionate focus on wealth accumulation raises significant concerns:

1. Economic Inequality: Large-scale business ventures inherently funnel wealth to the top 1%, exacerbating the economic divide. This practice is inconsistent with the church's teachings on caring for the poor and equalizing burdens.

2. Neglect of Charitable Giving: The church's failure to allocate a proportional amount of its resources to charitable programs contradicts its stated mission and undermines the trust of its members.

3. Perceived Dishonesty: Members are not informed that their contributions are largely directed toward building financial reserves and for-profit ventures rather than directly funding charitable efforts. This lack of transparency is morally and legally problematic.

Moral and Legal Dishonesty

262.    Building on the foundation of Huntsman's allegations, the plaintiff contends that the church's actions amount to moral and legal dishonesty:

1. Implied Contract Breach: Members reasonably expect their contributions to reflect the church's stated principles of charity, stewardship, and service. Diverting funds to wealth hoarding undermines this trust.

2. Exploitation of Faith: Members are compelled to pay tithing under spiritual and social pressures, believing they are supporting God's work. When these funds are misused, it constitutes a betrayal of this trust.

3. Contradiction of Purpose: The church cannot simultaneously claim to prioritize caring for the poor while disproportionately focusing on financial accumulation at the expense of direct aid.

The Call for Reform

263.    The plaintiff seeks to compel the church to realign its financial practices with its stated principles. Specifically:

1. Transparency: The church must provide clear and detailed accounts of how tithing funds are used versus fast offerings, distinguishing between charitable,

operational, and investment purposes. (Please review the motion and memorandum #14 that details how transparency should be balanced with accountability.)

2. Proportional Charitable Giving: The church should commit to allocating a meaningful and proportional percentage of its resources to programs that directly alleviate poverty and suffering, as benefits its mission.

3. Reaffirmation of Values: The church should publicly reaffirm its commitment to using tithing funds for their intended purposes, emphasizing transparency and stewardship.

Conclusion

264.    The church's financial practices, as revealed in the ongoing Huntsman case and highlighted in this complaint, betray the trust of its members and contradict its stated mission. By failing to align its actions with its teachings, the church has not only breached its implied contract with members but also exposed itself to significant legal and ethical scrutiny. The plaintiff calls on the church to correct this imbalance, honor its fiduciary responsibilities, and realign its financial practices with its core principles of charity, service, and humility.

**Count II: Negligence**

265.    The Church has a duty of care to its members to administer fast offerings and other aid resources fairly, equitably, and in alignment with its own teachings and representations.

266.    The Church breached this duty by failing to establish or enforce adequate policies, training, and oversight mechanisms to ensure consistent aid distribution.

267.    This breach resulted in harm to Plaintiff, who was denied reasonable and promised assistance during a time of need.

268.    Plaintiff seeks damages and equitable relief to address this negligence and prevent future harm to others.

**Count III: Intentional or Negligent Infliction of Emotional Distress**

269.  Plaintiff has suffered severe emotional distress as a result of the Church's failure to provide aid, particularly given the modest and reasonable nature of the request and the long history of substantial contributions by Plaintiff and his family.

270.  The Church's actions, including ignoring Plaintiff's repeated inquiries and breaking promises of assistance, were reckless and showed a disregard for the emotional impact on Plaintiff and his family.

271.  Alternatively, the Church negligently inflicted emotional distress by allowing systemic flaws in its aid distribution process to harm members in vulnerable situations.

272.  Plaintiff seeks damages to address the emotional harm caused by the Church's actions or inactions.

273.  Furthermore, plaintiff has suffered Systemic Cultural Discrimination and Broken Promises Resulting in Severe Emotional and Psychological Harm

Historical Context: Exclusive Environment 17 Years Ago

274.  Seventeen years ago, the Church fostered a cultural environment that was highly exclusive, particularly for LGBTQ+ individuals. This period was marked by systemic teachings and cultural norms that equated non-heteronormative identities with spiritual unworthiness and moral inferiority, regardless of an individual's adherence to doctrinal standards.

146

275.    While the Church has since taken steps toward greater inclusion, its cultural

environment at that time caused significant harm to members like the Plaintiff, whose

faith and strict adherence to Church teachings were met with rejection and

discrimination.

Explicit and Implied Promises of Blessings

276.    The Plaintiff was taught that strict adherence to the Church's teachings, including

the law of chastity, would result in both temporal and spiritual blessings. These

teachings included explicit and implied promises, reinforced by Church doctrine,

cultural rhetoric, and teachings from leaders, that:

o   Faithful service and adherence to Church standards would protect the Plaintiff's

family and ensure their well-being.

o   Righteous living would prepare the Plaintiff for a loving, more beautiful and

righteous spouse, as frequently described in Church teachings on eternal marriage.

o   Full participation in the Church and alignment with its teachings would bring

spiritual and temporal rewards, including community acceptance, love, and

fulfillment.

277.    The Plaintiff took these promises to heart, committing to the Church's teachings

and strictly adhering to its law of chastity. His willingness to enter into a relationship

with a girlfriend who upheld extremely high standards of purity, including refraining

from kissing on the lips until marriage, demonstrated his full alignment with Church doctrine.

278.    Despite this strict adherence, the Plaintiff was rejected solely because of his bisexual identity.  As the plaintiff and his girlfriend were deeply in love at the time. Part of the reason that she openly told everyone concerning the plaintiff's challenges is because nobody could understand why we were breaking up and not proceeding forward to marriage as we were outwardly an ideal couple in many ways. This rejection shattered the explicit and implied promises that had guided the Plaintiff's faith, leaving him with a profound sense of betrayal and unworthiness.  Leaving him to wonder if God had abandoned him and in spite of the sacrifices he made on his mission, between the death of his mother, division in his family, and now rejection of his girlfriend, he felt completely isolated and loss.

Rejection Rooted in Systemic Cultural Bias

279.    The Plaintiff's girlfriend ended the relationship explicitly due to his bisexual identity, a decision that reflected the systemic bias perpetuated by the Church's teachings and cultural environment. At the time, Church leaders and materials consistently framed non-heterosexual identities as spiritually defective and incompatible with righteousness, even when individuals adhered to the Church's behavioral standards.

280.    This systemic bias stigmatized LGBTQ+ individuals and normalized rejection based solely on identity, regardless of worthiness or adherence to doctrine. The girlfriend's decision was not an independent act but a direct reflection of the discriminatory cultural environment fostered by the Church.

Breach of Promises and Emotional Harm

281.    The rejection exposed the hollowness of the Church's explicit and implied promises. Despite faithfully following the Church's teachings, the Plaintiff was denied the blessings of family protection, community acceptance, and a promised spouse. This breach of promises caused significant emotional and psychological harm, including:

   o    A profound sense of betrayal, as the Church failed to fulfill the promises that had shaped the Plaintiff's faith and actions.

   o    Deep feelings of shame and unworthiness, exacerbated by the Church's cultural teachings that framed his bisexuality as spiritually defective.

   o     Suicidal ideation, as the rejection and systemic harm compounded the Plaintiff's internalized shame and left him questioning his value and place in both the Church and the world.

Connection to Broader Systemic Issues in the Case

282.    The Plaintiff's rejection is not an isolated incident but part of a broader pattern of systemic harm caused by the Church's cultural practices. These practices disproportionately stigmatized LGBTQ+ individuals and created environments where rejection, shame, and emotional devastation were normalized, even for those who fully adhered to the Church's doctrinal standards.

283.    The Church's systemic culture of exclusivity and stigmatization perpetuated harm by fostering unattainable expectations and punishing individuals for aspects of their identity beyond their control. This rejection exemplifies how the Church's promises and cultural norms created lasting harm to its most vulnerable members.

## Acknowledgment of Progress

284.    While the Church has made strides toward greater inclusion in recent years, these changes do not erase the harm caused by its teachings and cultural practices 17 years ago. The Plaintiff's experience illustrates the profound impact of the Church's exclusive environment during that time and its failure to provide the blessings and protection it promised.

## Statute of Limitations and Systemic Context

285.    Although the incident occurred 17 years ago, it is inseparable from the broader systemic issues raised in this case. The harm caused by the Church's broken promises and discriminatory practices has been ongoing and compounding, as the Plaintiff

continues to grapple with the emotional and psychological consequences of this rejection.

286.    This claim fits within the larger framework of institutional responsibility and systemic harm argued throughout this complaint, making it integral to the case.


Relief Sought

287.    The Plaintiff seeks acknowledgment of the systemic harm caused by the Church's broken promises and cultural practices, which perpetuated discriminatory attitudes and caused severe emotional and psychological harm.

288.    The Plaintiff does not seek damages for the relationship failure itself but for the broader harm caused by the Church's explicit and implied promises. These promises fostered unattainable expectations and left the Plaintiff with lasting emotional scars, including suicidal ideation, as a result of systemic bias and rejection.

**Count IV: Breach of Fiduciary Duty**

289.    The Church has a fiduciary relationship with its members, who entrust substantial financial contributions with the understanding that these funds will be used to support the Church's charitable mission and aid members in need.

290.    The Church's representations regarding the purpose of tithing and fast offerings created a fiduciary relationship between the Church and its members. By entrusting substantial financial contributions to the Church, Plaintiff and his family relied on its promises to use these funds to support members in need. The Church's failure to honor these obligations constitutes a breach of this fiduciary duty, undermining the trust that forms the foundation of its relationship with its members.

291.    The Church's longstanding teachings and its administration of fast offerings create a fiduciary relationship with members, who entrust financial contributions in reliance on the Church's promise to aid those in need. By failing to fulfill this obligation during Plaintiff's time of financial and emotional hardship, the Church breached its fiduciary duty.

292.    This relationship creates an obligation for the Church to act in good faith and prioritize the well-being of its members in administering aid.

293.    The Church breached its fiduciary duty by failing to provide aid to Plaintiff during a time of need, despite the availability of resources and prior assurances.

294.    Plaintiff seeks equitable relief to ensure that the Church fulfills its fiduciary obligations in a transparent and accountable manner.

**Count V: Unjust Enrichment**

295.   Plaintiff and his family have contributed significant financial resources to the Church through tithing and fast offerings and other service, creating an expectation of reasonable assistance when needed.

296.   The Church's accumulation of fast offerings and tithing contributions, while failing to provide even modest assistance to members in need, constitutes unjust enrichment. This practice creates systemic inequities by allowing the Church to retain financial resources intended for charitable purposes while failing to fulfill its obligations to those who rely on its promises of care and support.

297.   By failing to provide aid while retaining these contributions, the Church has been unjustly enriched at Plaintiff's expense.

298.   This disparity between contributions and assistance creates a systemic inequity that harms not only Plaintiff but other members facing similar circumstances.

299.   Plaintiff seeks restitution for unjust enrichment and equitable relief to prevent future disparities.

**Count VI: Unconscionability in Tithing and Fast Offering Practices**

300.     The Church of Jesus Christ of Latter-day Saints mandates 10% of gross income as tithing for access to sacred religious ordinances, temple privileges, and spiritual progression. This rigid doctrinal requirement disproportionately burdens lower-income members while the Church holds over $100 billion in reserves and generates billions in annual surplus revenue. Historically, tithing was interpreted as a voluntary contribution of **surplus income**, a flexible approach aligned with individual financial circumstances. The modern requirement of 10% of gross income, enforced through spiritual penalties and lack of transparency, is unconscionable in both design and application.

301.     Additionally, the underutilization of fast offerings—a fund specifically intended to care for the poor—further exacerbates systemic inequities and undermines the Church's professed mission to aid the vulnerable.

**Historical Context: From Surplus to Gross Income**

302.     **Original Doctrine**:

• Doctrine and Covenants Section 119, a foundational text of the Church, established tithing as a contribution of "surplus income," allowing members to prioritize basic needs before fulfilling financial obligations to the Church.

• This surplus-based model reflected equitable religious principles, recognizing the varying financial capacities of individual members.

154

303.    **Modern Interpretation**:

• Over time, the Church reinterpreted tithing as 10% of gross income, regardless of financial hardship. This shift imposes disproportionate burdens on lower-income members and deviates from the original, more equitable intent of the doctrine.

304.    **Coercion Through Spiritual Penalties**:

• Members who fail to pay tithing are denied access to temple ordinances and spiritual privileges considered essential to eternal salvation. For devout members, these are not optional benefits but spiritual necessities, effectively coercing compliance.

**Disparity Between Church Wealth and Member Contributions**

305.    **Immense Financial Capacity**:

• The Church maintains reserves exceeding **$100 billion**, alongside annual surpluses of **$7–12 billion**, far surpassing its operational needs.

• Despite this financial strength, members are required to pay 10% of gross income, creating significant hardships for those in lower economic strata.

306.    **Neglect of Fast Offerings**:

• Fast offerings, a fund specifically intended to address the needs of the poor and needy, lack transparency and administrative prioritization.

• While members faithfully contribute to fast offerings, delays, denials, and inconsistent distribution leave many without the aid they need, perpetuating systemic inequities.

307.   **Minimal Humanitarian Spending**:

• The Church allocates approximately **$1.36 billion annually** to humanitarian efforts—just **1.36% of its total reserves**—demonstrating a failure to align its financial practices with its professed mission to care for the poor.

**Legal Arguments: Procedural and Substantive Unconscionability**

308.    **Procedural Unconscionability**:

• **Imbalance of Power**: The Church wields immense institutional and spiritual authority, leaving members no meaningful choice but to comply with its tithing requirements.

• **Lack of Transparency**: Members are not provided with clear financial disclosures regarding the allocation of tithing and fast offerings, hindering informed decision-making.

309.    **Substantive Unconscionability**:

• **Excessive Burden on Vulnerable Members**: The requirement to pay 10% of gross income, regardless of financial hardship, is inequitable and disproportionate, particularly when contrasted with the Church's financial reserves.

• **Exploitation of Spiritual Dependence**: Tying tithing to spiritual privileges and salvation creates undue pressure on members to comply, even at great personal sacrifice.  Sacrifice which is wholly unnecessary for the wellbeing of the church.

• **Inequitable Aid Distribution**: The Church's failure to prioritize fast offerings as a mechanism for aiding members in need further compounds systemic disparities.

310.   The Church's tithing practices are unconscionable in their design and application. They exploit spiritual dependence, impose disproportionate financial burdens, and neglect the equitable distribution of aid through fast offerings. Reforming these practices is essential to align the Church's actions with its stated mission, restore trust among its members, and fulfill its obligations as a tax-exempt nonprofit organization.

**Count VII: Breach of Duty of Good Faith and Fair Dealing**

311.    The Church of Jesus Christ of Latter-day Saints, as a tax-exempt nonprofit entity, has an implied duty to exercise good faith and fair dealing in its relationships with members, particularly regarding the administration and use of financial contributions such as tithing and fast offerings. This duty arises from the trust-based relationship between the Church and its members, wherein members contribute financially in reliance on the Church's representations that these funds will be used to fulfill its stated mission to care for the poor and support the community. By failing to administer these funds equitably, transparently, and consistently, the Church has breached this duty, causing harm to the Plaintiff and other members.

**Legal Basis**

312.    **Implied Duty of Good Faith**:

• The duty of good faith and fair dealing is inherent in any relationship where trust, reliance, and implied agreements exist. While not a formal contract, the Church's relationship with its members is fiduciary-like, obligating it to act in good faith regarding members' financial contributions.

313.    **Application in Nonprofit and Religious Organizations**:

• Nonprofits, particularly those with tax-exempt status, are held to higher standards of accountability and fairness in their financial dealings, particularly when soliciting funds for specific purposes such as humanitarian aid.

**Breach of Duty**

314.   **Lack of Transparency**:

• Members are not provided with adequate disclosures on how tithing and fast offerings are allocated or used, creating an environment of financial opacity that undermines trust and accountability.

• The Church has failed to justify why such a significant portion of its reserves is withheld from charitable purposes, despite members' contributions being given in reliance on the promise of aid.

315.   **Inequitable Administration of Fast Offerings**:

• Fast offerings, intended to aid the poor and needy, are distributed inconsistently and arbitrarily, with delays and denials leaving many members without necessary assistance.

• This inequity violates the implied promise that fast offerings will be used effectively to meet members' needs.

316.   **Disproportionate Burden on Low-Income Members**:

• The requirement to pay 10% of gross income as tithing, coupled with inconsistent aid distribution, disproportionately harms lower-income members. These members contribute sacrificially while receiving little to no equitable support from fast offerings or humanitarian aid.

317. **Failure to Fulfill Stated Mission**:

• The Church's financial practices prioritize institutional wealth accumulation over fulfilling its stated mission to care for the poor and support members in need. This prioritization breaches the implicit understanding that contributions will be used for charitable and community purposes.

**Harm to the Plaintiff**

318. **Unfair Treatment**:

• The Plaintiff, despite contributing financially in good faith, experienced significant hardship when requests for aid were denied or delayed without adequate explanation. This treatment exemplifies the systemic inequities in the Church's administration of financial resources.

319. **Breach of Trust**:

• The Plaintiff contributed to tithing and fast offerings in reliance on the Church's promises of aid and support. The Church's failure to fulfill these promises constitutes a breach of the trust placed in it by the Plaintiff and other members.

**Relief Requested**

The Plaintiff seeks the following relief to address the breach of good faith and fair dealing:

320.    **Increased Transparency**:

• A requirement that the Church provide detailed financial reports on the collection, allocation, and use of fast offerings specifically.

• Specific disclosures on how fast offerings are administered and distributed, including guidelines for aid eligibility and decision-making.

321.    **Reform in Aid Distribution**:

• Implementation of standardized, equitable procedures for distributing fast offerings to ensure timely and consistent aid to members in need.

322.    **Realignment of Financial Priorities**:

• A reallocation of reserves to prioritize fast offerings and humanitarian aid, ensuring that member contributions are used in alignment with the Church's stated mission.

323.    **Restitution for Harm**:

• Restitution to the Plaintiff for the harm caused by the Church's failure to administer funds equitably and in good faith.

161

**Conclusion**

324.    The Church's breach of its duty of good faith and fair dealing has caused systemic

inequities and harm, undermining the trust of its members and its stated mission to

care for the poor and needy. By prioritizing institutional wealth accumulation over

equitable aid distribution, the Church has failed to honor its implicit obligations to its

members. Reform is necessary to restore fairness, accountability, and alignment with

its professed purpose.

**Count VII: Constructive Fraud For Tithing and Fast Offerings**

325.    The Church of Jesus Christ of Latter-day Saints (the "Church") has perpetuated financial practices that amount to constructive fraud. Constructive fraud arises when a party, owing fiduciary-like duties to another, fails to act in good faith or misrepresents material facts, resulting in harm to the reliant party. Through its systematic representations about tithing, fast offerings, and the use of its vast financial reserves, the Church has created a fiduciary-like trust relationship with its members. This relationship has been exploited to prioritize institutional wealth accumulation over fulfilling its stated mission to care for the poor and needy.

**Legal Basis**

326.    **Elements of Constructive Fraud**:

  • The existence of a fiduciary or fiduciary-like relationship.

  • A failure to disclose material facts or the making of misleading statements.

  • Reliance on these representations by the aggrieved party.

  • Harm or loss resulting from the reliance.

327.    **Application to Religious Organizations**:

  • Courts have upheld that while doctrinal matters are protected, secular financial misconduct, fiduciary breaches, and fraud claims are justiciable under neutral principles of law (see *Kedroff v. St. Nicholas Cathedral* and *Doe v. Holy See*).

**Fiduciary-Like Relationship**

328.    **Solicitation of Tithes and Offerings**:

• The Church explicitly instructs members to pay 10% of their gross income as tithing, presenting this as a divine commandment necessary for spiritual blessings and temple access. Additionally, members are encouraged to contribute fast offerings to help the needy.

• This creates a reliance relationship, wherein members trust the Church to use their contributions in alignment with its professed mission of charity.

329.    **Representations About Use of Funds**:

• The Church has stated that tithing funds are used to build the Kingdom of God, while fast offerings directly serve the poor and needy. These representations establish a reasonable expectation of equitable and humanitarian financial practices.

**Material Misrepresentations and Omissions**

330.    **Lack of Transparency**:

• Members are not provided with clear disclosures about how tithing and fast offerings are allocated. Investigations reveal that much of the Church's revenue is diverted to for-profit ventures rather than charitable purposes. The church's reported $100 billion reserves highlight its capacity to assist members but also its failure to meet reasonable expectations of financial stewardship.

331.   **Overstated Charitable Contributions**:

• The Church includes member volunteer hours and in-kind services in its charity reports, inflating its actual financial aid. These reports mislead members into believing their contributions have a larger impact than is substantiated by data.

**Reliance and Harm**

332.   **Plaintiff's Reliance**:

• Plaintiff contributed significant tithing and fast offerings over a lifetime in conjunction with other family, in reliance on the Church's promises of support during times of need. When the Plaintiff sought aid, it was inconsistently provided or denied, leaving the Plaintiff in a state of financial and emotional distress.

333.   **Broader Harm to Members**:

• Members, particularly low-income individuals, are disproportionately burdened by the Church's demands for tithing and fast offerings, contributing sacrificially

while receiving minimal support. This undermines the Church's stated mission of helping the poor.

**Constructive Fraud through Wealth Hoarding**

334.    **Institutional Wealth Prioritization:**

• The Church's emphasis on amassing reserves and investing in for-profit ventures detracts from its stated charitable purposes.

• While the Church argues that these reserves prepare for future crises, the doctrine of constructive fraud arises because members reasonably expected current needs to be prioritized.  Especially members in real time crisis.

335.    **Comparison to Historical Practices:**

• Early Church doctrine promoted tithing on surplus, recognizing the varying financial capacities of members. By enforcing a rigid 10% gross income requirement, the Church exploits its members' trust while failing to adapt to modern economic realities.

**Relief Requested**

336.    **Increased Transparency:**

• Mandate public reporting of all tithing, fast offerings, and reserve allocations to ensure compliance with the Church's stated mission.

337. **Reform of Tithing Doctrine**:

• Reevaluate the rigid enforcement of the 10% gross income requirement in light of the Church's financial capacity and historical teachings.

338. **Enhanced Accountability for Aid Distribution**:

• Implement standardized procedures for fast offering distribution to ensure timely and equitable support for members in need.

339. **Restitution for Fraudulent Practices**:

• Compensate the Plaintiff and similarly situated members for the harm caused by the Church's misrepresentations and inequitable practices.

**Count VIII: Negligent Supervision**

340.   The Church of Jesus Christ of Latter-day Saints (the "Church") owed a duty to its members, particularly vulnerable individuals such as children, to supervise and provide oversight over the actions of its leaders, representatives, and doctrines as implemented in member households. By promoting teachings that encouraged invasive and abusive behaviors without safeguards or proper oversight, the Church negligently allowed harm to occur to the Plaintiff. This failure to supervise and ensure the responsible application of its teachings constitutes a breach of duty, directly resulting in significant harm to the Plaintiff.

341.   The Church's systemic failure to supervise the stepfather or provide safeguards to protect vulnerable individuals allowed him to escalate his behavior toward the Plaintiff unchecked. While worthiness interviews were routine, the stepfather's fixation on the Plaintiff—including walking in on him while showering, monitoring his sexual purity, and making inappropriate comments about his physical appearance—clearly exceeded the bounds of any Church-sanctioned behavior.

342.   These escalating and targeted actions demonstrate a predatory misuse of authority that the Church failed to identify or address, despite its responsibility to supervise its leaders and protect members from harm. The Church's systemic neglect enabled the stepfather to exploit his position and cause significant harm to the Plaintiff.

**Legal Basis**

343.   **Duty of Care:**

• The Church owes its members a duty of care, particularly children, to prevent foreseeable harm caused by the actions of leaders, parents, and other authority figures acting under its doctrines or in its name.

• The Church, as a tax-exempt religious institution, holds significant influence over its members, creating a fiduciary-like duty to ensure its teachings and representatives do not cause harm.

344.   **Foreseeability**:

• It was foreseeable that teachings on chastity and worthiness, without appropriate safeguards, could be misapplied in harmful ways, particularly in households with unchecked authority figures.

• The Church's history of systemic abuse cases and reliance on strict doctrinal enforcement further underscores the foreseeability of such harm.

345.   **Breach of Duty**:

• The Church failed to:

  • Provide proper oversight or training to leaders and parents on the healthy and appropriate application of its teachings.

  • Implement safeguards to prevent the misuse of worthiness interviews and other doctrinal enforcement practices.

  • Recognize or act upon red flags indicating that its teachings were being used to justify abusive or invasive behaviors.

346.   **Proximate Cause**:

• The Church's negligent supervision of its teachings and representatives directly enabled the Plaintiff's stepfather to exploit Church doctrines to justify his abusive actions. This negligence created the conditions for the harm suffered by the Plaintiff.

347. **Damages**:

• The Plaintiff suffered severe emotional, psychological, and developmental harm as a result of the Church's failure to supervise its doctrines and their application in member households.

**Specific Failures by the Church**

348. **Promotion of Shame-Based Teachings**:

• The Church promoted rigid and shame-based teachings on chastity that equated masturbation with severe sin, fostering an environment where invasive and abusive behaviors could be justified.

349. **Lack of Oversight in Worthiness Interviews**:

• The Church failed to establish guidelines or boundaries for worthiness interviews and similar practices, allowing them to be misused as tools of control and humiliation.

350. **Failure to Monitor and Regulate Doctrinal Enforcement**:

• The Church allowed leaders and parents to enforce its doctrines without oversight, training, or accountability, creating conditions for abuse.

**Harm to the Plaintiff**

The Church's failure to supervise its teachings and representatives resulted in significant harm to the Plaintiff, including:

351.   **Emotional and Psychological Damage**:

• The Plaintiff endured humiliation, fear, and shame as a result of the invasive and abusive actions of his stepfather, actions directly rooted in the Church's teachings.

352.   **Loss of Trust and Faith**:

• The Plaintiff's trust in the Church as a moral and protective institution was shattered, causing long-term damage to his spiritual and emotional well-being.

353.   **Lifelong Impact**:

• The Plaintiff continues to deal with the repercussions of the Church's failure to protect him, including the effects of childhood trauma and its impact on his relationships and worldview.

**Relief Requested**

To address the Church's negligence and prevent future harm, the Plaintiff seeks the following relief:

354.   **Compensatory Damages**:

• For emotional distress, psychological harm, and other damages caused by the Church's failure to supervise its teachings and representatives.

355.   **Punitive Damages**:

• To hold the Church accountable for its systemic failures and ensure meaningful reform.

356.   **Systemic Reforms**:

• Implementation of mandatory training for leaders and parents on healthy and appropriate application of Church teachings.

• Creation of oversight mechanisms to monitor worthiness interviews and other practices prone to misuse.

• Revision of shame-based teachings on chastity to prevent their justification for abusive or invasive behaviors.

**Conclusion**

357.    The Church's failure to supervise its teachings and ensure the safety of its members, particularly vulnerable children, represents a breach of its duty of care. This negligence enabled the harm suffered by the Plaintiff and highlights systemic issues that require immediate accountability and reform.

**Count IX: Invasion of Privacy (Intrusion Upon Seclusion)**

358.    The Plaintiff brings this claim for invasion of privacy under the principle

of **intrusion upon seclusion**, alleging that the Church of Jesus Christ of Latter-day

Saints ("the Church") fostered a culture that enabled repeated invasions of his

personal privacy. These invasions were perpetuated by the Plaintiff's stepfather,

acting under the influence of the Church's teachings on chastity and worthiness,

which created an environment that justified intrusive and abusive behavior. The

Church failed to provide oversight or safeguards to protect the Plaintiff's privacy,

causing significant emotional and psychological harm.



**Legal Basis**

359.    **Elements of Intrusion Upon Seclusion**:

• The Plaintiff alleges that the following actions constitute an invasion of privacy

under the doctrine of **intrusion upon seclusion**:

360.    **Intentional Intrusion**: The Plaintiff's stepfather intentionally and repeatedly

invaded his private spaces, including:

• Walking in on the Plaintiff while showering, under the pretense of monitoring

his chastity.

• Removing the Plaintiff's bed covers in an attempt to "catch" him engaging in private behavior.

• Conducting invasive and humiliating worthiness interviews, coercing the Plaintiff to discuss intimate details of his private actions.

361.  **Highly Offensive to a Reasonable Person**: These acts would be considered highly offensive by any reasonable person, as they violate fundamental boundaries of privacy and dignity.

362.  **Plaintiff's Expectation of Privacy**: The Plaintiff had a reasonable expectation of privacy in the shower, in his bed, and regarding his private thoughts and behaviors.

363.  **Church's Responsibility**:

• The Church fostered an environment in which these invasive behaviors were justified and normalized through:

• Rigid and shame-based teachings on chastity that equated natural behaviors with severe sin.

• Delegation of enforcement of these teachings to parents and Church leaders without providing guidance or safeguards to ensure proper boundaries.

• Failure to oversee or regulate worthiness interviews, which were prone to misuse as tools of control and humiliation.

• By failing to monitor how its doctrines were applied, the Church enabled and perpetuated a culture in which such invasions of privacy could thrive unchecked.

174

**Harm to the Plaintiff**

The Plaintiff suffered significant emotional and psychological harm as a direct result of these invasions of privacy, including:

364. **Humiliation and Shame**:

• The Plaintiff experienced deep humiliation as a result of the repeated intrusions, particularly in situations where he was most vulnerable.

365. **Emotional Distress**:

• The Plaintiff endured long-lasting emotional distress stemming from the loss of privacy and the abuse of power and psychological warfare by someone acting under the Church's influence.

366. **Trust and Autonomy**:

• The Plaintiff's ability to trust authority figures and maintain a sense of personal autonomy was severely undermined.

**Relief Requested**

The Plaintiff seeks the following relief for the Church's failure to prevent these invasions of privacy:

367. **Compensatory Damages**:

• For the emotional, psychological, and developmental harm caused by the invasions of privacy and the Church's failure to prevent them.

368.   **Punitive Damages**:

• To hold the Church accountable for fostering an environment that justified such invasive behaviors and deter future misconduct.  Because the sexual abuse occurred in Utah, a request for application of the Utah law for punitive damages cap is requested under Utah Code 78B-8-201, which are capped at 3 times the compensatory damages.

369.   **Institutional Reforms**:

• Implementation of training programs for Church leaders and parents to ensure respect for privacy and proper boundaries.

• Revision of teachings on chastity to prevent them from being misused to justify intrusive and harmful behavior.

• Oversight mechanisms for worthiness interviews to prevent abuse or misuse.

**Supporting Case Law**

370.   **Doe v. Liberatore**, 478 F. Supp. 2d 742 (M.D. Pa. 2007):

• Recognized repeated and invasive actions as a valid claim for intrusion upon seclusion.

371.   **Restatement (Second) of Torts § 652B:**

• Defines intrusion upon seclusion as intentionally intruding upon another's private affairs in a way that would be highly offensive to a reasonable person.

372.   **Other Relevant Cases:**

• *Doe v. Boy Scouts of America*, 147 Cal. App. 4th 853 (Cal. Ct. App. 2007): Emphasized the responsibility of organizations to prevent harm caused by their agents or systemic practices.

**Count X: Intentional Infliction of Emotional Distress**

373.     The Plaintiff brings this claim for **Intentional Infliction of Emotional Distress (IIED)** against the Church of Jesus Christ of Latter-day Saints ("the Church"), alleging that the Church's actions, teachings, and failures to safeguard its members from harm caused severe emotional distress. The Church's doctrines on chastity and worthiness, coupled with its lack of oversight and systemic failures, enabled the Plaintiff's stepfather to engage in invasive, abusive, and psychologically damaging behavior. These actions, along with the Church's institutional neglect, constituted extreme and outrageous conduct that caused the Plaintiff significant and lasting emotional harm.

**Legal Basis**

374.     **Extreme and Outrageous Conduct**:

The Plaintiff alleges that the Church's conduct meets the legal standard for IIED due to:

1. Its promotion of rigid and shame-based teachings on chastity, equating natural behaviors with serious sin, creating an environment of fear and humiliation.

2. Its failure to provide guidelines or oversight for worthiness interviews, which were used as tools of coercion and psychological control.

3. Its systemic neglect in supervising individuals acting under its doctrines, enabling invasive and abusive behavior by the Plaintiff's stepfather.

375.   **Intent or Reckless Disregard**:

• The Church acted with reckless disregard for the psychological harm its teachings and practices would cause, particularly to vulnerable members such as children. It knew or should have known that its failure to monitor or safeguard its teachings could lead to harm.

376.   **Severe Emotional Distress**:

• The Plaintiff suffered significant emotional and psychological harm as a direct result of the Church's actions and omissions, including humiliation, anxiety, and lasting trauma.

**Specific Instances of Outrageous Conduct**

The Church's extreme and outrageous conduct includes:

377.   **Promotion of Harmful Doctrines**:

• The Church's teachings on chastity created a culture of shame and fear, particularly around natural behaviors such as masturbation. These teachings were weaponized by the Plaintiff's stepfather to justify invasive and abusive actions.

378.   **Failure to Provide Oversight**:

• The Church failed to implement safeguards or provide training to prevent the misuse of worthiness interviews or other mechanisms for enforcing doctrine.

379.   **Invasive and Abusive Practices**:

• The Plaintiff's stepfather, acting under the influence of the Church's teachings, engaged in repeated acts of psychological abuse, including:

• Conducting invasive worthiness interviews that coerced the Plaintiff into disclosing intimate details of his private behavior.

• Walking in on the Plaintiff in the shower and removing bed covers to "monitor" his behavior.

• These acts were deeply humiliating and caused the Plaintiff significant distress.

**Harm to the Plaintiff**

380.   **Humiliation and Shame**:

• The Plaintiff experienced profound humiliation as a result of the intrusive and abusive actions justified by the Church's teachings.

381. **Anxiety and Emotional Trauma**:

• The Plaintiff suffered severe anxiety, emotional distress, and long-lasting psychological harm stemming from the Church's systemic failures.

382. **Loss of Trust**:

• The Plaintiff's trust in authority figures and religious institutions was irreparably damaged, causing ongoing emotional and spiritual turmoil.

**Relief Requested**

The Plaintiff seeks the following relief for the Church's intentional infliction of emotional distress:

383. **Compensatory Damages**:

• For the emotional, psychological, and developmental harm caused by the Church's actions and omissions.

384. **Punitive Damages (According To Utah Punitive Cap Law)**:

• To hold the Church accountable for its reckless disregard for the well-being of its members and to deter future harm.

385. **Systemic Reforms**:

• Implementation of guidelines and safeguards to prevent the misuse of worthiness interviews and other invasive practices.

• Revisions to shame-based teachings on chastity to prevent their justification for abusive behavior.

**Supporting Case Law**

386. **Doe v. Cutter Biological, Inc.**, 971 F.2d 375 (9th Cir. 1992):

• Recognized that extreme and outrageous conduct causing severe emotional distress could support an IIED claim.

387. **Nally v. Grace Community Church**, 763 P.2d 948 (Cal. 1988):

• While the plaintiff in this case was unsuccessful, the court acknowledged that IIED claims could arise from harmful counseling or religious practices that cause severe emotional distress.

388. **Restatement (Second) of Torts § 46**:

• Provides the legal standard for IIED, defining it as conduct that is so extreme and outrageous as to exceed all bounds of decency in a civilized society.

**Count XI: Constructive Fraud For Sexual Abuse**

389.     The Plaintiff brings this claim for Constructive Fraud against the Church of Jesus
Christ of Latter-day Saints ("the Church") for breaching the trust and confidence
placed in it by the Plaintiff and his family. The Church knowingly fostered a culture
in which its doctrines and teachings could be exploited to justify invasive and abusive
behavior, leading to significant harm to the Plaintiff. By failing to provide proper
oversight and safeguards to protect vulnerable members, particularly children, the
Church misrepresented its intentions and obligations to act in the best interests of its
members.

Legal Basis

390.    Elements of Constructive Fraud:

• Constructive fraud occurs when a party, in a position of trust and confidence,
breaches its duty by failing to act in good faith or by misleading another party to
their detriment.

• The Plaintiff alleges that the Church's actions and omissions meet the legal
standard for constructive fraud due to:

• Its position as a trusted religious institution.

• Its promotion of shame-based teachings and enforcement mechanisms without
proper safeguards.

• Its failure to protect the Plaintiff from foreseeable harm caused by these
teachings.

391.    Special Relationship:

• The Church occupied a position of trust and influence over the Plaintiff and his family, fostering reliance on its teachings and doctrines as moral and spiritual guidance.

• This fiduciary-like relationship obligated the Church to act in good faith and avoid harm to its members.

392.    Material Misrepresentations:

• The Church misrepresented its intentions by promoting teachings and practices that were presented as spiritually necessary but that, in practice, enabled abusive and invasive behavior.

• Specifically, the Church's emphasis on chastity and worthiness interviews created a framework for control and coercion, which the Plaintiff's stepfather exploited to inflict harm.

393.    Reliance and Harm:

• The Plaintiff and his family relied on the Church's representations that its teachings and practices were necessary for spiritual well-being and aligned with its mission to protect and care for its members.

• This reliance led to harm when the Church failed to provide oversight or guidance to prevent the misuse of its doctrines, resulting in the Plaintiff's stepfather's invasive and abusive behavior.

Connection to Sexual Abuse Allegations

394.    Exploitation of Trust:

• The Plaintiff's stepfather, acting under the influence of the Church's teachings, engaged in invasive and abusive behavior that was justified within the context of the Church's doctrines.

• By promoting teachings that equated natural behaviors like masturbation with severe sin and by delegating enforcement to parents and leaders without proper oversight, the Church created the conditions for this abuse to occur.

395.    Systemic Failures:

• The Church's failure to monitor how its doctrines were applied or to provide safeguards against their misuse represents a breach of its fiduciary-like duty to its members.

• This lack of oversight allowed the Plaintiff's stepfather to weaponize the Church's teachings, causing severe emotional and psychological harm to the Plaintiff.

396.    Culture of Shame and Control:

• The Church's shame-based teachings on chastity, coupled with invasive practices like worthiness interviews, fostered an environment where abuse was normalized and justified as spiritually necessary.

Harm to the Plaintiff

The Church's constructive fraud caused significant harm to the Plaintiff, including:

397.    Emotional and Psychological Damage:

• The Plaintiff suffered profound humiliation, anxiety, and long-lasting trauma as a result of the invasive and abusive behavior justified by the Church's teachings.

398.   Loss of Trust:

• The Plaintiff's trust in the Church as a moral and protective institution was shattered, leading to spiritual and emotional turmoil.

399.   Lifelong Impact:

• The Plaintiff continues to deal with the repercussions of the Church's failure to act in good faith and to protect him from harm.


Relief Requested


The Plaintiff seeks the following relief to address the Church's constructive fraud:

400.   Compensatory Damages:

• For the emotional, psychological, and developmental harm caused by the Church's misrepresentations and omissions.

401.   Punitive Damages:

• To hold the Church accountable for its systemic failures and deter future misconduct.

402.   Systemic Reforms:

• Revision of shame-based teachings on chastity to prevent them from being misused to justify abusive behavior.

• Implementation of safeguards for worthiness interviews and other practices prone to misuse.

• Oversight mechanisms to monitor the application of Church teachings and ensure they do not harm vulnerable members.

403.    Supporting Case Law

1. Doe v. Boy Scouts of America, 147 Cal. App. 4th 853 (Cal. Ct. App. 2007):

• Established that organizations with fiduciary-like relationships can be held liable for harm caused by systemic failures to supervise or protect members.

2. Moses v. Diocese of Colorado, 863 P.2d 310 (Colo. 1993):

• Recognized that churches have a duty to protect members from foreseeable harm and to act in good faith when occupying a position of trust.

3. Restatement (Second) of Torts § 551:

• States that nondisclosure or omission of material facts can constitute constructive fraud when a duty to disclose exists.

**Count XII: Breach of Fiduciary Duty Over Sexual Abuse**

404.     The Plaintiff brings this claim for **Breach of Fiduciary Duty** against the Church

of Jesus Christ of Latter-day Saints ("the Church"). As a religious institution, the

Church occupied a position of trust and confidence over the Plaintiff and his family,

fostering reliance on its teachings, guidance, and moral authority. This fiduciary-like

relationship obligated the Church to act in good faith, with care and loyalty, to protect

its members, particularly vulnerable individuals like children. By failing to provide

adequate oversight, safeguards, or accountability mechanisms, the Church breached

its fiduciary duty, enabling harm to the Plaintiff through systemic failures and

specific abusive actions.

**Legal Basis**

405.     **Existence of Fiduciary Duty**:

• The Church, as a trusted religious institution, assumed a fiduciary-like duty

toward its members, including:

• Providing guidance and moral teachings intended to protect and uplift members.

• Ensuring that its practices and doctrines were applied responsibly and without

harm.

• Safeguarding vulnerable members, particularly children, from foreseeable harm

arising from its teachings and enforcement mechanisms.

406.     **Breach of Duty**:

• The Church breached its fiduciary duty by:

407. **Promoting Harmful Teachings**:

• The Church's shame-based teachings on chastity and its emphasis on worthiness interviews created an environment where invasive and abusive behavior was normalized.

408. **Failing to Provide Oversight**:

• The Church failed to monitor or regulate how its teachings were enforced by parents and leaders, allowing individuals like the Plaintiff's stepfather to misuse its doctrines.

409. **Neglecting Vulnerable Members**:

• The Church failed to implement safeguards to protect children and vulnerable members from harm, despite its awareness of systemic issues related to its teachings and enforcement practices.

410. **Causation**:

• The Church's breach of its fiduciary duty directly resulted in harm to the Plaintiff, as it allowed his stepfather to exploit Church teachings to justify invasive and abusive behavior, causing severe emotional and psychological harm.

411. **Damages**:

• The Plaintiff suffered significant harm, including emotional distress, humiliation, loss of trust, and long-term psychological trauma, as a result of the Church's breach of its fiduciary duty.


**Connection to Sexual Abuse Allegations**

412. **Exploitation of Power Dynamics**:

• The Church's teachings on chastity and worthiness created a framework in which parents and leaders could exercise unchecked authority, leading to abuse. The Plaintiff's stepfather weaponized these teachings to justify his invasive and abusive behavior, including:

• Walking in on the Plaintiff in the shower to "monitor" his chastity.

• Conducting invasive worthiness interviews that coerced the Plaintiff into disclosing intimate details of his private behavior.

• Ripping the covers off the Plaintiff's bed to "catch" him touching himself.

413. **Failure to Safeguard Against Abuse**:

• Despite its fiduciary-like duty to protect vulnerable members, the Church failed to provide safeguards or accountability mechanisms to prevent the misuse of its teachings. This systemic failure allowed the Plaintiff's stepfather to act without oversight or consequence.

414. **Complicity Through Inaction**:

• By failing to address or anticipate the harm that could arise from its teachings, the Church breached its duty to act in the best interests of its members. This inaction directly enabled the harm suffered by the Plaintiff.

**Harm to the Plaintiff**

The Church's breach of fiduciary duty caused significant harm to the Plaintiff, including:

415. **Emotional and Psychological Trauma**:

191

• The Plaintiff endured severe emotional distress, humiliation, and long-lasting

psychological harm as a result of the invasive and abusive behavior justified by

the Church's teachings.

416. **Loss of Trust**:

• The Plaintiff's trust in the Church as a moral and protective institution was

irreparably damaged, leading to spiritual and emotional turmoil.

417. **Impact on Autonomy and Dignity**:

• The Plaintiff's sense of personal autonomy and dignity was undermined by the

Church's failure to protect him from invasive and abusive practices.


**Relief Requested**


The Plaintiff seeks the following relief for the Church's breach of fiduciary duty:

418. **Compensatory Damages**:

• For the emotional, psychological, and developmental harm caused by the

Church's breach of its fiduciary duty.

419. **Punitive Damages (Using Utah Punitive Damages Cap)**:

• To hold the Church accountable for its systemic failures and deter future

breaches of trust.

420. **Systemic Reforms**:

• Implementation of safeguards to prevent the misuse of Church teachings,

particularly those related to chastity and worthiness.

- Creation of accountability mechanisms to ensure leaders and parents do not exploit Church teachings to justify abusive behavior.

- Revision of shame-based teachings to prevent harm to vulnerable members.

**Supporting Case Law**

421. **Moses v. Diocese of Colorado**, 863 P.2d 310 (Colo. 1993):

    - Held that religious institutions owe a fiduciary duty to their members when they occupy a position of trust and confidence.

422. **Doe v. Evans**, 814 So. 2d 370 (Fla. 2002):

    - Recognized the fiduciary duty of religious organizations to act in the best interests of their members and protect them from harm.

423. **Martinelli v. Bridgeport Roman Catholic Diocesan Corp.**, 989 A.2d 695 (Conn. 2010):

- Affirmed that churches could be held liable for breaches of fiduciary duty that result in harm to members.

**Count XII: Institutional Negligence and Liability for Sexual Abuse**

424.    The Plaintiff brings this claim against the Church of Jesus Christ of Latter-day

Saints ("the Church") for enabling and failing to prevent sexual abuse perpetrated by

the Plaintiff's stepfather. Acting under the influence of the Church's doctrines and

culture, the Plaintiff's stepfather exploited his position of authority to commit abusive

acts against the Plaintiff. The Church's systemic failures—its lack of safeguards,

inadequate oversight, and promotion of shame-based teachings—directly facilitated

the abuse and caused significant harm to the Plaintiff.

**Legal Basis**

425.    **Institutional Negligence**:

• The Church owed a duty of care to its members, particularly vulnerable individuals such

as children, to prevent foreseeable harm caused by the actions of those in positions of

authority within its organization.

• The Church breached this duty by:

• Promoting teachings and practices that justified and enabled invasive and abusive

behavior.

• Failing to provide oversight or training to ensure that its doctrines were not misused.

• Neglecting to implement safeguards to protect children and vulnerable members from

abuse.

426.    **Foreseeability**:

• The Church knew or should have known that its teachings, cultural practices, and lack of oversight created conditions where abuse was foreseeable.

• Decades of public cases involving abuse in religious institutions highlight the foreseeability of harm in the absence of proactive measures.

427. **Breach of Fiduciary Duty**:

• By fostering reliance on its teachings and creating a culture of trust, the Church assumed a fiduciary-like duty to protect its members. Its failure to act in good faith and to prioritize the safety of vulnerable individuals over doctrinal enforcement constitutes a breach of this duty.

428. **Proximate Cause**:

• The Church's negligence directly enabled the Plaintiff's stepfather to use its doctrines as a justification for abusive behavior, causing significant emotional and psychological harm to the Plaintiff.

**Specific Acts of Abuse**

429. **Invasive and Abusive Conduct**:

• The Plaintiff's stepfather, acting under the influence of the Church's teachings on chastity and worthiness, engaged in repeated acts of psychological and emotional abuse, including:

• Walking in on the Plaintiff while showering to "monitor" his behavior.

• Ripping the covers off the Plaintiff's bed to "catch" him engaging in private conduct.

• Coercing the Plaintiff into invasive and humiliating worthiness interviews.

430. **Cultural Justification of Abuse**:

• These actions were justified by the Plaintiff's stepfather as necessary enforcement of the Church's doctrines, which equate natural behaviors like masturbation with severe sin. The Church's teachings and lack of safeguards enabled and normalized these invasions of privacy and abuse.

**Harm to the Plaintiff**

431. **Severe Emotional and Psychological Harm**:

• The Plaintiff suffered profound emotional distress, humiliation, and long-lasting trauma as a result of the abuse and the Church's systemic failures.

432. **Loss of Trust in the Church**:

• The Plaintiff's trust in the Church as a moral and protective institution was irreparably damaged.

433. **Lifelong Impact**:

• The abuse and its effects continue to have a lasting impact on the Plaintiff's mental health, personal relationships, and worldview.

**Relief Requested**

The Plaintiff seeks the following relief to address the harm caused by the Church's institutional negligence:

434. **Compensatory Damages**:

• For emotional, psychological, and developmental harm caused by the abuse and the Church's systemic failures.

435.    **Punitive Damages**:

• To hold the Church accountable for enabling abuse through its negligence and to deter future harm.

436.    **Systemic Reforms**:

• Implementation of comprehensive abuse prevention policies, including:

• Mandatory training for leaders and parents on recognizing and preventing abuse.

• Oversight mechanisms to ensure that doctrines are not misused to justify invasive or harmful behavior.

• Transparent reporting and investigation procedures for abuse allegations.

437.    **Declaratory Relief**:

• A declaration that the Church's actions and systemic failures constituted institutional negligence, enabling harm to the Plaintiff and other vulnerable members.


**Supporting Case Law**

438.    **Doe v. Boy Scouts of America**, 147 Cal. App. 4th 853 (Cal. Ct. App. 2007):

• Established that organizations could be held liable for failing to prevent abuse when they had a duty of care to their members.

439.    **Doe v. Liberatore**, 478 F. Supp. 2d 742 (M.D. Pa. 2007):

• Held that systemic failures by religious organizations to oversee individuals in positions of power constituted negligence, supporting claims of abuse.

440.    **Restatement (Second) of Torts § 314A**:

• Recognizes the duty of institutions to protect individuals from foreseeable harm when a special relationship exists.

**Count XIII: Failure to Train or Supervise**

441.     The Church of Jesus Christ of Latter-day Saints owes its members a duty of care, particularly when placing individuals in positions of authority such as bishops, scout leaders, and other Church-affiliated leaders. This duty includes ensuring that these leaders are adequately trained and supervised to prevent abuse, misconduct, and harm to members. By failing to properly train and supervise its leaders, the Church created an environment in which abuse and systemic harm could occur, including the abuse suffered by the Plaintiff.

**Legal Basis**

442.     **Duty of Care**:

   • As an organization with hierarchical leadership, the Church has a duty to establish policies and training to prevent harm to members under the supervision of its leaders.

   • The Church exercises control over its leaders and is responsible for their conduct within the scope of their duties.

443.     **Negligent Training and Supervision**:

   • The Church failed to provide adequate training to its leaders to recognize, prevent, and address abuse, particularly in the context of worthiness interviews, youth programs, and family counseling.

   • The Church failed to adequately supervise leaders like the Plaintiff's stepfather, whose behavior demonstrated clear signs of inappropriate and abusive tendencies.

444.     **Systemic Oversight**:

• The Church's centralized authority and control over local leaders make it directly responsible for systemic failures in oversight, including the lack of safeguards against abuse.

**Breach of Duty**

445.     **Failure to Train**:

• The Church did not provide leaders with proper guidance on recognizing and addressing psychological or sexual abuse within families or Church programs.

• Leaders were not trained to handle sensitive topics like chastity or worthiness interviews in a way that safeguarded the emotional and psychological well-being of members, particularly minors.

446.     **Failure to Supervise**:

• The Church failed to monitor and oversee the actions of local leaders, including bishops and scout leaders, who were given significant authority over vulnerable members like the Plaintiff.

• Despite warning signs of abusive behavior, and complaints from previous parents when he was bishop, the Church took no meaningful steps to investigate or intervene in the Plaintiff's stepfather's conduct.

447.    **Enabling Harm Through Systemic Neglect**:

• The Church's lack of oversight allowed individuals like the Plaintiff's stepfather to misuse their authority, perpetuating cycles of abuse and harm.

• Systemic neglect created an environment where abuse could thrive unchecked, causing lasting harm to the Plaintiff and others.

**Harm to the Plaintiff**

448.   **Direct Harm**:

• The Plaintiff suffered psychological and emotional abuse as a result of the Church's failure to supervise his stepfather and provide proper oversight of Church-sanctioned programs, including Boy Scouts and worthiness interviews.

449.   **Systemic Harm**:

• The Church's systemic failures contributed to a culture of fear, shame, and vulnerability, exacerbating the Plaintiff's trauma and perpetuating the harm caused by his stepfather.

**Relief Requested**

The Plaintiff seeks the following relief to address the Church's failure to train or supervise its leaders:

450.   **Policy Reforms**:

• Implementation of comprehensive training programs for all Church leaders, focusing on abuse prevention, recognition, and response.

• Establishment of safeguards to ensure worthiness interviews and similar practices are conducted in a manner that protects minors and vulnerable members.

451.   **Accountability Measures**:

• Independent audits of the Church's training and supervision practices.

• Public acknowledgment of systemic failures and a commitment to reform.

452.   **Compensatory and Punitive Damages:**

• Compensation for the Plaintiff's emotional and psychological harm resulting from the Church's negligence.

• Punitive damages to deter the Church from neglecting its duty to train and supervise leaders in the future.

**Count XIV: Failure to Warn**

453.    The Church of Jesus Christ of Latter-day Saints has a duty to warn its members of

foreseeable risks and dangers arising from the misuse or abuse of its doctrines,

practices, and authority. This duty includes warning members about the potential for

psychological, emotional, and physical harm caused by untrained or unsupervised

leaders, harmful worthiness interviews, and other systemic practices. The Church's

failure to provide such warnings enabled the harm suffered by the Plaintiff and others

in similar circumstances.

**Legal Basis**

454.    **Duty to Warn**:

• The Church has a duty to protect its members by providing adequate warnings of risks

associated with its policies and practices. This duty arises from the Church's position of

authority, its tax-exempt status as a nonprofit entity, and the trust placed in it by its

members.

455.    **Foreseeable Risks**:

• The Church knew or should have known that its practices, such as worthiness

interviews and the delegation of significant authority to local leaders, created a

foreseeable risk of harm, particularly to vulnerable individuals like minors and those in

abusive households.

456.    **Failure to Act**:

• Despite being aware of these risks, the Church failed to take reasonable steps to warn or protect its members. This failure includes not warning members about the dangers of:

• Leaders abusing their authority to commit psychological or sexual abuse.

• The psychological harm caused by shame-based teachings and worthiness interviews.

• The systemic neglect of abuse survivors within the Church structure.

## Breach of Duty

457.   **Systemic Silence**:

• The Church failed to warn members about the risks inherent in its systemic practices, despite having knowledge of prior abuse cases and systemic failures within its organization.

458.   **Failure to Disclose Known Risks**:

• The Church withheld information regarding known risks of abuse, such as the potential for leaders to misuse their authority during worthiness interviews or in positions of trust (e.g., scout leaders).

459.   **Failure to Implement Safeguards**:

• The Church did not provide adequate warnings to mitigate risks, such as requiring parental oversight during worthiness interviews or screening leaders more thoroughly.

## Harm to the Plaintiff

460.   **Direct Harm**:

• The Plaintiff suffered psychological and emotional abuse from his stepfather, a Church leader whose actions were facilitated by the Church's failure to warn of the risks associated with unsupervised authority and worthiness interviews.

461.   **Lasting Impact**:

• The Plaintiff's long-term psychological harm is a direct result of the Church's failure to warn and its systemic neglect, which enabled his stepfather's abuse and exacerbated the Plaintiff's trauma.

**Relief Requested**

The Plaintiff seeks the following relief to address the Church's failure to warn:

462.   **Policy Reforms**:

• Require the Church to implement warnings and safeguards to protect members, particularly minors, from foreseeable risks of harm.

• Mandate transparency regarding known risks associated with its practices, such as worthiness interviews.

463.   **Compensatory and Punitive Damages**:

• Compensation for the Plaintiff's emotional and psychological harm caused by the Church's failure to warn.

• Punitive damages to hold the Church accountable for its systemic failures and to deter future neglect.

**Count XV: Civil Conspiracy**

464.    The Church of Jesus Christ of Latter-day Saints engaged in a coordinated effort to suppress allegations of abuse, protect abusers, and avoid public accountability for systemic failures. Through its policies, practices, and culture of secrecy, the Church enabled harmful behavior, including the abuse suffered by the Plaintiff. These actions amount to a civil conspiracy, causing direct harm to the Plaintiff and perpetuating systemic neglect.

**Legal Basis**

465.    **Elements of Civil Conspiracy**:

• **Agreement**: An agreement or concerted action existed among Church leaders and officials to suppress abuse allegations, protect abusers, and maintain the Church's reputation at the expense of victims. This agreement was evidenced through:

• Policies that discouraged reporting abuse to law enforcement.

• Reassigning known abusers to new positions without addressing allegations.

• Coordinated use of internal systems to silence victims and protect the Church's reputation.

• **Unlawful or Harmful Acts**: The conspiracy involved unlawful acts, including suppressing abuse allegations, failing to report abuse, and enabling abusers to retain positions of authority. These actions directly endangered members and violated the Church's duty of care.

• **Harm**: The Plaintiff suffered harm as a direct and foreseeable result of the Church's conspiracy to suppress abuse allegations and shield abusers from accountability.

466. **Duty of Care**:

• The Church owed a duty to protect members, particularly minors, from harm caused by its leaders and representatives.

• The Church's conspiracy to suppress allegations violated this duty, creating an environment where abuse could persist unchecked.

467. **Case Law Support**:

• **Doe v. Boy Scouts of America**, 356 P.3d 1049 (Or. 2015): Recognized institutional liability for systemic failures and conspiracies to suppress abuse allegations.

• **Green v. Church of Jesus Christ of Latter-day Saints**, 2008 UT 20, 184 P.3d 1269 (Utah): Demonstrated the Church's systemic failures and institutional neglect, which parallel the Plaintiff's allegations.

• **Doe v. Archdiocese of Portland**, 717 P.2d 1161 (Or. 1986): Held that patterns of concealment and suppression of abuse can constitute conspiracy.

**Breach of Duty**

468. **Suppressing Allegations**:

• The Church actively discouraged members from reporting abuse to law enforcement, instructing them to resolve issues internally through Church mechanisms.

• Leaders were directed to prioritize the Church's reputation over the safety and well-being of its members, creating a culture of silence and complicity.

469. **Protecting Abusers**:

• The Church's failure to investigate or remove abusers from positions of authority allowed abuse to persist. This includes the Plaintiff's stepfather, who was able to abuse his authority as a scout leader and Church representative.

470. **Systemic Secrecy**:

• The Church maintained policies of secrecy, including the use of internal legal channels and a lack of transparency regarding known risks of abuse. This systemic approach prevented victims like the Plaintiff from receiving justice and allowed abusers to continue their harmful behavior.

**Harm to the Plaintiff**

471. **Direct Harm**:

• The Plaintiff suffered emotional and psychological abuse as a result of the Church's failure to warn and protect him from his stepfather's harmful actions.

• The Church's conspiracy to suppress abuse allegations and protect abusers perpetuated the Plaintiff's suffering.

472. **Systemic Impact**:

207

• The Church's systemic failures created an environment where the Plaintiff's abuse was not only possible but enabled. These failures compounded the Plaintiff's trauma and left lasting emotional scars.

**Relief Requested**

The Plaintiff seeks the following relief to address the Church's civil conspiracy:

473.   **Compensatory and Punitive Damages**:

• Compensation for the emotional and psychological harm caused by the Church's systemic failures and conspiracy to suppress abuse allegations.

• Punitive damages to hold the Church accountable for its coordinated actions and deter future misconduct.

474.   **Reform Measures**:

• Implementation of transparent policies for reporting and addressing abuse allegations.

• Independent investigations into systemic failures and conspiracies to suppress abuse.

475.   **Public Accountability**:

• Acknowledgment of the Church's role in enabling and concealing abuse, along with commitments to systemic reform.

476.   **Broader Societal Impact**:

• Establishing a legal precedent that holds institutions accountable for conspiracies to suppress abuse and protect abusers, ensuring that future victims are not silenced or ignored.

**Count XVI: Fraudulent Concealment**

477.    The Church of Jesus Christ of Latter-day Saints engaged in a pattern of fraudulent concealment by intentionally withholding critical information regarding the risks of abuse by its leaders, the misrepresentation of its financial practices, and its failure to provide adequate safeguards to protect members. By concealing this information, the Church perpetuated harm to the Plaintiff and others, breaching the trust placed in it by its members and exacerbating systemic failures.

**Legal Basis**

478.    **Elements of Fraudulent Concealment**:

• **Concealment of Material Facts**: The Church withheld material facts about:

• Known risks of abuse by leaders and systemic failures to address abuse.

• Financial practices that prioritized institutional wealth accumulation over stated humanitarian and spiritual missions.

• **Duty to Disclose**: As a tax-exempt nonprofit organization and trusted spiritual authority, the Church had a duty to disclose material facts to its members.

• **Intent to Induce Reliance**: The Church's concealment was intended to maintain its reputation, financial contributions, and member loyalty, while preventing scrutiny or legal accountability.

• **Detrimental Reliance**: The Plaintiff and other members relied on the Church's representations and omissions, resulting in harm.

479.    **Case Law Support**:

• Fraudulent concealment claims have been upheld where organizations withhold material facts that lead to harm. For example:

• **Doe v. Boy Scouts of America**, 356 P.3d 1049 (Or. 2015): Recognized organizational liability for concealing risks of abuse.

• **Green v. Church of Jesus Christ of Latter-day Saints**, 2008 UT 20, 184 P.3d 1269 (Utah): Demonstrated systemic concealment of abuse risks and failures.

• **Doe v. Archdiocese of Portland**, 717 P.2d 1161 (Or. 1986): Held organizations accountable for concealing information about abuse risks.

## Breach of Duty

480.   **Concealment of Abuse Risks**:

• The Church knowingly failed to disclose information about the risks of abuse by leaders, such as scoutmasters and bishops, despite its awareness of prior abuse cases.

• Policies of secrecy, including internal reporting mechanisms, prevented members from learning of these risks or holding abusers accountable.

481.   **Misrepresentation of Financial Practices**:

• The Church concealed the extent of its financial reserves and the true allocation of member contributions, including tithing and fast offerings.

• Members were misled to believe their contributions were primarily used for humanitarian aid and spiritual purposes, while a significant portion was retained for wealth accumulation.

482.   **Failure to Disclose Systemic Failures**:

• The Church concealed its systemic failures, including the lack of adequate training, supervision, and safeguards for leaders with authority over vulnerable members.

## Harm to the Plaintiff

483.   **Direct Harm**:

• The Plaintiff suffered emotional and psychological abuse due to the Church's concealment of abuse risks, which enabled his stepfather's harmful actions.

• The Plaintiff relied on the Church's misrepresentations and omissions about its support systems and financial practices, leading to further harm when support was denied.

484.   **Systemic Harm**:

• The Church's concealment contributed to a culture of secrecy and neglect, perpetuating harm to the Plaintiff and others in similar situations.

## Relief Requested

The Plaintiff seeks the following relief to address the Church's fraudulent concealment:

485.   **Compensatory and Punitive Damages**:

• Compensation for the emotional, psychological, and financial harm caused by the Church's fraudulent concealment.

• Punitive damages to deter the Church from engaging in similar conduct in the future.

486.   **Transparency Measures**:

• Require the Church to disclose financial information regarding tithing and fast offerings, including their allocation and use.

• Mandate transparency about abuse allegations and the Church's internal policies for addressing them.

487.    **Reform Requirements**:

• Implement policies to ensure members are informed about abuse risks and the Church's financial practices.

• Establish independent oversight mechanisms to monitor abuse allegations and financial transparency.

**Count XVII: Enabling Harm Through Systemic Neglect**

488.    The Church of Jesus Christ of Latter-day Saints enabled harm to the Plaintiff

through systemic neglect of its duty to safeguard members from abuse, provide

adequate support systems, and address systemic risks inherent in its structure and

teachings. This neglect created an environment where harm could flourish unchecked,

directly contributing to the Plaintiff's suffering and perpetuating broader patterns of

institutional failure.

**Legal Basis**

489.    **Duty of Care**:

    • The Church, as a tax-exempt nonprofit organization and trusted spiritual

authority, owed a duty of care to its members, particularly minors and vulnerable

individuals, to ensure their safety and well-being.

    • This duty included protecting members from foreseeable harm caused by its

leaders, policies, and teachings.

490.    **Systemic Neglect**:

    • The Church failed to implement and enforce safeguards, policies, and oversight

mechanisms necessary to prevent harm.

• Specific failures include:

    • **Lack of Supervision**: Neglecting to properly train and supervise leaders in

positions of authority, including scoutmasters and bishops.

214

- **Failure to Address Known Risks**: Ignoring or concealing systemic risks of abuse despite prior incidents and complaints.
- **Inadequate Support Systems**: Failing to provide meaningful support or resources to abuse victims, leaving them to suffer in isolation.
- **Harmful Cultural Norms**: Promoting teachings and cultural practices that discouraged victims from seeking help, such as:
- Overemphasis on chastity and "worthiness."
- Internal resolution of abuse allegations without external accountability.

491.  **Case Law Support**:

- Courts have recognized systemic neglect as a basis for holding institutions accountable for harm caused by their actions or inactions:
- **Doe v. Boy Scouts of America**, 356 P.3d 1049 (Or. 2015): Highlighted institutional liability for systemic failures to protect members.
- **Green v. Church of Jesus Christ of Latter-day Saints**, 2008 UT 20, 184 P.3d 1269 (Utah): Recognized systemic failures in addressing abuse risks.
- **Doe v. Archdiocese of Portland**, 717 P.2d 1161 (Or. 1986): Established liability for systemic neglect in enabling abuse.

**Breach of Duty**

492.  **Failure to Protect Members**:

- The Church neglected its duty to protect members from harm caused by leaders in positions of trust, including the Plaintiff's stepfather, who abused his authority as a scout leader and Church representative.

> • The lack of safeguards, such as adequate background checks or oversight, created an environment where abuse could occur without intervention.

493.   **Failure to Address Known Risks**:

> • Despite awareness of prior abuse cases and systemic vulnerabilities, the Church failed to implement meaningful reforms or warn members of potential risks, prioritizing its reputation over member safety.

494.   **Failure to Provide Support**:

> • The Church failed to provide adequate emotional, psychological, or practical support to victims of abuse, compounding the harm they experienced.

495.   **Promotion of Harmful Cultural Norms**:

> • The Church's teachings and practices reinforced a culture where abuse was normalized or overlooked, including:

> • Worthiness interviews that exposed minors to invasive questioning.

> • Emphasis on obedience and forgiveness, discouraging victims from reporting abuse or holding abusers accountable.

**Harm to the Plaintiff**

496.   **Direct Harm**:

> • The Plaintiff suffered emotional and psychological abuse as a result of the Church's systemic neglect, which enabled his stepfather's harmful actions.

> • The Church's failure to provide meaningful support compounded the Plaintiff's trauma and left him without recourse.

497.   **Connection to Systemic Failures**:

• The Plaintiff's harm is directly tied to the Church's broader systemic failures, including its lack of oversight, promotion of harmful cultural norms, and failure to address abuse risks.

498.   **Long-Term Impact**:

• The Plaintiff continues to suffer emotional and psychological harm as a result of the Church's systemic neglect, which created an environment that enabled abuse and perpetuated trauma.

**Relief Requested**

The Plaintiff seeks the following relief to address the Church's enabling of harm through systemic neglect:

499.   **Compensatory and Punitive Damages**:

• Compensation for the emotional, psychological, and financial harm caused by the Church's systemic neglect.

• Punitive damages to hold the Church accountable and deter future neglect.

500.   **Reform Measures**:

• Implementation of comprehensive safeguards to protect members, particularly minors, from harm.

• Mandatory training and supervision for leaders in positions of authority.

• Creation of independent oversight mechanisms to address abuse allegations and systemic failures.

501.   **Public Accountability**:

• Acknowledgment of the Church's systemic neglect and its role in enabling harm, along with commitments to meaningful reform.

502. **Transparency:**

• Full disclosure of prior abuse cases and systemic failures to ensure accountability and build trust among members.

**Claim XVIII: Negligence and Systemic Failure of Duty of Care During Missionary Service**

The Plaintiff's Experience as a Missionary

503.   The Church of Jesus Christ of Latter-day Saints assumes a duty of care over its missionaries, who live under its strict control while fulfilling their responsibilities. This unique relationship obligates the Church to act in the best interests of its missionaries, particularly during times of personal or familial crises. However, during the Plaintiff's missionary service, the Church's rigid policies and systemic failures prioritized institutional objectives over the Plaintiff's emotional and psychological well-being.

504.   The Plaintiff served as a missionary during a time when his mother was suffering from systemic scleroderma'a severe illness that ultimately claimed her life. The Church's restrictive communication policies at the time prohibited missionaries from having regular phone contact with their families, leaving the Plaintiff unaware of the severity of his mother's condition. By the time the Plaintiff was informed of her death, it was too late for him to provide comfort to his family or say goodbye to his mother.

505.   Adding to the trauma, the Plaintiff's mission president delivered the devastating news of his mother's passing over the phone, failing to show the compassion and personal care required in such a sensitive and life-altering moment. Despite the profound grief and isolation the Plaintiff experienced, he remained on his mission for an additional year, continuing to serve in a state of emotional turmoil without any

meaningful psychological or pastoral support from the Church. This lack of care and understanding further compounded the Plaintiff's suffering, as he struggled to balance his grief with the expectations of his missionary responsibilities.

506.    Furthermore, six months after the plaintiff's mother's death, while the plaintiff was still serving, the plaintiff's stepfather sold the family business for $30,000,000. He split the proceeds among the church, himself, and his children while cutting my brothers and I completely out.  Meaning that the plaintiff was denied a meaningful chance to understand and challenge these actions while he was in the service of the church.  While the church ultimately significantly gained from this transaction, both from the service of the plaintiff as well as from the substantial financial donation from the sale of the business.

Systemic Negligence and Breach of Duty

507.    The Church's missionary program places young adults under its direct care, creating a clear duty to act responsibly and compassionately. In the Plaintiff's case, the Church breached this duty through the following actions:

            1. Restrictive Communication Policies: By prohibiting regular contact with his family, the Church denied the Plaintiff critical information about his mother's illness, depriving him of the opportunity to make informed decisions about his service and familial obligations.

            2. Insensitive Notification: The mission president's decision to inform the Plaintiff of his mother's death over the phone, rather than in person,

demonstrated a disregard for the emotional impact of such news and a

failure to provide appropriate support.

3. Lack of Emotional and Psychological Support: Despite the profound

grief and trauma the Plaintiff experienced, the Church offered no

meaningful psychological or pastoral care during or after his mission.

4. Failure to Accommodate Individual Needs: The Church's strict

adherence to policies neglected to consider the Plaintiff's unique

circumstances, demonstrating systemic indifference to personal crises to

the church's ultimate benefit.

508.   These actions reflect a broader pattern of institutional negligence, where policies

and rigid adherence to rules are prioritized over the well-being of individuals.

Discovery Rule and Continuing Harm Doctrine

509.   The Plaintiff was unable to fully recognize the extent of the Church's negligence

due to its systemic practices, which emphasized obedience and discouraged critical

reflection. Only years later, through ongoing reflection and growing awareness, did

the Plaintiff understand the emotional harm caused by these policies and practices.

The trauma from these events continues to impact the Plaintiff's mental and

emotional well-being.

A Broader Pattern of Systemic Neglect

510.    The Plaintiff's experience is emblematic of a broader systemic failure within the Church to adequately care for missionaries and other vulnerable members. By isolating missionaries and ignoring their emotional needs during personal crises, the Church perpetuates harm that could be avoided through compassion and flexibility.

511.    The Plaintiff's decision to remain on his mission for another year despite the trauma of his mother's death is a testament to his faith and dedication. However, the lack of care and acknowledgment from the Church during this time highlights the systemic failures that left the Plaintiff unsupported in his grief.

Relief Sought

512.    The Plaintiff seeks acknowledgment of the harm caused by these policies and systemic failures. Specifically:

1. A formal apology for the Church's failure to provide adequate care and support during the Plaintiff's mother's illness and death.

2. Policy reforms to ensure missionaries have greater support during family crises, including regular communication and compassionate responses to tragedies.

3. Compensation for the financial, emotional, and psychological harm caused by the Church's negligence, including the failure to offer any form of support during and after this traumatic experience.

**Claim XIV:  Wrongful Death Claim Against the Church Regarding Dana Thornock Rasmussen**

513.    The plaintiff asserts a wrongful death claim against The Church of Jesus Christ of Latter-day Saints ("the Church" ), alleging systemic negligence, a breach of duty of care, and an institutional culture that directly contributed to the untimely death of his mother, Dana Thornock Rasmussen. This claim addresses not only the emotional toll on the plaintiff and his family but also the broader cultural environment within the Church that facilitated her suffering and ultimate death.

Expanded Narrative and Connection to Negligence

514.    Dana Thornock Rasmussen's death from systemic scleroderma, a condition aggravated by emotional and psychological distress, was directly linked to an environment of religious and cultural rigidity perpetuated by the Church. The Church's doctrinal focus on moral perfection, as interpreted and enforced by the plaintiff's stepfather, created an environment of coercion and psychological abuse disguised as righteousness. This environment left no room for personal autonomy, balance, or respite, exacerbating her already fragile health.

515.    The plaintiff asserts that this rigidity was not only tolerated but indirectly endorsed by the Church, whose teachings were weaponized to justify the stepfather's covert narcissistic behavior. These teachings, including an overemphasis on

"breaking the will" of others and viewing natural human tendencies as sinful, were key contributors to her emotional decline.

The Church's Duty of Care

516.    The Church had a duty to provide pastoral care and support, especially during the plaintiff's service as a missionary, a time of significant sacrifice. However, the Church failed to extend any meaningful support when Dana's health deteriorated and after her death. When the plaintiff's mission president informed him of his mother's death, it was done over the phone rather than in person, disregarding the emotional and psychological needs of a grieving missionary.

517.    Despite the devastating news, the plaintiff remained on his mission for an additional year, serving faithfully under immense emotional strain. This lack of tangible support during such a critical time reflects a systemic disregard for the well-being of missionaries and their families, further emphasizing the Church's negligence.

Legal Argument Against Statute of Limitations

518.    The plaintiff invokes the Discovery Rule and Continuing Harm Doctrine to address potential statute of limitations concerns. The harm caused by the Church's systemic negligence and cultural rigidity was not immediately evident at the time of Dana's death. Over time, the plaintiff has come to understand the extent to which the Church's teachings and lack of intervention contributed to her suffering and death.

519.     Moreover, the cultural harm perpetuated by the Church remains ongoing. The
         plaintiff asserts that the systemic failures identified in this claim continue to harm
         others in similar circumstances, underscoring the necessity of this lawsuit to address
         both past and present harms.

Specific Damages and Relief Requested

520.     The plaintiff seeks acknowledgment and accountability from the Church for its
         role in creating and perpetuating an environment that led to Dana Rasmussen's death.
         Specifically, the plaintiff requests:

521.     Compensatory Damages:

To address the financial and emotional toll on the plaintiff and his family, including:

- Funeral and medical expenses incurred as a result of Dana's illness.
- Emotional distress experienced by the plaintiff during and after his mission,
  compounded by the lack of pastoral support.
- Long-term psychological harm stemming from the Church's systemic failures.

522.     Institutional Reforms:

- Acknowledgment of the role Church culture played in this case.
- Implementation of policies to ensure compassionate pastoral care for
  missionaries and their families, especially during times of crisis.
- Training for Church leaders to identify and address covert abuse and
  narcissistic behavior within families.

- A commitment to reducing doctrinal rigidity and emphasizing Christlike compassion and autonomy.

523.   Declaratory Relief:  A public statement from the Church acknowledging the harm caused by rigid cultural practices and affirming its commitment to fostering an environment of compassion, flexibility, and support for families and individuals.

Call for Systemic Accountability

524.   This claim is not solely about seeking damages but about ensuring the Church recognizes its role in perpetuating harm and takes meaningful steps toward reform. The plaintiff urges the Church to acknowledge the imbalance between its doctrinal focus on moral perfection and the need for compassion and individual well-being. The systemic rigidity that contributed to Dana Rasmussen's death mirrors the condition that ultimately claimed her life: an immune system that turned against the body it was designed to protect.

525.   The plaintiff calls on the Church to reflect on its teachings and practices and to take action to prevent further harm to vulnerable members. This case is an opportunity for the Church to lead with compassion and accountability, reinforcing its mission to uplift and care for all of God's children.

**Claim XV:  For Intentional or Negligent Infliction of Emotional Distress During Mission**

526.    The plaintiff asserts that the Church of Jesus Christ of Latter-day Saints
(hereinafter "the Church") caused significant emotional distress through its failure to
provide adequate support, compassion, or guidance during and after the death of the
plaintiff's mother. This failure reflects systemic neglect in fulfilling its heightened
duty of care to missionaries under its supervision.

Facts Supporting the Claim

527.    Lack of Compassionate Support:

- While serving as a missionary for the Church, the plaintiff's mother passed
away unexpectedly. The plaintiff was informed of her death by his mission
president over the phone, rather than in person, reflecting a lack of sensitivity
to the gravity of the situation.

- The plaintiff was neither offered the option to return home for the funeral nor
provided meaningful emotional or psychological support despite the profound
impact of the loss. Instead, he was expected to continue his missionary
service, ultimately serving an additional year in an emotionally vulnerable
state.

528.    Neglect of Missionary Welfare:

- The mission president, despite being in communication with the plaintiff's
stepfather, a known source of familial abuse, failed to assess the plaintiff's
well-being or take steps to mitigate the harm caused by this abusive influence.

- No formal protocols or resources were provided to help the plaintiff process his grief, leaving him isolated and unsupported in his time of need.

529. Institutional Neglect:

- The Church's failure to offer any form of counseling or compassionate outreach reflects a systemic issue within its policies and culture, prioritizing adherence to missionary service over the emotional welfare of its members.

Legal Argument Against the Statute of Limitations

530. The plaintiff acknowledges the potential expiration of the statute of limitations for this claim. However, the plaintiff argues that equitable tolling is warranted for the following reasons:

1. Delayed Discovery of Emotional Harm:

   o The emotional harm caused by the Church's actions fully manifested over time as the plaintiff processed the compounded grief, systemic neglect, and institutional betrayal. This delayed discovery makes the standard limitations period inapplicable to the unique circumstances of this case.

2. Cultural and Religious Conditioning:

   o As a lifelong member of the Church, the plaintiff was conditioned to accept the Church's actions without question, making it extraordinarily difficult to recognize or challenge its neglect within the statutory period.

o    â€¢ The Church's immense cultural and institutional power created an environment where the plaintiff's grievances were effectively suppressed, further justifying equitable tolling.

3. Public Policy Considerations:

o    Public policy strongly supports the protection of missionaries and other members who rely on the Church's guidance and care. Allowing this claim to proceed would send a clear message that institutions must prioritize the mental and emotional welfare of their members, particularly in vulnerable contexts such as missionary service.

4. Continuing Negligence:

o    The Church's failure to address the systemic deficiencies that led to the plaintiff's harm constitutes ongoing negligence. The statute of limitations should not shield the Church from accountability for harm rooted in continuing neglect of its moral and institutional responsibilities.

531.    Relief Requested

The plaintiff seeks the following:

1. Recognition that the statute of limitations should be equitably tolled due to the unique circumstances of delayed discovery, cultural conditioning, and public policy considerations.

2. Compensation for the severe emotional distress caused by the Church's negligent and indifferent actions during and after the plaintiff's mother's death.

3. An injunction requiring the Church to implement systemic reforms to ensure missionaries are provided adequate emotional and psychological support during crises.

**Claim XVI: Religious Coercion and Systemic Harm**

532.     The LDS Church's policies and cultural practices surrounding missionary service represent a form of coercion that crosses the boundaries of religious freedom into undue influence. While missionary service is nominally voluntary, the Church's teachings, cultural expectations, and social pressures create a system where refusal to serve often results in ostracization, diminished opportunities, and profound guilt.

533.     The plaintiff, like many others, was raised in a Church environment that equated missionary service with spiritual worthiness and eternal salvation. The Church often emphasizes the sacrifices of its early pioneers and martyrs as an example for members to follow. While inspiring, these narratives can also become coercive, creating an environment where members feel they must make extreme personal sacrifices to remain in good standing.

The Plaintiff's Experience

534.     The plaintiff, deeply committed to their faith at the time, accepted the call to serve as a missionary. However, this decision came at an extraordinary personal cost. While on their mission, the plaintiff's mother passed away from a debilitating illness. Despite this devastating loss, the plaintiff was neither informed in advance nor offered an opportunity to return home for her funeral. Instead, the plaintiff was encouraged to continue serving, with no meaningful psychological or emotional

support provided. This approach exemplifies the Church's systemic failure to balance its spiritual goals with the well-being of its members.

535.   The plaintiff remained on their mission for an additional year after their mother's death, a sacrifice made in part due to the Church's teachings about duty and obedience. The plaintiff now contends that this sacrifice, compelled by Church teachings and cultural pressures, deprived them of irreplaceable time with their mother and caused lasting emotional harm.

Legal Argument

536.   The Church's practices surrounding missionary service raise significant concerns about undue influence and coercion, particularly when targeting vulnerable youth. While religious freedom is protected under the First Amendment, the courts have established limitations on religious practices that cause harm or exploit individuals:

1. Undue Influence and Coercion: The Church's systemic emphasis on missionary service as a requirement for social and spiritual acceptance undermines the voluntariness of the decision. This aligns with precedents like Reynolds v. United States, which upheld limitations on harmful religious practices, and Sherbert v. Verner, which highlighted the need to balance religious freedoms with individual rights. The plaintiff argues that the Church's cultural and systemic pressures nullify true voluntariness, especially for young, impressionable members.

2. Emotional Distress and Long-Term Harm:  The plaintiff experienced significant emotional distress as a result of the Church's failure to provide

meaningful support during their mother's death. The Church's actions, or lack thereof, constitute negligent infliction of emotional distress, as its failure to offer adequate care or options during a crisis directly contributed to the plaintiff's suffering.

3. Statute of Limitations Argument:  The plaintiff contends that the emotional and psychological harm caused by the Church's coercive practices constitutes a continuing injury. Courts have recognized that certain harms, especially those involving coercion and emotional manipulation, may justify tolling the statute of limitations. The plaintiff argues that their understanding of the harm caused by the Church's actions only became fully apparent after years of reflection, justifying the claim despite the passage of time.

The Need for Reform

537.    This claim also highlights the broader systemic issues within the Church's approach to missionary service. By placing extreme social and moral stakes on participation, the Church risks alienating members, perpetuating harm, and creating a culture of disingenuous compliance rather than genuine faith.

538.    The Church has since revised its policies, allowing missionaries to contact family weekly, a change that reflects a growing recognition of the need for emotional support during service. However, the plaintiff contends that these changes came too late to address the harm caused by earlier practices.

Cult-Like Conditioning

539. The plaintiff further argues that the Church's cultural practices border on cult-like conditioning, particularly when extreme sacrifices are demanded under the guise of voluntariness. Similar to the plaintiff's stepfather's manipulative behaviors justified under religious pretense, the Church's systemic conditioning pressures members to conform at the expense of their personal well-being. This dynamic erodes the line between faith-based commitment and coercive control, raising questions about the ethical and legal boundaries of the Church's practices.

540. Recommendations for Reform

1. Clarify Voluntariness: The Church should take steps to ensure that missionary service is truly voluntary, free from undue social or spiritual pressure.

2. Provide Emotional and Psychological Support: Missionaries should have access to professional support services, particularly during crises.

3. Acknowledge and Address Past Harm: The Church should publicly recognize the sacrifices made by members like the plaintiff and take steps to provide restitution or support where harm has occurred.

4. Revise Teaching Narratives: The Church should emphasize personal agency and inspiration in its teachings, rather than obligation or coercion.

Research Supporting Systemic Coercion

541.    Sociological studies of high-demand religious organizations, including the LDS

Church, have documented how social and cultural expectations can create an

environment of implicit coercion. Key findings include:

1. Psychological Pressure from Doctrine and Leadership

Research shows that doctrines emphasizing sacrifice and obedience often instill

feelings of obligation and guilt in members. For example, the LDS doctrine

heavily emphasizes the need for young men to serve missions as a priesthood

duty, equating it with spiritual worthiness and divine approval.

2. Social Conditioning and Cultural Reinforcement

Studies highlight the use of social conditioning within religious groups to enforce

conformity. Young members are taught from childhood that missionary service is

a rite of passage, critical to their spiritual progression and family honor. Deviation

from this path is often met with subtle ostracization or diminished standing in the

community.  Even in the plaintiffs own home, there were strong undertones of

being cut off by his stepfather without service.  While his grandfather offered to

pay for a mission from a young age. Solidifying expectations.

3. Impact on Mental and Emotional Health

Research also underscores the negative psychological impact of coercion. Studies

have linked undue pressure in religious environments to increased anxiety,

depression, and diminished self-esteem, particularly among individuals unable to

meet these high expectations.

Case Law Contextualizing Coercion

542.    While the First Amendment protects religious organizations, courts have

increasingly recognized the limits of religious influence when it crosses into coercion

or harm. For instance:

- o   Doe v. Holy See (2009) involved claims of systemic abuse within a

  religious institution, illustrating how courts can hold organizations

  accountable for patterns of coercion or neglect.

- o   Other cases have highlighted that religious freedom does not extend to

  undue influence that leads to measurable harm, providing a legal basis

  for addressing coercive dynamics within the LDS missionary program.

Harm Caused by Systemic Coercion

543.    The plaintiff's experience is emblematic of these broader patterns. As a young

missionary, the plaintiff faced significant social, cultural, and spiritual pressure to

serve despite personal challenges, including a lack of support following the death of

his mother. The psychological toll of this coercion was compounded by the Church's

failure to provide meaningful assistance during this time, leaving the plaintiff isolated

and burdened with guilt.

544.    This systemic pressure, paired with the Church's subsequent changes to

missionary policies (e.g., allowing weekly calls home), underscores the plaintiff's

assertion that the program previously prioritized conformity over well-being. While

these changes are positive, they highlight the harm caused to those who served under the previous, more rigid system.

The Call for Accountability and Reform

545.    The plaintiff does not challenge the Church's right to encourage missionary service but asserts that the methods employed to enforce this expectation have caused measurable harm. By framing missionary service as voluntary while leveraging systemic coercion, the Church has created an environment where individuals feel compelled to sacrifice autonomy and well-being for the sake of conformity.

546.    The plaintiff seeks accountability for the emotional and psychological harm caused by this coercive system and calls for further reforms to ensure that future missionaries are supported and empowered to serve without undue pressure. This includes:

1. Acknowledgment of Harm: A formal acknowledgment by the Church of the harm caused by systemic coercion in its missionary program.

2. Increased Support for Missionaries: Policies that prioritize the mental, emotional, and spiritual well-being of missionaries, including transparent acknowledgment of personal choice in service.

3. Cultural Shifts: Educational efforts to reduce stigma against those who choose not to serve missions, fostering a culture of compassion and understanding rather than judgment and ostracization.

Conclusion

547.    The plaintiff respectfully submits this claim to bring attention to the systemic

harm caused by the Church's practices and to advocate for meaningful reform. By

addressing these issues, the Church can better align its practices with its spiritual

mission, protect its members from harm, and safeguard its reputation against future

legal and ethical challenges.

**Count XVII: Systemic Bad Faith and Gross Negligence**

458. Nature of the Claim:  The Defendants acted with bad faith and gross negligence in their interactions with the Plaintiff, resulting in substantial harm. The Defendants' actions went beyond mere negligence, demonstrating intentional misconduct, reckless disregard, and a failure to honor commitments that the Plaintiff reasonably relied upon.

459. Legal Duty and Breach:  The Defendants owed a duty of care to the Plaintiff, arising from their:

o   Representations and implied promises of support and assistance to contributors in times of need.

o   Longstanding relationship with the Plaintiff, including his financial contributions, time, and adherence to the Church's teachings, which established a reasonable expectation of support.

460. The Defendants breached this duty in the following ways:

o   Acting in bad faith by intentionally misrepresenting their willingness and commitment to provide support to contributors like the Plaintiff, despite years of reliance and demonstrated need.

o   Engaging in grossly negligent conduct by failing to fulfill their obligations in a manner consistent with their representations, instead recklessly disregarding the Plaintiff's well-being and the harm caused by their failure to act.

461. Specific Acts of Bad Faith and Gross Negligence: The Defendants' bad faith and gross negligence are evidenced by:

o   Promises and Misrepresentations:

o   The Church made explicit and implicit assurances that members who faithfully contributed financially and through service would receive support in times of need. These assurances were used to solicit contributions from the Plaintiff.

o   The Church denied the Plaintiff food aid despite his longstanding contributions and reliance on their representations, failing to provide reasonable explanations for the denial.

o   Reckless Disregard for Harm:

o   The Church knowingly withheld promised assistance, fully aware of the Plaintiff's dire circumstances and the significant harm this denial would cause

o   The Church's conduct demonstrated a disregard for its own principles and obligations, prioritizing institutional interests over the welfare of its contributors.

o   Furthermore, the church systemically protected abusers over victims.

462. Harm Caused:  As a direct and proximate result of the Defendants' bad faith and gross negligence, the Plaintiff suffered significant harm, including:

o   Emotional distress, stemming from the betrayal of trust and reliance on the Church's promises.

o   Financial hardship, exacerbated by the Defendants' refusal to provide assistance despite the Plaintiff's demonstrated need.

o   Reputational damage, caused by the Church's actions undermining the Plaintiff's standing within his community and family.

463. Secular Nature of the Claim

This claim does not seek to challenge the Church's religious doctrines or beliefs but instead addresses the Defendants' secular conduct, including:

o   Mismanagement of administrative decisions regarding aid distribution.

o   Misrepresentation of commitments made to contributors, which fall outside the scope of protected religious autonomy.

464. Relief Requested

The Plaintiff seeks the following relief:

1. Compensatory damages for emotional distress, financial losses, and reputational harm resulting from the Defendants' bad faith and gross negligence.

2. Punitive damages to deter the Defendants from engaging in similar conduct in the future.

3. Any further relief the Court deems just and equitable.

**Systemic Responsibility**

Introduction

465. The Plaintiff asserts that the Church of Jesus Christ of Latter-day Saints ("the Church") bears systemic responsibility for the harm suffered by its members due to its failure to exercise proper oversight, enforce safeguards, and align its teachings with its professed mission of protecting the vulnerable. The Plaintiff contends that this systemic failure extends beyond individual instances of abuse to encompass institutional policies, practices, and omissions that enabled and perpetuated harm.

466. The church's rigid teachings on chastity combined with its lack of oversight and accountability, created an environment where individuals like the plaintiff's stepfather could misuse their authority under the guise of religious authority. By failing to address the potential for such teachings to be weaponized, the church enabled a culture where abuse was perpetuated and victims were isolated.

Core Elements of Systemic Responsibility

467. Institutional Neglect:

• The Church failed to monitor or regulate the enforcement of its doctrines, allowing harmful practices to proliferate unchecked.

• By delegating significant power to leaders and parents without providing adequate training or oversight, the Church created an environment where abuse and harm were foreseeable.

468. Cultural Enabling of Harm:

• The Church's teachings on chastity and worthiness, including shame-based doctrines, fostered a culture of control and surveillance that justified invasive and abusive behavior.

• This cultural environment normalized the misuse of Church doctrines, leading to significant emotional, psychological, and spiritual harm for vulnerable members, including the Plaintiff.

469. Failure to Align Actions with Mission:

• Despite its professed mission to care for the poor, protect the vulnerable, and uplift the downtrodden, the Church prioritized institutional preservation over the well-being of its members.

• The Church's significant financial resources were not allocated in ways that protected its most vulnerable members or addressed systemic issues that enabled harm.

470. Foreseeability of Harm:

• The Church knew or should have known that its systemic failures—lack of safeguards, harmful teachings, and failure to address patterns of abuse—would lead to harm.

• Decades of public cases involving abuse within religious organizations underscore the foreseeability of harm in the absence of proactive institutional accountability.

## Legal Claims Rooted in Systemic Responsibility

The Plaintiff asserts that the Church's systemic failures support the following legal claims:

471. Negligent Supervision:

• The Church failed to supervise its doctrines, leaders, and members in ways that would prevent harm, allowing systemic failures to impact the Plaintiff directly.

472. Breach of Fiduciary Duty:

• The Church's failure to fulfill its fiduciary-like duty to act in the best interests of its members constitutes a systemic breach of trust and loyalty.

473. Constructive Fraud:

• The Church misrepresented its mission and intentions, fostering reliance on harmful practices and systems that caused significant harm to the Plaintiff.

474. Intentional Infliction of Emotional Distress (IIED):

• The systemic perpetuation of shame-based teachings and lack of safeguards created a framework for extreme and outrageous conduct that caused severe emotional distress.

## Addressing Division Through Doctrinal Balance

475. This case does not challenge the theological validity of the doctrines of The Church of Jesus Christ of Latter-day Saints. Instead, it seeks to examine the real-world consequences of how these doctrines are applied. The Plaintiff asserts that the Church has a responsibility to balance its teachings in a way that promotes harmony and reduces harm. This process is essential for fostering unity, addressing systemic harms, and strengthening the Church's mission to serve all individuals.

**Scriptural Tensions and Real-World Division**

476. **The Church's Role in Controlling the Narrative**:

• The scriptures, including the Book of Mormon, often present arguments and counterarguments to encourage balance and self-reflection. For example, while Alma 30:6–7 describes contention among believers and nonbelievers, Mosiah 18:21 calls for unity, stating, "And he commanded them that there should be no contention one with another, but that they should look forward with one eye, having one faith and one baptism."

• The Church wields significant influence over which aspects of scripture are emphasized. This power allows it to shape the narrative and focus on teachings that align with current societal needs. However, an overemphasis on spiritually affirmative stories, while neglecting the real-world outcomes of doctrinal application, risks alienating members and exacerbating systemic harms.

477. **Polarizing Narratives and Their Impact**:

• Modern interpretations of scriptures that warn against apostasy often create an environment where believers view nonbelievers as threats, while nonbelievers see believers as dogmatic. This dynamic fosters division within families and communities.

• The Plaintiff's family has experienced such divisions firsthand, where doctrinal rigidity has created a sense of superiority among believers and feelings of rejection or alienation among nonbelievers. These divisions are systemic and reflect the Church's failure to acknowledge and address the real-world consequences of its teachings.

## The Second Coming and Preparedness

478.**A Balanced Approach to Readiness**:

• The doctrine of the Second Coming emphasizes vigilance and spiritual preparedness, as taught in Matthew 24:42: "Watch therefore: for ye know not what hour your Lord doth come." However, readiness should also include a focus on actionable service and addressing immediate societal needs.

• The Church must actively decide how to present this doctrine in a way that inspires unity and compassion rather than fear or division. This requires a balance between spiritual preparation and real-world action.

479.**Harmful Consequences of Imbalance**:

• An overemphasis on apocalyptic readiness has, at times, justified actions that neglect or harm individuals and communities. For example, financial hoarding

under the guise of preparation often takes precedence over addressing poverty and
immediate humanitarian needs.

• As Matthew 24:36 states, "But of that day and hour knoweth no man,"
reinforcing the uncertainty of the Second Coming should shift focus toward
unifying service rather than divisive rhetoric or behaviors.


## A Call to Action for the Church

480. **Taking Accountability for Real-World Outcomes**:

• The Church must acknowledge that its choices in how it emphasizes scripture
directly impact its members and society. By selectively focusing on spiritually
affirmative stories that reinforce the status quo, the Church risks ignoring
systemic issues and the voices of those harmed by its practices.

• The Plaintiff calls on the Church to take greater accountability for these
outcomes by actively engaging with all voices in its community, including those
who struggle with doctrinal rigidity or feel disenfranchised. This engagement
should protect the organization's interests while also fostering understanding and
reducing harm.

481. **Creating a Larger Stage for Dialogue**:

• A meaningful stage must be created for all voices to be heard—both believers
and nonbelievers, the faithful and the questioning. The Church has the capacity to
model this balance by emphasizing teachings that promote unity and actionable
compassion, while still upholding its core spiritual values.

• For example, the Church could increase transparency in its decision-making processes, engage with marginalized members, and incorporate constructive feedback from those affected by systemic harms.

## The Opportunity for Systemic Reform

482. **Realigning the Church's Mission:**

• By addressing these issues, the Church has the opportunity to realign its mission with the broader principles of love, service, and unity. As John 13:34 reminds us, "A new commandment I give unto you, That ye love one another; as I have loved you." This teaching compels the Church to prioritize compassion over contention and inclusion over division.

• Rebalancing the emphasis on certain doctrines, such as preparedness for the Second Coming, could help the Church become a stronger, more unifying force in society.

483. **Strengthening Families and Communities:**

• The Church's focus should not solely be on spiritual salvation but also on the practical well-being of its members. By addressing doctrinal imbalances and systemic harms, the Church can strengthen families, foster understanding, and build stronger, more compassionate communities.

• This shift would not only reduce harm but also enhance the Church's credibility and legacy as an institution that truly serves the interests of all its members.

## Conclusion

484. The Plaintiff asserts that the Church cannot entirely blame individual members for misinterpreting or misapplying doctrine while ignoring its own role in shaping the narrative. As the steward of these teachings, the Church has a responsibility to foster balance and address systemic harms. By doing so, it can promote harmony, reduce division, and fulfill its mission to uplift and serve humanity. This process requires transparency, accountability, and an active commitment to the well-being of all individuals, regardless of their beliefs or status within the Church.

**The Church's Responsibility as a Steward of Doctrine and Scripture**

485. The Plaintiff anticipates that the Church of Jesus Christ of Latter-day Saints will argue that it cannot be held accountable for the negative outcomes stemming from scriptural teachings or doctrinal applications, as it does not claim to have written the scriptures. While this argument may hold surface-level merit, it ignores the Church's nearly absolute authority over how scriptures and doctrines are interpreted, applied, and enforced among its members. As a self-declared steward of divine truth, the Church must also bear responsibility for the consequences—both positive and negative—of how these teachings are taught and implemented.

**The Power to Interpret and Apply Doctrine**

486. The Church has long demonstrated its ability to adapt scriptural interpretation to meet societal needs, proving that it has the power to prevent harm and guide positive outcomes. This control over application carries an inherent responsibility to provide checks and balances that mitigate the misuse of scripture and doctrine.

487. **Selective Application of Scriptural Narratives:**

• While polygamy is a practice referenced in Church scripture, the Church has chosen to abandon it and distance itself from organizations that still practice it.

This demonstrates the Church's ability to de-emphasize certain doctrines when necessary to align with societal expectations and its own evolving mission.

• Similarly, the story of Nephi in the Book of Mormon, in which he commits murder under divine instruction to obtain sacred records, is not taught as a literal call to emulate such behavior. Instead, the Church contextualizes the story to align with broader teachings of faith and obedience.

• Other examples, such as the selective teaching of scriptures relating to forgiveness, chastity, and obedience, further illustrate the Church's ability to determine how doctrine is emphasized and applied.

488. **Examples of Balancing Doctrinal Rigor with Inclusivity**:

• The Church's recent approach to the LGBTQ community demonstrates its ability to balance doctrinal adherence with compassion. While it has not changed its core teachings on families, it has called for greater understanding and inclusivity, showing that it can evolve to reduce harm and promote unity.

## Accountability as a Steward

489. As an institution that claims divine stewardship, the Church must take accountability for the outcomes of its doctrines and teachings. It cannot selectively accept credit for positive outcomes while disavowing responsibility for harm.

490. **Taking Credit for Good**:

• The Church frequently emphasizes its role in inspiring acts of charity and service, even including the volunteer hours of its members in its reported financial contributions. This demonstrates its willingness to claim credit for the actions of its members.

• For example, the Church's annual reports tout billions in donations, but much of this is calculated by including member-donated time, rather than actual financial expenditures. This willingness to accept credit for good deeds highlights the Church's direct influence over its membership.

491. **Refusing Accountability for Harm:**

• Conversely, the Church has consistently leaned on arguments of individual free will and the "foibles of men" to avoid organizational accountability for harm. This deflection perpetuates harm and prevents systemic reform.

• The Plaintiff's experiences with his stepfather's misuse of doctrine to justify abusive behaviors exemplify the harm caused when the Church fails to implement checks and balances on its teachings.

492. **Time for Organizational Accountability:**

• The Church has spent generations demanding accountability from its members while refusing to hold itself accountable as an organization. This practice must end. True stewardship requires humility and the willingness to address harm, even when it implicates the Church itself.

• Without such accountability, the Church risks becoming the same type of institution that abuses power at every step, as seen in the Plaintiff's concurrent case against Bedford County. The Church has the opportunity to choose humility

252

and reform, or to double down on deflection and risk alienating its members and the broader public.

**Creating Space and Reducing Polarization**

493. Accountability and reform will naturally reduce polarization within and outside the Church. By allowing itself to be held accountable, the Church can create space for individuals like the Plaintiff who have been alienated through its general practices and doctrines, as well as through increased transparency that reveals historical issues with its truth claims.

494. **Fostering Understanding and Compassion**:

• Acknowledging harm and addressing systemic issues will reduce the divide between believers and nonbelievers. Believers often rely on spiritually affirmative stories to justify their faith, while nonbelievers may feel compelled to use harsh rhetoric like "brainwashing" to challenge the Church's narratives. Accountability provides a middle ground where both perspectives can be acknowledged and respected.

495. **Balancing Claims of Truth and Application**:

• This is not about challenging the Church's claims of truth or power but about balancing these claims with real-world application and outcomes. The Church has the ability to control the narrative by focusing on the scriptural principles that foster compassion, unity, and understanding, while mitigating the harm caused by overly rigid or harmful interpretations.

496. **Strengthening the Mission of the Church**:

• By addressing systemic issues, the Church can strengthen its mission to uplift and care for all its members. Balancing its claims of truth with a focus on real-world outcomes will help fulfill its divine mission while fostering a more inclusive and harmonious community.

## Checks and Balances Must Be Instituted

497. **Preventing Misuse of Doctrine**:

• The Church has demonstrated the ability to reinterpret scripture when it aligns with its goals. This same capacity must be applied to prevent the misuse of doctrine in ways that harm individuals, families, and communities.

• In the Plaintiff's case, Church teachings on sexual purity and authority were misused to justify invasive and abusive behaviors by a trusted authority figure. The Church cannot evade responsibility for enabling this harm through its doctrinal teachings and cultural enforcement.

498. **Mitigating Systemic Harm**:

• By leaning into spiritually affirmative narratives and dismissing systemic issues, the Church contributes to harm and alienation among its members. Implementing safeguards against harmful interpretations of scripture would demonstrate the humility and accountability that true stewardship requires.

## A Call to Action for Reform

499. The Plaintiff calls on the Church to step forward and take meaningful accountability for the real-world consequences of its teachings. This accountability is not an attack on the Church's faith or doctrines but an appeal for reform that aligns its practices with its stated mission to uplift and care for its members.

500. **Acknowledge the Power to Shape Outcomes**:

• The Church holds significant influence over the interpretation and application of its doctrines. It must use this power responsibly to mitigate harm and foster a more compassionate and inclusive environment.

• This includes taking ownership of the systemic harm caused by its teachings, even when those teachings are not inherently flawed but misapplied.

501. **Promote Organizational Humility**:

• By acknowledging its role in both good and bad outcomes, the Church can demonstrate true humility and leadership. This is an opportunity to strengthen its mission and credibility by addressing systemic issues head-on.

502. **Balance the Narrative**:

• The Church must stop selectively focusing on positive outcomes while ignoring harm. A balanced narrative that addresses systemic harm and promotes reform will foster greater unity and trust within the Church and among its members.

**Conclusion**

503. The Church of Jesus Christ of Latter-day Saints cannot deflect accountability for the real-world consequences of its teachings. As stewards of scripture and doctrine, the Church has both the power and responsibility to promote good and prevent harm. By taking this step toward organizational humility and reform, the Church can lead by example, foster greater unity, and better fulfill its divine mission. Failure to do so risks perpetuating the systemic harms that have caused suffering for generations of its members, including the Plaintiff.

**Further Proposed Reforms and Relief Requested**

504. **Revisiting Tithing Doctrine**:

• Return to the original interpretation of surplus income, allowing members to meet their basic needs before contributing financially to the Church.

• Eliminate the requirement of tithing for temple access and spiritual privileges for members experiencing financial hardship.

505. **Transparency in Fast Offerings**:

• Mandate detailed financial reporting for fast offerings, including allocations and distributions, to ensure these funds are used effectively and equitably.

• Implement standardized guidelines for administering fast offerings to eliminate delays, denials, and inconsistencies.

506. **Increased Emphasis on Fast Offerings**:

• Shift institutional focus from mandatory tithing to fast offerings as the primary means of supporting the Church's mission to care for the poor.

• Encourage members who cannot afford both tithing and fast offerings to prioritize fast offerings, aligning with the Church's stated mission.

507.**Reallocation of Reserves**:

• Redirect a significant portion of the Church's reserves toward humanitarian aid and member support, ensuring alignment with its stated purpose as a tax-exempt entity.

## Secular and Ethical Accountability

### 508. Legal Obligations as a Tax-Exempt Entity:

• The Church's tax-exempt status requires it to use funds for charitable purposes. Excessive reserve accumulation and insufficient aid distribution raise questions about compliance with these obligations.

• Courts have the authority to address the Church's financial practices under secular law, as established in *Watson v. Jones* and *James Huntsman v. Corporation of the President*.

### 509. Alignment with Christ's Teachings:

• Christ's teachings on caring for the poor (Matthew 25:35-40) emphasize the moral obligation to prioritize aid over institutional wealth accumulation.

• A renewed focus on fast offerings and equitable aid distribution would align the Church's practices with its professed mission and ethical responsibilities.

510. Declaratory relief establishing that the Church's aid practices are inconsistent and require reform.

- Plaintiff requests declaratory relief establishing that the Church's practices regarding fast offerings and aid distribution are inconsistent, subjective, and lacking in transparency, creating harm to members who rely on such promises.

- Plaintiff seeks injunctive relief requiring the Church to implement systemic reforms, including:

  a. Transparent and consistent policies for distributing fast offerings;

  b. Training for bishops and local leaders to ensure fair and equitable aid practices;

  c. A mechanism for members to appeal aid denials or address discrepancies.

- These reforms serve both Plaintiff and the broader Church membership by aligning aid practices with the Church's stated principles of charity and support.

511. Injunctive relief requiring the Church to implement transparent policies, training, and appeal mechanisms for aid distribution.

512. Compensatory damages for emotional and financial harm caused by the Church's actions, in an amount to be determined at trial.

513. Restitution for unjust enrichment arising from Plaintiff's substantial contributions, which were provided with the expectations of charitable aid as outlined in the Church's teachings and practices but were not fulfilled in practice.

514. An independent audit of the Church's fast offering distribution to ensure transparency and equitable use of funds and alignment with the stated charitable purposes of these contributions.

515. Implementation of clear timelines for processing and resolving aid requests to minimize delays.

516. Establishment of a centralized appeals process for members to challenge aid denials.

517. A reduced emphasis on mandatory tithing contributions, recognizing that the Church's financial reserves and business ventures provide sufficient funds to sustain its operations.

518. An increased emphasis on fast offerings as the primary means of addressing financial need within the Church. Fast offerings directly support struggling members and align with Christ's teachings on charity and care for the poor.

519. Greater transparency regarding the Church's use of financial resources, ensuring that funds are allocated in alignment with its stated mission to care for the poor and needy.

520. The plaintiff respectfully requests that the Court order the Church to implement transparent, objective, and equitable policies for distributing aid. Such reforms are necessary to ensure that members in need are no longer left to suffer while the Church retains vast financial reserves. The plaintiff also calls for a reevaluation of the Church's teachings on tithing and preparation, particularly among the poor, to align its practices with the principles of charity and justice found in the teachings of Christ.

521. The story of the widow's mite serves as a poignant reminder of the faith and devotion of the vulnerable, but it also underscores the moral failing of systems that demand such sacrifices. Similarly, the parable of the ten virgins, while teaching valuable lessons on preparation, must be balanced with the imperative to assist those in need. With resources far exceeding its operational needs, the Church has a moral and spiritual obligation to ensure that no member faces deprivation or shame for their inability to give or prepare. This case seeks not only to redress harm but to bring about systemic reform that upholds the Church's professed mission to care for the poor and needy.

**Continued Damages For Sexual Abuse**

522. **Compensatory Damages**

• Award the Plaintiff compensatory damages in an amount to be determined at trial for:

• **Emotional and Psychological Harm**: Damages for the significant emotional distress, humiliation, and long-lasting trauma caused by the Defendant's negligence and systemic failures.

• **Loss of Trust and Faith**: Damages for the spiritual and emotional harm caused by the breach of fiduciary duty and the Defendant's failure to protect the Plaintiff.

• **Pain and Suffering**: Damages for the profound and ongoing impact on the Plaintiff's mental health and personal development.

523.**Punitive Damages**

• Award punitive damages to hold the Defendant accountable for:

• Fostering a culture of shame-based teachings and worthiness practices that enabled abuse.

• Failing to provide safeguards or oversight to prevent harm to vulnerable members like the Plaintiff.

• Prioritizing institutional wealth and control over the safety and well-being of its members.

• Such damages are necessary to deter the Defendant from perpetuating similar conduct in the future.

524.**Injunctive Relief**

• Issue injunctive relief requiring the Defendant to implement systemic reforms, including:

525.**Abuse Prevention Measures**:

• Mandatory training for Church leaders, parents, and members on maintaining healthy boundaries, respecting privacy, and preventing abuse.

• Establishment of oversight mechanisms to monitor and regulate worthiness interviews and other practices prone to misuse.

526.**Transparency and Accountability**:

• Public disclosure of policies related to child protection, worthiness interviews, and disciplinary actions.

• Creation of a transparent reporting and investigation process for abuse allegations.

527.**Doctrinal Reforms**:

• Revision of shame-based teachings on chastity and worthiness to ensure they are not misused to justify invasive or abusive behavior.

• Emphasis on compassion, dignity, and support for vulnerable members, including children and those experiencing personal struggles.

528.**Restitution for Past Contributions**

• Require the Defendant to provide restitution for tithes, fast offerings, or other contributions made by the Plaintiff and his family, which were solicited under false pretenses or misused in ways contrary to the Church's stated mission to protect and care for its members.

529.**Court-Appointed Monitoring**

• Appoint an independent monitor or panel to oversee the implementation of systemic reforms, ensuring:

• Compliance with court-ordered measures.

• Ongoing accountability for the Defendant's practices related to child protection, financial transparency, and member well-being.

530.**Declaratory Relief**

• Declare that the Defendant's conduct, including its systemic failures and negligence, constitutes:

• A breach of fiduciary duty owed to its members.

• Negligent supervision and enabling of harmful practices.

• Constructive fraud through misrepresentation of its mission and failure to act in the best interests of its members.

531.**Additional Relief**

• Award any additional relief the Court deems just and proper, including:

• Funding for mental health counseling and support services for the Plaintiff and other victims of the Defendant's systemic failures.

• Public acknowledgment of the harm caused by the Defendant's practices and a formal apology to the Plaintiff and other affected members.

**Conclusion**

**Witnessing Systemic Retaliation Against Victims**

532. The plaintiff's wife personally witnessed the systemic retaliation and neglect that abuse victims often faced within the Church. During group therapy sessions organized by the Church, the plaintiff's wife and other women shared their experiences of seeking help for abuse. Many of these women recounted how they had been harmed not only by their abusers but also by the Church leadership tasked with protecting them.

533. Women described incidents of sexual abuse perpetrated by bishops, stake presidents, and other Church authorities. When these women sought justice or safety, their pleas were often met with blame, dismissal, or outright punishment. Meanwhile, their abusers frequently faced minimal or no consequences, protected by a system that prioritized confidentiality and reputation over accountability and justice.

534. These accounts reveal a troubling dynamic: the Church's approach to abuse often punishes the victim rather than addressing the perpetrator. The plaintiff and his wife believe this pattern is rooted in the Church's systemic failures, including its emphasis on forgiveness, male authority, and internal resolution of conflicts. Such an environment leaves victims unsupported, emboldens abusers, and perpetuates cycles of harm.

535. This troubling dynamic is further evidenced by the Church's uneven handling of disciplinary matters. For example, the plaintiff's wife was subjected to the humiliation of a Church disciplinary council after she and her ex-husband engaged in heavy petting before their marriage. Despite the fact that this behavior was consensual and occurred while both individuals were unmarried, the Church required the plaintiff's wife to confess her actions before a room full of men and undergo an intense repentance process.

536. By contrast, the plaintiff's wife's ex-husband—who repeatedly engaged in physical violence, verbal abuse, and psychological harm—was never subjected to the same public scrutiny or consequences. Despite multiple bishops being informed of his abusive behavior, Church leaders consistently handled the matter privately, allowing him to maintain his standing in the Church and avoid any significant discipline. This stark contrast highlights a systemic imbalance within the Church's priorities: while the Church focuses on controlling sexual behavior, it fails to address or appropriately respond to acts of domestic violence and abuse.

537. As the plaintiff brings this lawsuit, the Church must recognize and avoid repeating these patterns of retaliation and neglect. Should the Church choose to excommunicate the plaintiff instead of the perpetrator or take other retaliatory actions in response to this lawsuit, such actions would serve only to reinforce the systemic failures outlined in this complaint. Excommunication or other punitive measures would send a chilling message

to victims and whistleblowers alike: that those who come forward to expose

abuse or seek accountability will be silenced and punished.

538. The plaintiff explicitly warns the Church against taking any such retaliatory

action. Any attempt to excommunicate or punish the plaintiff in connection

with this lawsuit will result in additional legal claims, further highlighting the

Church's systemic negligence and failure to protect its members. The plaintiff

hopes to resolve this matter in a way that prioritizes justice, accountability,

and meaningful reform, but he will not hesitate to take further action if

necessary.

**Why the Church is the Appropriate Entity to Sue**

539. The plaintiff acknowledges that, in isolation, the sexual abuse perpetrated by

his stepfather might fall short of meeting traditional legal standards due to its

covert nature. The stepfather's actions—repeatedly walking in on the plaintiff

in the shower and creating a climate of fear—did not involve physical contact

as far as the plaintiff remembers. While these behaviors inflicted significant

emotional and psychological harm, the absence of physical contact or explicit

sexual acts could lead a court to dismiss the abuse as insubstantial under

existing legal frameworks.

540. However, when placed in the broader context of the Church's teachings,

culture, and systemic failures, the abuse takes on clear legal weight. The

plaintiff's stepfather's behavior cannot be viewed in isolation, as it was

enabled and reinforced by the Church's institutional environment. The hyper-focus on sexual purity within the Church, combined with the deference to male authority and the lack of meaningful oversight, created a system in which covert abuse could thrive without consequence.

541. The plaintiff's stepfather often took liberties in interpreting Church doctrine, favoring an Old Testament-style approach that emphasized fear, control, and domination. While gaining a perverse sense of gratification over the endeavor while sexually terrorizing the plaintiff with his psychological warfare. He frequently described child-rearing as a "battle of wills," likening it to breaking a horse. He cited scriptures such as "the natural man is an enemy to God" to justify his harsh and authoritarian methods, which instilled fear and shame in the plaintiff and his siblings. This approach stood in stark contrast to Christ's teachings in the New Testament, which invite individuals to emulate the innocence and purity of little children—those whom Christ cherished and protected.

542. The dichotomy in Church doctrine, which contains both Old Testament teachings focused on control and New Testament teachings focused on love and respect, has allowed Church leaders and members to adopt vastly different approaches. Over the years, the Church itself has waffled between these two paradigms, creating a culture where individuals like the plaintiff's stepfather could justify abusive behavior by selectively interpreting scripture. This dichotomy enables abusers to weaponize doctrine while simultaneously maintaining the Church's claims to moral authority.

543. The Church must now make a conscious decision about which paradigm it will prioritize: the fear, force, and control exemplified in its more Old Testament approach, or the unconditional love, mutual respect, and invitation to transformation embodied by Christ in the New Testament. The plaintiff believes that without a deliberate shift toward Christ-like love and care for the vulnerable, the Church's culture will continue to enable and perpetuate harm under the guise of religious authority.

544. Furthermore, the plaintiff's fear of speaking out against his stepfather was deeply rooted in this doctrinal tension. The plaintiff internalized teachings that framed humanity as inherently sinful and unworthy, leading him to view himself as irredeemable—a "natural man" and a "son of perdition." These beliefs, instilled by the Church's cultural environment, left him feeling ashamed, isolated, and incapable of seeking help. This same cultural environment emboldened his stepfather, whose actions went unchecked due to the Church's failure to establish safeguards or provide appropriate accountability mechanisms.

545. Because the plaintiff's stepfather's abuse operated within this systemic framework, it must be addressed at the institutional level. The Church, as the system that created the environment enabling the abuse, is the most appropriate entity to hold accountable. Suing the stepfather alone would fail to address the root causes of the harm and would leave the larger systemic issues unchallenged.

546. The plaintiff's case also highlights a critical gap in the legal system's ability to address covert abuse. Without the context of the Church's systemic failures, the plaintiff's claims against his stepfather would likely be dismissed as insubstantial. This demonstrates the need to hold institutions accountable when they enable and perpetuate environments that allow covert abuse to occur. By addressing the systemic nature of the problem, this lawsuit seeks to not only bring justice to the plaintiff but also to expose and reform the conditions that allow covert abuse to go unchallenged.

**A Call for Accountability and Reform**

547. This case is not simply about holding one individual accountable for their abusive actions. It is about addressing the systemic failures within the Church that enabled and perpetuated harm. The plaintiff's stepfather's covert abuse, while devastating, cannot be fully understood outside the cultural and institutional context created by the Church. Without these systemic issues, his behavior may have been recognized and stopped, and the plaintiff's suffering could have been prevented.

548. The Church now faces a pivotal choice. It must decide whether to continue down a path shaped by fear, control, and domination—the hallmarks of an Old Testament approach—or embrace the love, respect, and invitation to transformation exemplified by Christ in the New Testament. The Church has

long wavered between these two paradigms, and this ambiguity has created a dangerous environment where abusers can thrive while victims are silenced.

549. The plaintiff's stepfather, like many others, weaponized the Church's teachings to justify his actions, interpreting scriptures such as "the natural man is an enemy to God" as a license to dominate, control, and instill fear. This approach starkly contrasts with Christ's invitation to be like little children, whom He cherished and protected. The plaintiff himself internalized this harmful dichotomy, coming to view himself as irredeemable—a "son of perdition"—due to the Church's hyper-focus on sexual purity and its failure to provide age-appropriate, compassionate guidance.

550. The plaintiff brings this lawsuit not out of spite but out of a desire to hold the Church accountable for the systemic conditions it has created and to ensure that others are spared from similar harm. The Church must recognize that its cultural practices and doctrinal ambiguities have profound real-world consequences. If it continues to prioritize reputation and authority over love and accountability, it risks perpetuating cycles of abuse and losing the moral authority it claims to hold.

551. This case is a call to action—a chance for the Church to reflect, reform, and recommit to its highest values. By addressing the systemic failures at the heart of this lawsuit, the Church has the opportunity to become a true haven for the vulnerable and a champion for justice. But if it fails to act, it will only reinforce the patterns of harm that have brought us to this moment.

**Examining Real-World Consequences: Fostering Peace and Understanding**

552. This case does not seek to challenge the validity of the doctrines taught by the Church of Jesus Christ of Latter-day Saints, nor does it ask the court to wade into matters of theological truth. Instead, it asks the court to evaluate the tangible, real-world consequences of these doctrines as they are applied in practice and to ensure that their implementation does not lead to systemic harm, neglect, or abuse. By focusing on the outcomes of these teachings, this case aims to foster greater understanding between believers and nonbelievers while mitigating the negative fallout that often arises when differing perspectives collide.

Balancing Perspectives

553. Believers often highlight anecdotal stories that demonstrate the faith-promoting benefits of Church teachings, pointing to lives improved and communities strengthened. These narratives, however, can unintentionally overshadow or invalidate the experiences of those who have been harmed by the same doctrines. On the other side, nonbelievers often take a harsher approach, labeling adherence to these teachings as "brainwashing" or criticizing the institution in ways that foster hostility and misunderstanding.

554. Neither approach fosters dialogue, compassion, or meaningful reform. This court is uniquely positioned to take a balanced approach, evaluating the real-world consequences of Church doctrines without deliberating on their validity. By addressing the systemic issues that arise from these teachings, the

court can provide a framework for reconciliation and societal improvement that benefits both believers and nonbelievers alike.

The Role of the Courts in Mitigating Harm

555. The court's role is not to determine whether the doctrines themselves are true or valid but to evaluate whether their application causes foreseeable harm and whether the Church has taken reasonable steps to prevent such harm. For example:

• Doctrinal Rigor and Oversight: When the Church emphasizes strict adherence to principles such as chastity or priesthood authority without providing safeguards, it creates an environment where individuals can misuse these teachings to exert control or perpetrate abuse.

• Systemic Accountability: The Church has a responsibility to ensure that its teachings and practices are implemented in ways that protect all members, particularly vulnerable populations like children, women, and those in crisis.

• Balancing Doctrine and Practice: By evaluating the impact of these teachings on real lives, the court can help foster an environment where spiritual beliefs coexist with compassion and accountability.

A Path Toward Understanding

556. This case serves as an opportunity to build a bridge of understanding between believers and nonbelievers, mitigating the hostility that often arises from these deeply personal issues. It seeks to strengthen society by:

1. Encouraging believers to recognize the unintended consequences of rigid doctrinal enforcement and how it can lead to harm.

2. Challenging nonbelievers to approach these issues with compassion, recognizing that many adhere to these teachings out of sincere faith.

3. Promoting systemic reform that ensures doctrines are applied in ways that uphold the dignity, safety, and well-being of all members.

557. The Plaintiff brings this case not to attack the Church's faith or its foundational beliefs but to address how its teachings are implemented and the harm that arises when they are misused or left unchecked. By examining these issues, this court has the opportunity to promote peace, understanding, and a stronger society where differing perspectives can coexist without causing unnecessary harm or division.

558. The Plaintiff's intent in bringing this case is not to divide, but to unite. By fostering an environment where believers and nonbelievers can coexist with mutual respect and understanding, the Church has an opportunity to strengthen its mission and better serve its members and society as a whole. This approach shifts the focus away from doctrinal differences and toward the fundamental well-being of our fellow man, which is ultimately aligned with the Church's stated goals of love, service, and community.

**Inclusivity as a Strength**

559. **Acknowledging Diversity Within the Faith**:

• Among the Church's members and those who have left, there exists a wide range of beliefs and levels of adherence to doctrine. By creating space for those who struggle with

274

certain teachings or have chosen to step away, the Church can demonstrate compassion and inclusivity while retaining a meaningful connection with those individuals.

• This inclusivity does not weaken the Church's mission but strengthens it by showing that its core values—love, charity, and service—are extended to all, regardless of belief or status.

560. **Reducing Hostility and Division**:

• The current dynamic often fosters a sense of superiority among believers and feelings of alienation or rejection among nonbelievers, creating an impasse. Believers may view nonbelievers as apostates, while nonbelievers may see believers as brainwashed. This environment undermines both individual relationships and the Church's broader societal impact.

• By actively addressing these divides and promoting cooperation and understanding, the Church can reduce hostility and foster a sense of unity even in the face of doctrinal disagreements.

561. **Aligning with the Church's Mission**

1. **The Fundamental Teachings of Christ**:

• Christ's teachings emphasized love, service, and the well-being of all people, regardless of their faith or status. John 13:34 states, "A new commandment I give unto you, That ye love one another; as I have loved you." This foundational principle can guide the Church toward greater inclusivity and reconciliation.

• Creating a space where doctrinal differences are not a barrier to cooperation or compassion aligns the Church more closely with Christ's example.

2. **Service to the Vulnerable**:

• The Church has a stated mission to care for the poor and the vulnerable. Ensuring that this mission is fulfilled without prejudice or doctrinal barriers reinforces the Church's integrity and strengthens its ability to serve all people effectively.

562. **The Broader Societal Impact**

1. **A Model for Compassion and Cooperation**:

   • By taking a leading role in fostering understanding between believers and nonbelievers, the Church can set a powerful example for other institutions. This example would demonstrate how doctrinal adherence can coexist with inclusivity and compassion.

   • Such an approach not only benefits the Church but also contributes to a stronger, more unified society where differences are respected rather than weaponized.

2. **Strengthening the Church's Legacy**:

   • The Church's ability to evolve and address the needs of its members in a changing world will determine its long-term relevance and strength. By focusing on the well-being of individuals over doctrinal rigidity, the Church positions itself as a dynamic, compassionate institution capable of inspiring generations to come.

563. The Plaintiff's aim is to encourage the Church to reflect on how its teachings and practices impact all individuals—believers and nonbelievers alike. By creating space for inclusivity, the Church can mitigate harm, foster cooperation, and refocus on the well-being of all people. This approach not only strengthens society but also reinforces the Church's mission to serve, uplift, and unify.

**A Constructive Call for Accountability**

564. The Plaintiff wishes to clarify that this action is not a condemnation of the Church or its foundational mission. It is not brought forth out of hostility or an attempt to undermine its truth claims. Rather, this lawsuit serves as a constructive plea for accountability and reform, rooted in the belief that the Church possesses the capacity to lead by example and address the harm resulting from its systems and practices.

565. **Historical Precedent of Marginalized Voices**

• Throughout history, some of the most profound calls for reform and righteousness came from individuals in humble or marginalized positions. Prophets like Amos, a simple shepherd, were chosen to speak out against systemic injustices, calling for accountability and urging the powerful to align with divine principles.

• The Plaintiff, a simple door-to-door salesman, stands in a parallel position, advocating for reform from a position of humility and perceived insignificance. While the Plaintiff does not claim the mantle of a prophet, his role as a voice of warning to one of the most powerful religious organizations in the world carries similar weight in modern times.

566. **A Modern Parallel**

• The Plaintiff stands before the Church as a disenfranchised member without formal authority, but with a deep understanding of the harm caused by systemic neglect. Like a shepherd who speaks truth to power, the Plaintiff calls for a

reevaluation of practices that alienate and harm vulnerable members of the Church community.

### 567. Avoiding Dismissal as Apostasy

• It would be prudent for the Church not to dismiss this plea as mere apostasy. Historically, labeling dissenting voices as apostate has led to the marginalization of individuals advocating for necessary change. Recognizing the value in such perspectives can prevent the alienation of members who seek the Church's growth and betterment.

### 568. A Voice of Warning, Not Destruction

• The Plaintiff does not seek to exploit the Church's legal vulnerabilities to its detriment. Instead, this action serves as a warning. If the Church remains unresponsive to calls for accountability and reform, it risks future challenges from others who may not share the Plaintiff's intent to preserve and strengthen the institution.

• The Plaintiff recognizes the Church's potential to lead by example, not only for its members but for all institutions grappling with accountability and systemic harm.

### 569. Embracing Accountability to Prevent Exploitation

• By proactively addressing its shortcomings, the Church can fortify itself against potential exploitation of its weaknesses. Embracing transparency and reform not only aligns with its spiritual mission but also safeguards its structural integrity against those who might seek its downfall.

**Willingness to Resolve Through Meaningful Reform**

570. The Plaintiff acknowledges the profound personal toll of the systemic failures addressed in this lawsuit. These failures have not only disenfranchised the Plaintiff from The Church of Jesus Christ of Latter-day Saints but also fractured familial relationships and contributed to a broader sense of isolation. As a result, the Plaintiff stands in a position with little left to lose by pursuing this case to its conclusion.

571. At the same time, the Plaintiff is actively working to hold a highly retaliatory government accountable in a separate case against Bedford County, one that is similarly poised to proceed through the court system. Given the significant personal and institutional stakes involved, the Plaintiff believes that meaningful alignment between the Plaintiff and the Church is in the best interest of all parties. Without such alignment, severe harm could be caused not only to the Plaintiff but also to the Church, its members, and its broader mission.

572. To this end, the Plaintiff is open and willing to resolve these matters outside of court, provided that the Church implements meaningful reforms to address the issues raised in this lawsuit. These reforms should include:

1. **Increased Transparency:** Clearer guidelines and reporting on the use and allocation of tithing funds, ensuring alignment with the Church's mission to care for the poor and needy.

2. **Safeguards Against Abuse:** Development of enforceable policies and practices to protect members from abuse and provide accountability for leaders.

3. **Support for Vulnerable Members:** Improved mechanisms to assist members facing financial, emotional, or spiritual crises, ensuring equitable treatment and access to aid.

573. Such reforms would provide the Church an opportunity to strengthen its governance and align more closely with its foundational principles, while avoiding the potential fallout of prolonged litigation.

**No Tolerance for Retaliation**

574. The Plaintiff emphasizes that this offer to settle is made in good faith, with the hope that the Church will seize this opportunity to internally address the systemic issues outlined. However, any actions perceived as retaliatory—such as threats of excommunication, declarations of apostasy, or attempts to discredit the Plaintiff—will leave no alternative but to carry this lawsuit through to its conclusion. In such an event, the Plaintiff will seek to establish legal precedent that could profoundly affect the Church's governance and its practices going forward.

575. The Plaintiff reiterates that this lawsuit is not intended to harm the Church but to bring about much-needed reforms that will benefit its members and its mission. Nevertheless, the Plaintiff stands ready to see this case through the court system if necessary, recognizing that meaningful resolution is critical to prevent further harm to both the Plaintiff and the Church.

**A Call for Mutual Benefit**

576. The Plaintiff believes that aligning on these issues offers an opportunity for reconciliation and growth for all parties. By addressing these matters internally, the Church can demonstrate its commitment to its mission, its members, and its values. Similarly, the Plaintiff can avoid further personal harm and focus on a broader fight for accountability in other areas. This moment represents a chance for meaningful reform, unity, and a resolution that avoids unnecessary and lasting damage.

577. The plaintiff takes no pleasure in filing this lawsuit against the LDS church. It has caused great internal conflict, as the plaintiff must balance genuine gratitude for the past assistance the Church has provide with the need to address systemic deficiencies that continue to harm those in real need. Acknowledging the Church's past aid does not erase the impact of these

deficiencies, which hinder its ability to fulfill its mission to serve the poor and the needy.

578. The plaintiff respectfully asks the Church to recognize the good faith efforts made to resolve these issues through proper channels and to ensure no further retaliation against the plaintiff, whether through withholding aid, labeling as an apostate, or other punitive measures such as excommunication. Having already face significant retaliation from Bedford County, the plaintiff wishes to align with the Church's mission and principles to protect the vulnerable, which serve as the foundation for both this lawsuit and the lawsuit against Bedford County.

579. The requested reforms—transparent aid policies, training for local leaders, and an appeals mechanism—are essential to addressing systemic inconsistencies in the Church's aid practices. These reforms align with the Church's mission of caring for its members, the poor and the needy, while ensuring equitable support for all, particularly those facing crises.

580. The Church's inconsistent aid practices have compounded the harm caused by Bedford County's retaliatory actions, leaving Plaintiff and his family without the reliable support necessary to navigate ongoing challenges. Implementing systemic reforms is not only vital to protect Plaintiff but also essential to uphold the Church's mission of caring for those in need. By ensuring timely and consistent aid, the Church can eliminate unnecessary barriers that harm vulnerable members and restore trust in its practices.

581. This case, together with the Plaintiff's ongoing lawsuit against Bedford County, represents an unprecedented effort to hold two of the most powerful institutions—Church and State—accountable for harm caused by arbitrary and inconsistent decision-making.   These lawsuits aim to highlight systemic failures in both governance and religious administration, emphasizing the profound impact such failures have on the most vulnerable populations. The Plaintiff brings this case not from a position of privilege or traditional power, but from a place of vulnerability and hardship, adding moral weight and urgency to this effort.

582. The Church and the State, while distinct in their roles, hold equal power in shaping the lives of individuals and communities. Their influence is vast, their reach unparalleled, and their decisions carry life-altering consequences. It is precisely because of this power that both must act with transparency, fairness, and accountability. While the State is bound by constitutional principles and laws, the Church is guided by its moral and spiritual commitments. Yet, in both cases, the failure to uphold these responsibilities creates harm that disproportionately impacts the vulnerable.

583. The sacred balance between Church and State, a cornerstone of our democracy, relies on mutual accountability and respect for their separate spheres of influence. The Plaintiff acknowledges that this balance must be preserved, as disrupting it could lead to greater harm. The purpose of this lawsuit is not to demand complete transparency or to undermine the Church's autonomy. Such an outcome would risk damaging the Church's spiritual

mission and destabilizing the delicate equilibrium between Church and State. Instead, the Plaintiff seeks to address specific instances of harm caused by inconsistency and arbitrariness in the administration of aid.

584. By challenging both Bedford County and the LDS Church simultaneously, this lawsuit calls attention to the shared responsibility of both institutions to protect the most vulnerable. The arbitrary enforcement of laws by Bedford County and the inconsistent aid distribution by the Church reveal a troubling pattern: decisions made without accountability harm those who are already struggling and erode the trust that individuals place in these powerful institutions.

585. The Plaintiff's purpose is not to disrupt or dismantle but to reform and realign. The accountability sought in this case is reasonably aimed at ensuring that the Church's actions align with its stated mission to care for the poor and needy, rather than undermining the value of vital and timely assistance that the church has already graciously given through Bishop Call. As well as a call to ensure that systemic abuse does not continue to facilitate those who would wrongfully leverage the church's authority for personal gain and abuse. Likewise, the Bedford County lawsuit seeks to ensure that governmental power is wielded fairly and without retaliation. Together, these cases represent a unified effort to restore trust and integrity in both Church and State by addressing the harm caused by their unchecked actions.

586. This Court has an extraordinary opportunity to affirm that power—whether wielded by government or religious institutions—must not be exercised

arbitrarily or without regard for its impact on the vulnerable. The Plaintiff respectfully asks for relief to address not only his personal hardships but also the broader systemic issues that affect countless others. These lawsuits serve as a call to both Church and State to fulfill their respective responsibilities with integrity, compassion, and accountability, preserving the sacred balance of power between them while protecting those who depend on their support.

Respectfully Submitted,

Riley Thornock

Pro Se

January 21, 2025

3017 MOUNTAIN RD. GLEN ALLEN, VA, 23 060-2050

P.O. Box 843